UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CASSIE CORDELL TRUEBLOOD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, et al., <br><br> Defendants. | CASE NO. C14-1178-MJP <br><br> ORDER OF CIVIL CONTEMPT |

**Summary of Ruling**

THE COURT hereby holds Defendants in contempt of court. Despite the allocation of tens of millions of dollars to solve the problems plaguing Washington's failing forensic mental health system, Defendants have not taken all reasonable steps to provide timely services. Because Defendants have elected not to take all of the steps necessary to protect the rights of some of our most vulnerable citizens, Defendants have not demonstrated substantial compliance with this Court's orders. Each additional day that Defendants fail to reduce wait times due to a

lack of effort or creativity or to the inability to follow recommendations is an additional day that class members languish in jail in violation of their right to due process as guaranteed by the United States Constitution. The people of Washington deserve to have their mental health needs and the needs of their spouses, parents, children, and friends attended to with the same urgency and dignity our society expects hospitals to respond with when presented with a broken bone or a cancerous tumor. Therefore, in order to compel Defendants' compliance with its orders and protect the rights of class members, the Court now imposes monetary sanctions as detailed below. The funds collected through these sanctions will be used for diversion programming for the benefit of class members. These contempt fines will continue until Defendants demonstrate substantial compliance with the seven-day standard, thereby purging their contempt.

**Background**

On April 2, 2015, this Court issued a permanent injunction requiring Defendants to cease violating the constitutional rights of Plaintiffs and class members by providing competency services in a timely manner. (Dkt. No. 131.) Class members are all pretrial detainees waiting in jail for court-ordered competency services that Defendants are statutorily required to provide. Class members' criminal cases are stopped and their trials cannot happen until Defendants provide these services. At all times relevant to this case, class members are presumed innocent and have not been convicted.

The Court ordered Defendants to reduce wait times consistent with the injunction's requirements as soon as practicable, but no later than January 2, 2016. On December 30, 2015, Defendants moved to modify the injunction to extend the compliance deadline. (Dkt. No. 174.) Defendants argued that although significant progress in reducing wait times had been made, factual changes related primarily to enforcement actions at Western State Hospital by the federal

Centers for Medicare & Medicaid Services meant that Defendants would not be able to achieve compliance until May 27, 2016. The Court granted the requested extension, and allowed Defendants to set a series of interim deadlines. (Dkt. No. 186.) The Court also set out specific milestones and projects for completion.

Despite the extension of the compliance deadline, Defendants have not reduced wait times in compliance with the seven-day standard established by the Court. In May 2016, only twenty percent of class members ordered to receive in-hospital evaluations were admitted within seven days of the signing of a court order. (Dkt. No. 278-1.) For the same month, only thirty-two percent of class members ordered to receive restoration services were admitted within seven days of a court order. Wait times experienced by class members vary widely; one class member admitted for restoration on May 24, 2016, three days before the compliance deadline, spent ninety-seven days waiting in jail for restoration services <u>after</u> having been found incompetent to stand trial. (Dkt. No. 278-1 at 29.)

Plaintiffs now ask the Court to hold Defendants in contempt. (Dkt. Nos. 240, 254.) Plaintiffs argue that Defendants' clear failure to reduce wait times to seven days for the vast majority of class members is a result of Defendants' decision to prioritize internal policies and preferences over the recommendations of the Court Monitor and her experts, and that reduced wait times could have been achieved had Defendants been more proactive about protecting class members' constitutional rights. Defendants concede that they are not in compliance because they have not reduced wait times as required by this Court's orders, but argue that they are not in contempt because they have taken all reasonable steps available to them to comply. (Dkt. No. 264.) Defendants argue that their efforts to reach compliance and the progress made to date in

1  reducing average wait times demonstrate that Defendants are in substantial compliance with this
2  Court's orders, making a finding of contempt inappropriate.
3      The Court's permanent injunction required that in-jail competency evaluations be
4  completed within seven days of a court order, and that admission to a state hospital be provided
5  within seven days of a court order for class members ordered to receive in-hospital competency
6  evaluations or to receive competency restoration services. (Dkt. Nos. 131, 186.) Defendants
7  appealed the portion of the injunction regarding in-jail competency evaluations to the Ninth
8  Circuit Court of Appeals, but did not appeal the portions concerning restoration services and in-
9  hospital evaluations. (See Dkt. No. 233.) Because there are still open issues regarding in-jail
10 evaluations, Plaintiffs' contempt motions address only the portions of the injunction regarding
11 in-hospital evaluations and restorations.
12     Having considered the Parties' briefing and the relevant record, having conducted site
13 visits to the alternative restoration facilities at Yakima and Maple Lane as well as Western State
14 Hospital, and having held a three-day evidentiary hearing and heard oral argument, the Court
15 now finds Defendants in contempt of court and imposes monetary sanctions that will continue
16 until such time as the contempt is purged.

**Findings of Fact**

18     1. Defendants have failed to comply with the specific and definite portions of this
19 Court's orders requiring the admission of class members ordered to receive in-hospital
20 competency evaluations and/or competency restoration services within seven days of a court
21 order. (See Dkt. No. 131 at 22.)
22     2. Data kept by the Washington Department of Social and Health Services ("DSHS")
23 demonstrate that it is has failed to comply. (Dkt. No. 278-1.) For orders for competency
24

1  restoration signed by judges in the month of May 2016, thirty-two percent (32%) of class

2  members were admitted within seven days.  Accordingly, DSHS failed to comply in sixty-eight

3  percent (68%) of restoration cases.  For orders for in-hospital competency evaluations signed by

4  judges in the month of May 2016, twenty percent (20%) of class members were admitted within

5  seven days.  Accordingly, DSHS failed to comply in eighty percent (80%) of inpatient evaluation

6  cases.

7       3. At Eastern State Hospital, where there are no issues with Centers for Medicare &

8  Medicaid Services ("CMS") certification or compliance, the percentage of class members

9  admitted for in-hospital evaluations within seven days was actually <u>lower</u> in May 2016 (7.7%)

10  than in February 2016 (30.8%), when the Court granted Defendants request to extend the

11  compliance deadline.  (Dkt. No. 278-1 at 2.)

12       4. Average wait times for competency services have declined since the Court entered its

13  April 2, 2015 order.  (<u>See</u> Dkt. No. 266.)  Defendants attribute the reduction in average wait

14  times primarily to the opening of additional beds and the hiring of additional staff.  Nevertheless,

15  averages cannot provide a complete picture because wait times continue to vary widely by class

16  member.  (<u>See</u> Dkt. No. 278-1.)  As stated above, one class member admitted for restoration on

17  May 24, 2016 spent ninety-seven (97) days waiting in jail for restoration services after having

18  been found incompetent to stand trial.  (<u>Id.</u> at 29.)  Another waited ninety-six (96) days until he

19  or she was admitted on May 10, 2016.  (<u>Id.</u>)  Another class member remained waiting in jail at

20  the time of the contempt hearing, despite having been ordered to receive restoration services on

21  March 16, 2016, a wait of at least ninety-three (93) days.  (<u>Id.</u> at 31.)  Wait times in excess of

22  forty (40) days are common.  (<u>Id.</u> at 28-35.)

23

24

ORDER OF CIVIL CONTEMPT- 5

5. The thirty-two percent compliance figure regarding May 2016 admissions for restoration services may overstate compliance because it includes a number of class members who waited zero (0) days between the date the order was signed and admission. (Id. at 1, 34.) These zeros potentially represent class members who were already at a restoration facility but who were not restored to competency during the statutory time period, and thus received an additional order for restoration without being returned to jail. DSHS was unable to provide additional details about the zeros, and did not know whether they represented class members already residing at restoration facilities. If the zeros are removed, the compliance figure for restorations in May 2016 becomes fifteen percent (15%).

6. DSHS contends that despite this noncompliance, significant progress has been made in reducing wait times. DSHS does not know, however, when it can achieve compliance with the seven-day standard for most class members. As testified to by Assistant Secretary Carla Reyes, no efforts were made by DSHS in advance of the contempt hearing to determine when compliance could be achieved. The reason proffered for this failure was that only recently-hired DSHS staff were capable of predicting when DSHS could be in compliance, and that they had not begun development of their predictive model early enough to have answers ready for the contempt proceeding. DSHS performed a similar predictive analysis when it choose the May 27, 2016 date in its December 2015 request for an extension of the compliance deadline.

7. Despite acknowledging noncompliance, DSHS has not requested a second extension of the compliance deadline.

8. Defendants have taken many steps to reduce wait times, and have actively worked to facilitate cooperation with other stakeholders in the forensic mental health system. Defendants have succeeded in lobbying for additional legislation to improve the provision of competency

services in Washington state. These actions have benefited class members and are to be commended. Defendants actions, however, have more often than not been too small in scale and too late in time, and have prioritized business as usual over the type of systemic reform required to address the constitutional crisis at the heart of this case. Defendants have repeatedly failed to meet deadlines they set for themselves, for example in beginning the hiring process for staff for the second phase of the triage program, as detailed below. While Defendants have taken many steps towards compliance, they have not taken all reasonable steps.

9. Since issuance of the permanent injunction, DSHS has hired thirteen new evaluators, a new forensic director, and many administrative and support staff, and has established a new Office of Forensic Mental Health Services. DSHS has successfully lobbied for and implemented salary raises for staff to assist with recruiting and retention, although salaries remain about twenty-five percent lower than those at the Veterans' Administration, with whom DSHS competes for candidates.

10. Since issuance of permanent injunction in April 2015, Defendants have opened twenty-seven (27) new beds at Eastern State Hospital ("ESH"), fifteen (15) new beds at Western State Hospital ("WSH"), and fifty-four (54) new beds at temporary alternative restoration facilities being run by private contractors at former correctional facilities. The temporary alternative restoration facilities at Maple Lane and Yakima do not provide inpatient competency evaluations, and only provide restoration services to certain class members who have, inter alia, low acuity, low risk of self harm, and no major physical health problems outside of their mental capacity. At the time of the contempt proceeding, not all beds at the alternative facilities were filled.

11. Defendants planned to open an additional thirty (30) beds at WSH, but discontinued that plan after (1) enforcement actions at WSH by CMS threatened the hospital's certification and funding, and (2) the elopement of two civilly committed patients through an unsecured window in the civil portion of WSH. Following the elopement, DSHS decided to move thirty civilly committed patients into the forensic portion of WSH into an empty forensic ward renovated to be used for class members. DSHS has provided no explanation for why these civil patients were given priority over class members to beds in WSH's forensic wing, or why the civil ward these civilly committed patients had resided in could not have been secured so that the forensic ward would remain available for class members. The only explanation provided about why arrangements could not have been made so that the empty ward would have been preserved for class members is that DSHS believes additional beds cannot now be safely opened at WSH.

12. When asked if the civil patient census at WSH could be reduced in order to accommodate more class members without opening additional beds, Assistant Secretary Reyes agreed that that could be done, but testified that some staff members currently working on civil wards are not appropriately trained to work on forensic wards. Assistant Secretary Reyes agreed that locum tenens and/or other privately-contracted staff could be hired to fill those positions. Assistant Secretary Reyes also testified that moving those found not guilty by reason of insanity ("NGRI patients") out of the state hospitals and into community settings was part of DSHS's long-term plan to free up space in the state hospitals, but that DSHS had taken no steps to begin that process as of the date of the contempt hearing.

13. Washington's state psychiatric hospitals provide services to patients facing criminal charges (called forensic mental health services) as well as to patients committed through the civil mental health system. Some patients, for example NGRI patients and other civil flips, begin on

ORDER OF CIVIL CONTEMPT- 8

the forensic or criminal side of the system and are later moved to the civil side. At trial, experts testified that there are large overlaps between these three patient populations, as an individual with severe mental illness might come into contact with both the criminal and civil systems over a given period of time. Despite the interrelatedness of the systems, there appears to be little, if any, top-level planning and coordination regarding the system-wide provision of mental health services by public institutions in Washington state.

14. Defendants have identified the Maple Lane alternative restoration facility, which has thirty restoration beds, as compensating for the unopened beds for class members at WSH. Defendants maintain that the thirty beds will return to WSH in July 2017, but DSHS will not start planning for that until January 2017 at the earliest. Defendants were not able to provide an explanation for why planning could not begin sooner than January 2017, other than that issues with CMS were ongoing and that the existence of the alternative restoration facilities compensated for the beds at WSH. Despite their years-long struggle to hire sufficient staff and the fact that Defendants are frequently unable to meet deadlines they set for themselves, Defendants maintain that they will be able to hire sufficient staff to open thirty beds in July 2017 even while refusing to begin the hiring process for those beds before January 2017.

15. Although many of the problems identified by CMS (such as safety problems resulting from inadequate staffing) mirror those identified by the Court in this litigation (inability to provide timely services resulting from inadequate staffing), and although the CMS issues pertain only to WSH, Defendants continue to put forward the CMS enforcement actions as a primary reason why DSHS has been unable to provide timely services to class members.

16. DSHS's main barrier to delivering timely competency services is its inability to effectively implement reform. The experience implementing a triage protocol is typical. Even

though Defendants have adopted a triage protocol, as required by the Court in its Order Modifying Permanent Injunction, its implementation has been haphazard and its benefits limited. First, because Defendants did not prepare a robust plan for dissemination of the triage protocol they developed, many DSHS employees were unaware of its existence up to a few weeks before the contempt proceeding. The DSHS Community Outreach Liaison testified that DSHS's failure to inform its own competency evaluators about the triage protocol's existence was a "massive oversight." Similarly, the staff person responsible for scheduling admissions to ESH was not aware of the protocol's existence, and other stakeholders including criminal defense attorneys from several counties also indicated they were not aware of the protocol.

Even where there is awareness of the triage protocol, it is not well understood. In Clark County, at least one judge in June 2016 found DSHS in contempt, and required DSHS to perform a triage screening on the class member as a way to purge the contempt. At the time of this Court's contempt hearing, only seven people from only three counties in Washington had been referred for a triage evaluation. While this stems partly from a lack of awareness about the protocol, it also stems from DSHS's decision to limit the categories of people eligible for expedited admission to such a small subsection of the class that most class members are excluded. Even though this Court's Order Modifying Permanent Injunction required the triage protocol to, inter alia, sort class members by the seriousness of the crimes with which they have been charged, the triage protocol adopted by DSHS simply provides for expedited admissions upon request only in the most extreme of circumstances and only for specific diagnoses. This limited triage program was adopted despite recommendations from the Court Monitor to adopt a more robust plan similar to those used in other jurisdictions.

The second phase of the triage protocol was scheduled to begin on July 1, 2016. Under Defendants' own timeline, hiring was to begin in April 2016 and was expected to take three months to complete. As of the June 20-22, 2016 contempt hearing, the job openings had not yet been posted, and Defendants conceded that phase two would not proceed on July 1, 2016, as expected.

17. Defendants' diversion and community outreach efforts have been similarly ineffective, despite Defendants' classification of successful diversion programming as "critical" to DSHS's long-term ability to comply with the seven-day standard. While DSHS has hired a full-time staff member dedicated to community outreach, the community outreach liaison had met with only eleven of Washington's thirty-nine counties during the nine months she has been employed. No specific education or outreach was conducted in Clark County after DSHS learned that stakeholders there had misunderstood how the triage protocol functioned. Defendants awarded $1.4 million to four counties to establish pilot diversion programs, but did no research into diversion methods and their success rates before making those awards. Defendants state that they successfully lobbied for legislation to enable "prosecutorial diversion," but the bill passed by the legislature simply reaffirms the preexisting power of prosecutors to dismiss charges in the interest of justice.

18. Defendants contend that their efforts to achieve compliance have been frustrated by third parties, such as criminal defense attorneys whose scheduling conflicts and resistance to the use of the alternative restoration facilities have prevented DSHS from meeting the seven-day standard. (Dkt. No. 264 at 4.) DSHS does not know, however, in what percentage of cases defense attorney availability is the cause of delay because DSHS's data keeping methodology lumps together defense counsel availability with interpreter availability. DSHS contracts with

interpreters, and unlike with a scheduling conflict with a defense attorney, could simply retain additional interpreters to compensate for any scheduling conflict. DSHS conceded that defense attorney availability has no impact whatsoever on the process for admission for restoration services.

19. Defendants have failed to take appropriate responsibility for failings caused by DSHS's own actions and inactions. When CMS first identified safety problems at WSH, former DSHS Secretary Kevin Quigley sought to blame "the courts" for WSH's failure to provide appropriate care to its patients, lamenting that he had "not be[en] firm enough and courageous enough with the courts." (Dkt. No. 182-1 at 2-3.) Defendants failed to meet <u>each and every</u> wait time benchmark in the Court's Order Modifying Permanent Injunction, even though those benchmarks were proposed by DSHS itself. (Dkt. No. 185.) Instead of attempting to identify what went wrong and how it could be fixed, Defendants have repeatedly ignored and/or minimized their failures and shortcomings, instead continually asserting that progress is being made. DSHS's refusal to examine its own work for errors or to find opportunities for improvement has contributed to its inability to provide timely services.

20. Defendants are indifferent to the costs imposed on Washington's counties, and therefore on Washington's taxpayers, by DSHS's failure to provide timely services. As testified to at the time of trial, class members are victimized in jail and sometimes harm themselves or others, resulting in financial liability for those incidents for the counties who are responsible for the care of their inmates. The counties spend millions of dollars a year caring for class members during periods of time where that responsibility lies with DSHS. (<u>See</u> Dkt. No. 218.)

21. Since January 2014, when DSHS recordkeeping on this issue began, DSHS has failed to comply with four hundred and seven (407) orders to provide forensic competency

services as ordered by the judges of Washington state. Sanctions for failure to comply totaled approximately $1.5 million as of the date of the contempt proceeding, and $132,000 in fines had been paid.

22. Defendants did not consult with the Court Monitor or her experts before making multiple important decisions regarding steps to comply with this Court's orders. Defendants did not consult with the Court Monitor (1) before moving thirty civilly committed patients into beds intended for class members inside the forensic portion of WSH; (2) before signing contracts with private contractors for the operation of the alternative restoration facilities inside former jails; (3) about policies for medication and for the use of seclusion and restraint at the alternative restoration facilities before opening those facilities; (4) about the triage plan's specifications before it was chosen; (5) about negotiations with CMS and whether steps could be taken that would satisfy both this Court and CMS; and (6) about diversion methods and their success rates before awarding $1.4 million in funds to four counties to establish diversion pilot programs. Because the Court Monitor was not consulted in advance, she was unable to recommend improvements or identify weaknesses before DSHS took the actions.

23. Defendants have rejected multiple recommendations from the Court Monitor and her experts. Defendants have declined the Court Monitor's recommendations (1) to diversify the types of mental health professionals used to serve class members at WSH, including the use of temporary and other privately-contracted staff; (2) to plan, as early as possible, for the opening of additional beds at WSH; (3) to select facilities other than jails in which to build the alternative restoration facilities; and (5) to pursue additional federal dollars for diversion by developing a proposal for a pilot program.

24. Defendants opened the alternative restoration facilities without remedying the safety problems and other concerns identified by the Court Monitor and her experts, thereby necessitating the issuance of two temporary restraining orders regarding use of those facilities, further slowing DSHS's progress towards compliance. Both facilities were opened in former jails that spanned two stories, necessitating extensive architectural renovations that required the investment of millions of dollars in public funds. No explanation has been provided as to how the expenditure of millions of dollars in public funds on these facilities is justified considering that Defendants maintain that use of the facilities is temporary and will not exceed two years. Wards in the state hospitals do not span multiple stories.

25. Defendants opened the Yakima facility with several obvious problems. The stairwell posed jumping, falling, and hanging risks, and multiple other ligature risks were present at the facility. The facility opened without a clear policy on the use of seclusion or restraint, although being forcibly restrained can be traumatic for class members even when done correctly. The facility opened without a policy on securing medications on an appropriate timeframe that would prevent class members from having to miss doses of their medications. At least one class member missed at least one dose of medication after being transferred to the Yakima facility.

26. Defendants opened the Maple Lane facility with several obvious problems. One of the facility's two seclusion and restraint rooms was a bare concrete cell, and DSHS only placed mattresses on the floor in response to complaints by the Court Monitor. Class members were forced to sleep with the lights on for the convenience of facility staff checking at regular intervals throughout the night that class members were still alive. The facility strip searched the first group of class members admitted, and required class members to change out of their jail clothing and into facility clothing in front of a video camera.

27. When first asked about the strip searching at Maple Lane, DSHS staff first denied that strip searches were being conducted. Next, DSHS conceded that strip searches were being conducted, but stated that strip searching was standard practice at the state hospitals. Next, Defendants conceded that strip searching is not conducted at any psychiatric hospital in Washington, and that the strip searching at Maple Lane had been conducted in contravention of DSHS policy. DSHS was unable to identify with certainty the decision maker who instituted strip searching, and was unable to identify who trained staff to conduct strip searches. Defendants did not know whether any disciplinary action had been taken following the revelation that strip searches were being conducted in contravention of DSHS policy.

28. The Court Monitor testified that the type of easily-fixable problems present at the alternative restoration facilities (for example, Maple Lane, a co-ed facility, was opened with bathrooms that had open windows without covers facing the main hallways of the facility, meaning that staff and other class members could observe any class member while using the toilet or taking a shower) demonstrate management's lack of understanding about class members and their needs, and display a lack of concern for class members' basic dignity.

29. Class members continue to suffer grave harm waiting in jail for Defendants to provide competency restoration services and inpatient competency evaluations. Each additional day spent waiting in jail is a day spent without proper medication and appropriate care. Untreated mental illnesses become more habitual over time, meaning it will take longer to restore an individual to competency and that the likelihood that an individual can ever be restored declines. Class members' functional capacity declines while they wait in jail, often in solitary confinement, and they become less able to communicate with their families and with defense counsel. While waiting in jail, class members may become more aggressive or withdraw

1   into themselves, and can become suicidal.  Class members can present a danger to staff and other

2   inmates, and can become targets for harassment and aggression by others while they wait.  This

3   immense suffering is both unnecessary and avoidable, and is a tragic result of Defendants'

4   failure to implement the reforms necessary to deliver timely services.

**Conclusions of Law**

6   1.  In order for the Court to find a party in civil contempt, the "moving party has the

7   burden of showing by clear and convincing evidence that the contemnors violated a specific and

8   definite order of the court.  The burden then shifts to the contemnors to demonstrate why they

9   were unable to comply."  F.T.C. v. Affordable Media, 179 F.3d 1228, 1239 (9th Cir. 1999)

10  (quoting Stone v. City and County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir.1992)).

11  "The contempt 'need not be willful,' and there is no good faith exception to the requirement of

12  obedience to a court order."  In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d

13  693, 695 (9th Cir. 1993) (citation omitted).

14  2.  Substantial compliance with a court order is a defense to an action for civil contempt.

15  Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986).  "If a violating party

16  has taken 'all reasonable steps' to comply with the court order, technical or inadvertant

17  violations of the order will not support a finding of civil contempt."  Id.  A party's inability to

18  comply with a judicial order also constitutes a defense to a charge of civil contempt.  F.T.C. v.

19  Affordable Media, 179 F.3d at 1239.

20  3.  Civil contempt sanctions can be imposed for one or both of two distinct purposes: to

21  compel or coerce the defendant into compliance with a court's order, and to compensate the

22  complainant for losses sustained as a result of the contemnor's noncompliance.  Shuffler v.

23  Heritage Bank, 720 F.2d 1141, 1147 (9th Cir. 1983).  "Where a fine is not compensatory, it is

24

1    civil only if the contemnor is afforded an opportunity to purge." Int'l Union, United Mine
2    Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994).

3    4. Civil contempt fines can take the form of per diem fines imposed for each day a
4    contemnor fails to comply with an affirmative court order, or of fixed fines imposed and
5    suspended pending future compliance. See Int'l Union, United Mine Workers of Am., 512 U.S.
6    at 829. A court, in determining the amount and duration of a coercive fine, must consider the
7    character and magnitude of the harm threatened by continued contumacy, and the probable
8    effectiveness of any suggested sanction in bringing about the result desired. Whittaker Corp. v.
9    Execuair Corp., 953 F.2d 510, 516 (9th Cir. 1992). "Generally, the minimum sanction necessary
10   to obtain compliance is to be imposed." Id. at 517.

11   5. Plaintiffs have demonstrated by clear and convincing evidence that Defendants are in
12   contempt of court. Defendants have failed to comply with the specific and definite portions of
13   this Court's orders requiring the admission of class members ordered to receive in-hospital
14   competency evaluations and/or competency restoration services within seven days of a court
15   order. Defendants have failed to take all reasonable steps to reduce wait times for competency
16   restoration services and in-hospital competency evaluations, and therefore have not taken all
17   reasonable steps to comply and have not demonstrated substantial compliance. Defendants have
18   not demonstrated that they were unable to comply with the Court's orders.

19   6. The CMS issues did not make it impossible for Defendants to comply. In fact,
20   because of the overlap in issues underpinning both this suit and the CMS actions, many if not all
21   CMS concerns could be addressed while working towards compliance with this Court's mandate.

22   7. The scheduling impact of third parties, including defense counsel, did not make it
23   impossible for Defendants to comply. Rather, the evidence shows that insufficient staff and bed

space, caused by DSHS's failure to take aggressive action to implement reforms, is the cause of Defendants' failure to comply.

8. Defendants failed to take all reasonable steps to comply. Defendants failed to make more beds available to class members at WSH, with or without increasing the hospital's overall census. Defendants failed to diversify the types of medical professionals serving class members, and failed to secure sufficient temporary and contracted staff to fill positions DSHS has not been able to fill permanently. DSHS failed to implement a robust triage program, and has not aggressively pursued diversion as a compliance strategy even while identifying diversion as "critical" to long-term success. DSHS has repeatedly failed to meet the deadlines it sets for itself, including every wait time benchmark leading up to the compliance deadline. DSHS chose to invest millions of dollars and countless working hours to open two alternative restoration facilities, which each required extensive and expensive physical renovations because of their locations in former jails and which will only be used for one or two years.

9. In determining the amount and duration of a coercive fine tailored to this situation, the Court is mindful of the grave harms suffered by class members while incarcerated waiting for services. (See Dkt. No. 131 at 9-11.) The Court is also mindful of Defendants' lengthy history of ignoring court orders, Defendants' inability to provide the Court with a date by which compliance can be achieved, and Defendants' failure to prioritize the constitutional rights of class members while making decisions as to how bed space at the state hospitals is allocated. The Court concludes that the fines now imposed, as detailed below, are the minimum sanction necessary in order to obtain compliance.

**Accordingly, the Court hereby holds Defendants in contempt, and imposes monetary sanctions in order to compel compliance with its orders. The fines will begin to**

**accrue the day after the date of this order, and will continue to accrue each calendar day unless and until Defendants achieve substantial compliance with the seven-day standard, thereby purging the contempt.**

The fines are imposed on a per class member, per day basis. For each class member, Defendants shall pay a fine for each day spent waiting in jail beyond seven days for in-hospital competency evaluations or for competency restoration services. For each class member who has waited more than seven days but fewer than fourteen days for either of these services, the fine shall be $500 per day. For each class member who has waited fourteen days or more, the fine shall be $1,000 per day.

The fines shall be deposited into the Registry of the Court after they are reduced to judgment, and shall remain in the Court's Registry until further order from the Court. The fines shall be reduced to judgment once per month, or more frequently if the Court in its discretion so orders. The judgments shall bear interest at the federal statutory rate until satisfied.

Funds deposited shall be held for the benefit of class members and the development of diversion programs to reduce dependence on the state hospitals. The Parties are ORDERED to develop, in consultation with the Court Monitor, plans for the expenditure of the funds. The plans shall be submitted **within thirty (30) days** of entry of the first money judgment.

In order to facilitate payment of the contempt fines, the Court also imposes a reporting requirement. On the fifteenth day of every month, beginning with the month of July 2016, Defendants shall submit to the Court wait time data in a manner identical to the data submitted on June 17, 2016, in the declaration of Bryan Zolnikov. (Dkt. No. 278.) Additionally, Defendants shall submit a proposed calculation of contempt fines along with the wait time data. The proposed calculation shall specify the amount of the fine to be imposed, and shall contain all

calculations performed by Defendants in order to reach the proposed number.  As with the monetary sanctions, this monthly reporting requirement shall terminate upon Defendants' achievement of substantial compliance with the seven-day standard for inpatient evaluations and restorations.

SO ORDERED.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 7th day of July, 2016.

Marsha J. Pechman
United States District Judge