1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  CASSIE CORDELL TRUEBLOOD, et
al.,

11                          Plaintiffs,

12          v.

13

14  WASHINGTON STATE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES,
et al.,

15

16                          Defendants.

CASE NO. C14-1178-MJP

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL
COMPETENCY EVALUATIONS

17

18          THIS MATTER comes before the Court on remand from the Ninth Circuit Court of

19  Appeals and on Plaintiffs' Motion to Reconsider Scope of Injunction Regarding In-Jail

20  Evaluations.  (Dkt. Nos. 233, 257, 259.)  Having held a seven-day bench trial in March 2015 and

21  an evidentiary hearing on July 25, 2016, and having considered oral argument, the Parties'

22  briefing, and the entirety of the related record, the Court hereby ORDERS that the permanent

23  injunction be MODIFIED to require the completion of in-jail competency evaluations within

24  fourteen days of the signing of a court order.

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 1

1

**<u>Summary</u>**

2

The Washington State Department of Social and Health Services ("DSHS") is violating

3

the constitutional due process rights of class members by failing to provide timely competency

4

evaluation and restoration services.  (Dkt. Nos. 104, 131, 233.)  Class members are all pretrial

5

detainees waiting in jail for court-ordered competency services that Defendants are statutorily

6

required to provide.  (<u>See</u> Dkt. No. 131.)  Class members' criminal cases are stopped and their

7

trials cannot happen until Defendants provide these services.  At all times relevant to this case,

8

class members are presumed innocent and have not been convicted.

9

To determine the appropriate remedy for Defendants' constitutional violations, the Court

10

held a seven-day bench trial in March 2015.  (Dkt. Nos. 119, 120, 121, 122, 123, 124, 125.)

11

Based on the evidence presented at trial and the arguments of the Parties, the Court concluded

12

that a multi-part permanent injunction requiring DSHS to provide timely services was the proper

13

remedy.  (Dkt. No. 131.)  While Defendants did not appeal the injunction's requirements as to in-

14

hospital evaluations or as to competency restoration services, Defendants appealed the

15

injunction's requirement that in-jail competency evaluations be completed within seven days.

16

(<u>See</u> Dkt. No. 233.)  The United States Court of Appeals for the Ninth Circuit agreed that a

17

permanent injunction relating to in-jail evaluations was appropriate to ensure that class members'

18

constitutional rights are protected, but vacated the seven-day requirement after finding that this

19

Court had not made sufficient findings to sustain that requirement.  (<u>Id.</u>)  The Ninth Circuit then

20

returned the case to this Court to reconsider "what constitutes a reasonable time in which to

21

conduct the evaluations."  (<u>Id.</u> at 18.)

22

Plaintiffs now argue that constitutional due process requires Defendants to complete in-

23

jail competency evaluations within ten days of a court order for such services.  (Dkt. No. 259.)

24

1   Defendants argue that due process and federalism principles counsel in favor of deferring to

2   Washington's statutory scheme, which requires in-jail evaluations to be completed within

3   fourteen days of DSHS's receipt of a court order for such services.  (Dkt. No. 279.)

4          Having held an evidentiary hearing and having considered the positions of the Parties, in

5   addition to the relevant record, the Court now orders that the injunction be modified to require

6   the completion of in-jail evaluations within fourteen days of the signing of a court order for such

7   services.  As explained in more detail below, the Court has balanced the legitimate interests of

8   class members and of the state and finds fourteen days to be the maximum justifiable period of

9   incarceration for an in-jail competency evaluation absent an individualized finding of good cause

10  to continue incarcerating that person.  But, while the Court accepts Washington's statutory

11  fourteen-day standard, it cannot accept the legislature's list of exceptions to the fourteen-day

12  requirement because the exceptions swallow the rule, leaving mentally ill persons to languish

13  while allowing DSHS to continue to make excuses, as has been its pattern.

14                         **Procedural Background**

15         On April 2, 2015, this Court issued a three-part permanent injunction against Defendants

16  that required Defendants to cease violating class members' constitutional rights by providing

17  timely competency services by, among other things: (1) completing provision of in-jail

18  competency evaluations within seven days of the signing of a court order, unless an extension is

19  secured for clinical good cause, (2) admitting those ordered to receive an in-hospital competency

20  evaluation to a state hospital within seven days of the signing of a court order, and (3) admitting

21

22

23

24

1  those ordered to receive competency restoration services to a state hospital within seven days of

2  a court order.  (Dkt. No. 131 at 21-23.)[1]

3    Defendants appealed the portion of the injunction relating to in-jail evaluations.  <u>See</u>

4  <u>Trueblood v. Washington State Dep't of Soc. & Health Servs.</u>, 822 F.3d 1037 (9th Cir. 2016).

5  The Ninth Circuit upheld many of this Court's conclusions regarding the constitutional rights of

6  class members, "agree[ing] that DSHS must conduct competency evaluations within a reasonable

7  time following a court's order," and affirming that a permanent injunction "remains an

8  appropriate vehicle for monitoring and ensuring that class members' constitutional rights are

9  protected."  <u>Id.</u> at 1040, 1046.  However, the Ninth Circuit vacated the seven-day deadline

10 imposed by this Court with regards to in-jail evaluations, finding that the Court had not

11 articulated a sufficiently strong constitutional basis for the imposition of the seven-day deadline.

12 <u>Id.</u> at 1046.  The Ninth Circuit remanded the case to this Court to reexamine the injunction and

13 the interests of the Parties, and to refashion a remedy that takes into account the interests of class

14 members and of the state as they relate specifically to in-jail competency evaluations.

15 Additionally, the Ninth Circuit instructed this Court to (1) reevaluate the injunction's

16 requirement that compliance be achieved within a certain amount of time after the court order is

17 signed, rather than within a certain amount of time after DSHS receives the court order, and (2)

18 broaden the good cause exception as it relates to in-jail evaluations.  <u>Id.</u> at 1045.

19

20 ─────────────────

21   [1] Much has happened in this case since the spring of 2015, when the Court issued its
   permanent injunction and Defendants appealed the first portion.  In the intervening months, for

22 example, Defendants asked for and received an extension of the compliance deadline, and then
   were held in civil contempt for failing to take all reasonable steps to achieve compliance as to in-

23 hospital evaluations and restoration services.  (<u>See</u> Dkt. Nos. 186, 289.)  Because many of these
   developments do not impact the considerations here, a lengthy procedural history of the case to

24 date is omitted.

1    Based upon the evidence and argument presented, the Court hereby makes and enters the

2   following Findings of Fact and Conclusions of Law:

3                                      **Findings of Fact**

4   **I.      The Class**

5          1.  Class members are all pretrial detainees waiting in jail for court-ordered competency

6   services that Defendants are statutorily required to provide.  Putative next friends seek to assert

7   claims on behalf of named Plaintiffs.  On October 31, 2014, the Court certified the class as: All

8   persons who are now, or will be in the future, charged with a crime in the State of Washington

9   and: (a) who are ordered by a court to receive competency evaluation or restoration services

10  through the Washington State Department of Social and Health Services ("DSHS"); (b) who are

11  waiting in jail for those services; and (c) for whom DSHS receives the court order.  At issue here

12  are those class members ordered to receive competency evaluations in jail, as opposed to in a

13  state hospital or in the community.

14         2.  Each named Plaintiff and class member is a constituent of Plaintiff Disability Rights

15  Washington ("DRW").  All fall within DRW's mandate to ensure that the rights of persons with

16  mental health conditions are protected.  DRW's interests are in complete alignment with those of

17  the class members.

18         3.  DRW is a private non-profit organization designated by the Governor of the State of

19  Washington as the protection and advocacy system for individuals with mental, physical,

20  sensory, and developmental disabilities in the state of Washington pursuant to the

21  Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041, <u>et seq.</u>; the

22  Protection and Advocacy for Individuals with Mental Illness Act, as amended, 42 U.S.C. §

23

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 5

1  10801, et seq.; the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e; and

2  RCW 71A.10.080.

3  **II.      The In-Jail Competency Evaluation Process and Statutory Regime**

4  4.  Defendant DSHS is charged under Washington law with overseeing competency

5  services, including the in-jail evaluations at issue here.  RCW 10.77 et seq.  If an individual is

6  found to be incompetent to stand trial, state law places responsibility on DSHS for "providing

7  mental health treatment and restoration of competency."  RCW 10.77.088; see also 10.77.084

8  and 10.77.086.

9  5.  When a court has ordered an individual to receive an in-jail competency evaluation,

10  the individual's criminal case is stayed during all competency-related proceedings. See RCW

11  10.77.084 (providing that after a criminal defendant has been found incompetent, the

12  proceedings against the defendant are stayed); Washington State Court Rules: Superior Court

13  Criminal Rules, CrR 3.3(e)(1) (excluding all proceedings related to the competency of a

14  defendant to stand trial when computing time for trial).

15  6.  Defendants provide competency evaluations in local jails, in the community, or at the

16  two state hospitals, Eastern State Hospital ("ESH") and Western State Hospital ("WSH").  See

17  RCW 10.77.060.  Nearly ninety percent of evaluations occur outside the state hospitals, either in

18  jails or, for persons who have been released from jail on personal recognizance, in the

19  community.

20  7.  The process begins when there is reason for a judge or an attorney to doubt that an

21  individual charged with a crime is competent to stand trial.  Because state and federal law forbid

22  the criminal prosecution of individuals who do not understand the charges against them or are

23  unable to aid in their own defenses, courts order that these individuals' competency be evaluated

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 6

1   to determine whether they may stand trial.  RCW 10.77.060; See also Medina v. California, 505

2   U.S. 437, 449 (1992) ("the Due Process Clause affords an incompetent defendant the right not to

3   be tried").

4        8.   When a court orders a competency evaluation, the court order and other necessary

5   documents are sent to Defendants, who then assign the case to an evaluator.

6        9.   In order to complete an in-jail evaluation that conforms with Washington's statutory

7   requirements, an evaluator requires the following documents: (1) the court order; (2) the

8   charging documents; and (3) discovery (e.g., criminal history, police reports).  As detailed

9   below, Washington law has been changed since trial and now requires court clerks and

10  prosecuting attorneys to provide DSHS with the court order, charging documents, and discovery

11  within twenty-four hours of the signing of a court order for an evaluation.  See RCW 10.77.075.

12       10.  While evaluators require access to the necessary documentation, the in-jail

13  evaluation is based primarily on a thirty-to-ninety-minute face-to-face interview with the

14  individual.

15       11.  On average, completing an in-jail evaluation requires between ten and fourteen hours

16  of work by the evaluator.  No credible evidence has been presented that performing the ten to

17  fourteen hours of work within the span of as little as seven days results in rushed or low-quality

18  evaluations.  Rather, as demonstrated by the experience with panel evaluators employed by

19  Pierce County under Senate Bill 5551—who complete in-jail evaluations within seven days of

20  assignment in approximately ninety-five percent of cases—evaluations completed within this

21  timeframe are reportedly of good quality and have not been rejected by the courts or the litigants

22  in Pierce County.

23

24

1   12.  After completion of the evaluation, the evaluator provides his or her report and

2   recommendation to the court in which the criminal proceeding is pending.  RCW 10.77.065.  If

3   the court finds the individual competent to stand trial, the criminal prosecution resumes.  If the

4   court finds the individual incompetent, the proceedings are stayed and the court may enter a

5   competency restoration order as allowed by RCW 10.77.086 or 10.77.088.

6   13.  Approximately fifty percent of individuals ordered to receive a competency

7   evaluation in Washington are found to be incompetent to stand trial.  Expert surveys of

8   Washington's forensic competency system found no signs of a widespread problem with

9   inappropriate or excessive referrals for competency evaluations.

10   14.  Individuals charged with non-serious non-felony crimes are not ordered for

11   restoration if they are found incompetent.  Instead, their charges are dismissed or stayed, and the

12   individual may be referred for civil commitment under RCW 71.05.

13   15.  Sixty percent of individuals charged with misdemeanors have their charges

14   dismissed after the completion of a competency evaluation.  Ninety percent of individuals

15   referred for competency evaluations have had prior contact with the criminal justice system.

16   Thirty-seven percent have been referred for a competency evaluation more than once since 2011.

17   16.  If the court orders that an incompetent individual receive competency restoration

18   services, the individual is placed on a waiting list for admission to one of the state hospitals, ESH

19   or WSH, or one of the alternative restoration facilities at Yakima and Maple Lane, where DSHS

20   provides competency restoration services.

21   17.  From 2001 to 2011, Washington has seen an eighty-two percent increase in the

22   demand for competency evaluations.  Demand for competency services has grown, and is

23

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 8

1    expected to continue to grow, at a rate of eight to ten percent per year.  In addition to yearly

2    growth, there are seasonal fluctuations in the demand for services each year.

3          18.  Delays in the provision of competency services result in people with confirmed or

4    suspected mental illness spending more time incarcerated for the same offenses than those

5    without mental illnesses.  In King County Correctional Facility, for instance, those with mental

6    illness spend on average three times more time incarcerated than those without mental illness.

7    Furthermore, overincarceration and the postponed adjudication of competence results in

8    significant costs to the public, especially when class members are held in solitary confinement.

9    The average cost to the public of incarcerating a class member in a Washington jail while they

10   wait for services is $96.13 per person per day.  (Dkt. No. 218 at 2.)  At all times relevant to this

11   case, class members are pretrial detainees and, as such, have not been convicted of the alleged

12   crime for which they were arrested and sent to jail.

13         19.  It is the policy of the state of Washington that evaluations should occur within seven

14   days.  See Senate Bill 6492; Senate Bill 5889.  Despite this policy, DSHS has struggled for years

15   to provide timely competency evaluations.  DSHS has maintained a waiting list for competency

16   evaluations for the last fifteen years.

17         20.  In 2012, the Washington state legislature, seeking to remedy DSHS's persistent

18   problem with providing timely services, enacted Senate Bill 6492, which created a seven-day

19   target deadline for providing court-ordered competency services, including in-jail evaluations,

20   for individuals detained in jails.  RCW 10.77.068.  The 2012 statute included a legislative

21   purpose section that stated:

22          "The purpose of this act is to sustainably improve the timeliness of services
            related to competency to stand trial by setting performance expectations,
23          establishing new mechanisms for accountability, and enacting reforms to ensure
            that forensic resources are expended in an efficient and clinically appropriate

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 9

1  manner without diminishing the quality of competency services, and to reduce the
2  time defendants with mental illness spend in jail awaiting evaluation and
   restoration of competency. This act is necessary for the immediate preservation
3  of the public peace, health, or safety, or support of the state government and its
   existing public institutions, and takes effect May 1, 2012."

4  21. In 2013, the legislature passed Senate Bill 5551 to further address the problem with

5  persistent delays in the competency system. RCW 10.77.073. Senate Bill 5551 authorized

6  counties to independently contract for evaluators from a panel when DSHS is consistently failing

7  to meet the seven-day target for the provision of in-jail evaluations. DSHS reimburses the

8  counties for the use of an outside evaluator at the rate of $800 per evaluation, which is below the

9  standard market rate for such an evaluation.

10  22. The only county to utilize panel evaluators pursuant to Senate Bill 5551 is Pierce

11  County. Although there can be a delay of one to three days in securing the necessary documents

12  and assigning the case to an evaluator, approximately ninety-five percent of evaluations by panel

13  evaluators are completed within seven days of assignment in Pierce County. These evaluations

14  are reportedly of good quality, and have not been rejected by the courts or the litigants in Pierce

15  County.

16  23. The Court Monitor has recommended that the state expand usage of the panel

17  evaluator system, but to date no other county has employed the panel evaluator system. (See

18  Dkt. No. 180 at 13.)

19  24. In early 2015, the legislature passed Senate Bill 5889 to amend the seven-day target

20  deadline contained in 2012's Senate Bill 6492. RCW 10.77.068 now establishes a seven-day

21  "performance target" for the "completion of a competency evaluation in jail" and a "maximum

22  time limit of fourteen days, plus an additional seven-day extension if needed for clinical

23  reasons." RCW 10.77.068. Section (1)(a) provides:

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 10

The legislature establishes the following performance targets and maximum time limits for the timeliness of the completion of accurate and reliable evaluations of competency to stand trial and admissions for inpatient restoration services related to competency to proceed or stand trial for adult criminal defendants. The legislature recognizes that these targets may not be achievable in all cases without compromise to the quality of competency evaluation and restoration services, but intends for the department to manage, allocate, and request appropriations for resources in order to meet these targets whenever possible without sacrificing the accuracy and quality of competency evaluations and restorations, and to otherwise make sustainable improvements and track performance related to the timeliness of competency services."

25. The revised RCW 10.77.068 allows DSHS to exceed the "maximum time limits" described above if DSHS:

"can demonstrate by a preponderance of the evidence that the reason for exceeding the maximum time limits was outside of the department's control including, but not limited to, the following circumstances:

(i) Despite a timely request, the department has not received necessary medical clearance information regarding the current medical status of a defendant in pretrial custody for the purposes of admission to a state hospital;

(ii) The individual circumstances of the defendant make accurate completion of an evaluation of competency to proceed or stand trial dependent upon review of mental health, substance use disorder, or medical history information which is in the custody of a third party and cannot be immediately obtained by the department. Completion of a competency evaluation shall not be postponed for procurement of mental health, substance use disorder, or medical history information which is merely supplementary to the competency determination;

(iii) Completion of the referral is frustrated by lack of availability or participation by counsel, jail or court personnel, interpreters, or the defendant;

(iv) The department does not have access to appropriate private space to conduct a competency evaluation for a defendant in pretrial custody;

(v) The defendant asserts legal rights that result in a delay in the provision of competency services; or

(vi) An unusual spike in the receipt of evaluation referrals or in the number of defendants requiring restoration services has occurred, causing temporary delays until the unexpected excess demand for competency services can be resolved."

RCW 10.77.068(1)(c).

26. Senate Bill 5889 was introduced in the legislature on February 9, 2015—fifty-five days after this Court granted Plaintiff's Motion for Summary Judgment—and was signed by the

Governor on March 12, 2015, four days before the trial in this matter began.  During her

testimony on the day after the bill was introduced, DSHS Assistant Secretary Jane Beyer—who

has now been replaced by Assistant Secretary Carla Reyes—asked the Senate Human Services

Committee to "move it [Senate Bill 5889] quickly, given an upcoming trial date of March 16."

Hearing on Senate Bill 5889 before the Washington Senate Committee on Human Services,

Mental Health and Housing, 2015 Leg., 64th Sess. (Wash. 2015), available at

http://www.tvw.org/watch/?eventID=2015021195.  Assistant Secretary Beyer later stated that

she "believe[d] that the bill . . . established maximum timelines that are consistent with the

constitutional provisions that are at issue in the Trueblood litigation."  Id.

27.  The time limits established in Senate Bill 5889 are calculated using "the date on

which the state hospital receives the court referral and charging documents, discovery, police

reports, the names and addresses of the attorneys for the defendant and state or county, the name

of the judge ordering the evaluation, information about the alleged crime, and criminal history

information related to the defendant."  RCW 10.77.068(1)(b).  The fourteen-day "maximum time

limit" "shall be phased in over a one-year period beginning July 1, 2015, in a manner that results

in measurable incremental progress toward meeting the time limits over the course of the year."

Id.  RCW 10.77.068(5) states that "[t]his section does not create any new entitlement or cause of

action related to the timeliness of competency evaluations or admission for inpatient restoration

services related to competency to proceed or stand trial, nor can it form the basis for contempt

sanctions under chapter 7.21 RCW or a motion to dismiss criminal charges."

28.  Also in 2015, DSHS successfully lobbied the legislature for a new law requiring

Washington's clerks of court to provide DSHS with a court order for a competency evaluation,

as well as the charging documents, within twenty-four hours of the order being signed.  RCW

1   10.77.075(1)-(3).  The law also requires prosecuting attorneys to provide the discovery

2   documents to DSHS within twenty-four hours, and requires jail administrators to provide

3   medical clearance within twenty-four hours for any individual ordered to be transported to a state

4   hospital.  Id.

5        29.  The regimes governing the provision of competency evaluations in jurisdictions

6   other than Washington state vary widely.  For example, states vary in the findings that must be

7   made by an evaluator.  Washington, for instance, requires only a description of the evaluation,

8   either a diagnosis or a description of the current mental status of the class member, and, if the

9   class member "suffers from a mental disease or defect, or has a developmental disability," an

10  opinion as to competency.  RCW 10.77.060.  Colorado, on the other hand, requires a diagnosis

11  and prognosis of the individual's mental disability or developmental disability in addition to

12  what is required in Washington.  (See Dkt. No. 139 at 23.)  Hawaii also requires that evaluators

13  include a diagnosis, and courts in Hawaii are required to provide evaluators with "all existing

14  medical, mental health, social, police, and juvenile records, including those expunged, and other

15  pertinent records in the custody of public agencies, notwithstanding any other statutes."  (Id. at

16  26.)  States also vary widely in the time allowed for the performance of the required tasks,

17  ranging from Rhode Island, which allows five days to complete an initial evaluation, to several

18  states that do not statutorily establish a maximum time frame for the completion of an in-jail

19  competency evaluation.

20       30.  Despite these legislative attempts to quicken the pace, and despite a 2015 allocation

21  of tens of millions of additional dollars, DSHS has continued to struggle to provide timely

22  services, almost never achieving the seven-day performance target for in-jail evaluations.  At the

23  time of trial, much of DSHS's data was incomplete and unreliable due to poor data collection

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 13

1 and management practices and a lack of consistency of practices across the state hospitals.

2 However, information provided by DSHS to the legislature in December 2014 is illustrative of

3 the nature and persistence of Defendants' delays at the time of trial.  Based on that information,

4 the average in-jail wait time for a completed competency evaluation was 14.7 days at WSH and

5 56.3 days at ESH.

6       31.  Following trial and the imposition of the Court's initial injunction, average wait

7 times for in-jail evaluations have declined.  Based on information submitted to the Court Monitor

8 as part of DSHS's July 2016 Monthly Report to the Court Monitor, the average in-jail wait time

9 for a completed in-jail competency evaluation was 10.8 days at WSH and 14.1 days at ESH.  The

10 combined average across hospitals was 11.4 days, an increase of one day over the previous

11 month's average of 10.4 days.  Thirty-five percent of in-jail evaluations were completed within

12 seven days of the signing of a court order.

13       32.  Following DSHS's successful efforts to require court clerks and prosecuting

14 attorneys to provide DSHS with the documents necessary to conduct an evaluation within

15 twenty-four hours of the signing of a court order, the average time that elapses between the

16 signing of a court order and DSHS's receipt of the necessary documents has also declined.

17 According to May 2016 data submitted to the Court Monitor, court orders were received by

18 DSHS on the same day they were signed in approximately seventy-two percent of cases.  DSHS

19 received the court order in three days or less in approximately ninety-five percent of cases.  Also

20 in May 2016, DSHS received the discovery from prosecuting attorneys on the same day the court

21 order was signed in approximately seventy-one percent of cases.  DSHS received the discovery

22 in three days or less in approximately ninety-five percent of cases.

23

24

### III.     The Harms Caused by Prolonged Incarceration

33.  Jails are inherently punitive institutions, and are not designed or administered so as to provide for the needs of the mentally ill.  A correctional environment, calibrated to provide safety and order, is incongruous with the particular needs of the mentally ill, and results in people with confirmed or suspected mental illness spending more time in solitary confinement, where their mental health further deteriorates.  This deterioration is in direct conflict with the State's interest in prompt evaluation and treatment so that the individual may be brought to trial, especially for individuals whose illnesses become more habitual and harder to treat while they wait in isolation.

34.  In jails, class members are routinely held in a solitary lock down for twenty-three hours out of every day for reasons unrelated to their mental health needs.  Class members are placed in solitary confinement because they are victimized by other inmates, or because symptoms of their illnesses prevent them from following generally applicable rules or behavioral expectations.  Sometimes class members are placed in solitary confinement for their erratic or unpredictable behavior, not as punishment for breaking the rules, but to prevent them from continuing to break other rules which may result in additional charges or some other more serious form of punishment.  These same solitary confinement cells are used to punish other inmates for bad behavior.  Class members cannot enter or exit their cells freely, and are not encouraged to interact with other people.  Even class members on suicide watch are observed by video camera; they experience almost no human interaction, even though isolation is known to be clinically destructive to these individuals' mental health.

35.  Incarceration, generally, is bad for class members for several reasons.  While waiting for long periods of time in local jails, class members are not receiving the mental health

1   treatment they need.  Their conditions worsen not only because of lack of treatment, but because

2   prolonged incarceration exacerbates mental illness, making symptoms more intense and more

3   permanent, and reducing the likelihood the person's competency can ever be restored.

4   Incarceration increases the likelihood of suicide.  Incarceration also unnecessarily exposes class

5   members to harmful conditions such as jail overcrowding, which leads to increased violence

6   among inmates and to the targeting of individuals perceived as weak.  Because class members

7   are stigmatized for what others perceive as erratic and unpredictable behavior, they are less

8   likely to find a social support network within the jail and therefore are less successful than others

9   at navigating the jail environment, increasing their feelings of isolation, terror, and despair.

10      36.  Fifty percent of people ordered evaluated in Washington are found incompetent to

11   stand trial, meaning they are in need of treatment to restore their competency if they are to be

12   legally tried for the charges which form the basis for their detention.  For these class members, a

13   finding of incompetency will not make treatment immediately available.  Instead, these class

14   members will be placed on a waiting list for admission to a state hospital or alternative

15   restoration facility, and will continue to wait in jail under the same conditions described above

16   until a restoration treatment bed is available.  As detailed by the Court in its Order of Civil

17   Contempt regarding restoration services, data from May 2016 demonstrates that wait times in

18   excess of 40 days for a restoration bed to become available were common more than one year

19   after trial.  (See Dkt. No. 289 at 4-6.)

20      37.  In Washington, sixty percent of individuals charged with misdemeanors have their

21   charges dismissed after the completion of a competency evaluation.

22      38.  Class members who are found competent, and therefore who are not in need of

23   mental health treatment in order to stand trial, still suffer from the negative effects of prolonged

24

incarceration discussed above while waiting for a competency evaluation.  As discussed above, the time spent waiting for an evaluation is excluded when computing the time for trial, and therefore these class members' suspected incompetence results in the delayed adjudication of their criminal cases.  Because the public bears the cost of incarcerating these class members while they wait for an evaluation, long evaluation wait times for class members who will be found competent results in significant additional cost to the public via the incarceration expenses shifted to the counties.  The average cost to the public of incarcerating a class member in a Washington jail while they wait for services is $96.13 per person per day.  (Dkt. No. 218 at 2.)

39.  In the month preceding trial, one class member committed suicide while incarcerated and waiting for DSHS to provide competency services.  Since trial, two class members have died while incarcerated and waiting for competency services.

40.  The harms caused by prolonged incarceration, as described above, are worse for class members than the stigma caused by a temporary stay at a state hospital for the purposes of completing a competency evaluation, and are also worse than the harms caused by the temporary separation from class member's counsel, family, and community necessary to complete the evaluation at the hospital.

## IV.    The Barriers to Timely Services

41.  The primary cause of delay in Defendants' provision of in-jail evaluations to class members has long been a shortage of evaluators throughout Washington state.  The evaluator shortages were primarily the result of insufficient funding and inadequate planning, though DSHS believes funding issues have largely been resolved since trial with the legislature's allocation of funds for thirteen additional evaluators.  Nevertheless, inadequate planning and institutional resistance to change remain issues today.

42.   As of the July 25, 2016, evidentiary hearing, twelve of the new evaluator positions were filled and one was vacant due to recent turnover, an example of DSHS's struggle to hire and retain qualified staff.  DSHS's ability to hire and retain staff has been hampered by the fact that DSHS does not pay competitive wages, by a cumbersome collective bargaining process, and by institutional resistance to expanding the pool of eligible applicants for vacant positions.  Since trial, DSHS has declined to adopt the Court Monitor's recommendation to utilize other qualified professionals to perform evaluations, including psychiatric nurse practitioners, physician's assistants, and masters in social work, and has failed to offer the requisite forensic training that could prepare these other professionals to perform evaluations.  High evaluator turnover has also hampered the timely provision of services because new evaluators are unable to complete evaluations as quickly as experienced evaluators, and because temporary vacancies during turnover result in lower system-wide capacity.

43.   DSHS has identified several structural and clinical barriers to timely in-jail evaluations that lie outside of DSHS's control, in addition to the staffing issues discussed above. DSHS identified (1) delays of one to three days in receiving all of the required documentation; (2) delays caused by scheduling an interpreter; (3) delays caused by defense attorneys requesting to be present during an evaluation but failing to make themselves available for the interview in a timely manner; (4) delays caused by a litigant's rejection of an assigned evaluator; (5) delays caused by long travel times for evaluators who travel between county jails; (6) delays caused by waiting for intoxicants to clear out of an individual's system before performing an evaluation; (7) delays caused by an evaluator's need for additional records or other documents; and (8) delays caused by a lack of adequate evaluation rooms or other evaluation facilities at the jails.  While these occurrences can potentially impact the timing of a particular evaluation, none of these

1   occurrences would prevent a well-run and well-staffed competency system from providing

2   timely competency evaluations to most class members most of the time, especially where good

3   cause extensions are available for several of the barriers listed above.

4        44.   Some of the barriers identified by DSHS as lying outside of its control are not in fact

5   outside of its control.  For example, DSHS can contract directly with interpreters at its

6   convenience.  While DSHS faced delays in receiving the documents necessary to conduct an

7   evaluation at the time of trial, DSHS has now successfully lobbied the legislature to legally

8   require court clerks and prosecuting attorneys to transmit the necessary documents within

9   twenty-four hours of a court order.  While DSHS cannot control the schedules and availability of

10  defense counsel, DSHS could offer evaluations on nights and weekends, when public defenders

11  do not have to be in court and therefore are more likely to be available.  To date, DSHS has not

12  offered night or weekend evaluations, despite the fact that the jails where the evaluations occur

13  operate twenty-four hours a day, every day of the year.  Similarly, while long evaluator travel

14  time does impact the timeliness of evaluations, DSHS is under no obligation to base the

15  evaluators in the locations it currently mandates they be located in.  These inefficiencies are the

16  result of administrative decisions made by DSHS in how to manage the in-jail evaluations

17  process.

18        45.   At the time of trial, because of insufficient staffing, there were delays of

19  approximately six to seven days before an evaluator was assigned to a case after DSHS received

20  all of the necessary documents.

21        46.   Despite a requirement by this Court that DSHS adopt a triage system to process class

22  members more efficiently, (Dkt. No. 186 at 11-15), there has been no attempt to sort class

23  members by the seriousness of their crimes, e.g. whether the charge is a misdemeanor or a

24

1  felony, and thus no attempt is made to sort between people who would spend two days in jail if

2  convicted and people who would spend years in prison.  There is no system-wide attempt to

3  triage class members based on the amount of time or resources that their cases require, e.g.

4  whether their evaluations are simple and can be done quickly or will require additional

5  interviews and the examination of substantial additional records.  There is no system-wide

6  attempt to sort out class members who have been in the system frequently and whose mental

7  health problems have been previously documented.  To date, implementation of the rudimentary

8  triage program adopted by DSHS has been delayed and haphazard, and its benefits limited.  (See

9  Dkt. No. 289 at 9-11.)

10  47. DSHS's ability to provide timely in-jail evaluations has improved dramatically as a

11  result of the increased funding and the additional evaluators hired, as discussed above.  As a

12  result, average wait times are now near fourteen days across the state, though figures for average

13  wait times are of limited utility because the actual wait times experienced continue to vary

14  widely by class member.  Nevertheless, DSHS's success in reducing wait times demonstrates

15  that the barriers it identified do not prevent it from providing timely services with adequate

16  resources and planning.

17  48. Although improvement is apparent, the lack of accurate, consistent data has made it

18  difficult for DSHS to understand and predict demand for its services, to improve its operating

19  policies and procedures, and to adequately plan for the future.  Inconsistent procedures and

20  practices across the hospitals hamper the timely provision of services, as does the fact that the

21  hospitals do not consistently use electronic medical records instead of paper records.  Timely

22  services are further hampered by DSHS's lack of knowledge about, and lack of willingness to

23  use, electronic court records, which are available for most jurisdictions twenty-four hours a day

24

1   and which contain much of the information needed to provide competency services.  Problems

2   with the integrity of DSHS's data persist today, fifteen months after the Court issued its initial

3   injunction.  For example, DSHS is tracking delays caused by defense counsel availability

4   together with delays caused by interpreter availability, even though DSHS can contract directly

5   with interpreters.  Therefore, although DSHS frequently presents defense counsel availability as

6   a major barrier to timely services, it has no data that can demonstrate in what percentage of cases

7   defense counsel availability is the actual cause of delay.

8        49. DSHS consistently ignores court orders to provide class members with services or to

9   admit class members to the state hospitals, even when they have been found in contempt.  DSHS

10  has developed a de facto policy to continue to administer the forensic mental health system in the

11  manner it considers best; court orders which conflict with its waiting list methodology are

12  ignored as a matter of course.  Numerous orders from numerous courts have been ignored under

13  this policy.  On July 7, 2016, DSHS was found in contempt by this Court for failing to take all

14  reasonable steps to achieve compliance with the portions of the injunction regarding in-hospital

15  evaluations and restoration treatment services.  (Dkt. No. 289.)

16       50. The Court's original injunction provided a way to extend the time when based upon

17  the individual needs of the class member.  (See Dkt. No. 131 at 22.)  This exception was never

18  used and no request has ever been made of a referring court.

19                              **Conclusions of Law**

20       1. DRW has standing to represent the interests of persons who require competency

21  services, and to seek a permanent injunction and declaratory judgment establishing the time

22  frames within which due process requires that services be provided.  See Oregon Advocacy Ctr.

23  v. Mink, 322 F.3d 1101, 1112 (9th Cir. 2003); In re Lamb, 173 Wn.2d 173, 196-197 (2011)

24

1    (citing to federal law providing DRW with the authority to "pursue legal, administrative, and

2    other appropriate remedies . . . to ensure the protection of, and advocacy for, the rights of persons

3    with . . . disabilities."); Doe v. Stincer, 175 F.3d 879 (9th Cir. 1999); Hunt v. Washington State

4    Apple Advertising Commission, 432 U.S. 333 (1997).  Next friends have standing because they

5    have shown that: (1) each Plaintiff is unable to litigate his own cause due to mental incapacity or

6    other similar disability; and (2) each next friend has some significant relationship with, and is

7    truly dedicated to the best interests of, each Plaintiff.  Coal. of Clergy, Lawyers, & Professors v.

8    Bush, 310 F.3d 1153, 1159-60 (9th Cir. 2002).

9         2.  Plaintiffs' burden of proof on their claims is a preponderance of the evidence.

10        3.  Constitutional questions regarding the conditions and circumstances of pretrial

11   confinement are properly addressed under the Due Process Clause of the Fourteenth Amendment

12   to the United States Constitution.  Trueblood, 822 F.3d at 1043-44; Mink, 322 F.3d at 1120-21.

13        4.  The foundational liberty interest under the due process clause is freedom from

14   incarceration.  Oviatt ex rel. Waugh v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992).  Individuals

15   have a fundamental liberty interest in being free from incarceration absent a criminal conviction,

16   and there exist corresponding constitutional limitations on pretrial detention and other forms of

17   physical restraint.  See Lopez-Valenzuela v. Arpaio, 770 F.3d 772, 777-78, 780-81 (9th Cir.

18   2014) (en banc), see also Zadvydas v. Davis, 533 U.S. 678, 690 (2001).

19        5.  In Mink, "all of the detainees had been found incompetent and had a distinct "liberty

20   interest[] in freedom from incarceration" so they could receive restorative treatment."

21   Trueblood, 822 F.3d at 1044.  The Mink court held that "[w]hether the substantive due process

22   rights of incapacitated criminal defendants have been violated must be determined by balancing

23

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 22

1    their liberty interests in freedom from incarceration and in restorative treatment against the

2    legitimate interests of the state."  322 F.3d at 1121.

3        6.  The framework adopted by the Ninth Circuit in <u>Mink</u>, which itself adopted the

4    framework set out by the Supreme Court in <u>Jackson v. Indiana</u>, 406 U.S. 715 (1972), and

5    <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), "is equally applicable to individuals awaiting

6    competency evaluations," including class members here.  <u>Trueblood</u>, 822 F.3d at 1043.  "In

7    <u>Jackson</u>, the Supreme Court articulated a general 'rule of reasonableness' limiting the duration of

8    pretrial detention for incompetent defendants and requiring, at a minimum, 'that the nature and

9    duration of commitment bear some reasonable relation to the purpose for which the individual is

10   committed."  <u>Id.</u> (quoting <u>Jackson</u>, 406 U.S. at 733, 738).  "Thus, '[w]hether the substantive due

11   process rights of incapacitated criminal defendants have been violated must be determined by

12   balancing their liberty interests in freedom from incarceration and in restorative treatment against

13   the legitimate interests of the state.'"  <u>Id.</u> (quoting <u>Mink</u>, 322 F.3d at 1121, and <u>Youngberg</u>, 457

14   U.S. at 321.)

15       7.  Accordingly, in order to determine whether class members' substantive due process

16   rights have been violated by Defendants' failure to provide timely in-jail competency

17   evaluations, the Court must "[w]eigh[] the parties' respective interests" to determine if there is "a

18   'reasonable relation' between the length of time from the court order to the inception of the

19   competency evaluation."  <u>Trueblood</u>, 822 F.3d at 1043.

20       8.  "The interests to be weighed before a finding of incompetency bear a similarity to the

21   <u>Mink</u> situation, but are factually distinct."  <u>Trueblood</u>, 822 F.3d at 1044.

22       9.  Class members have suffered, and continue to suffer, prolonged incarceration in city

23   and county jails for the purpose of waiting for in-jail competency evaluations from Defendants

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 23

1   because of suspected mental incompetence.  Their prolonged incarceration implicates their right

2   to be free from incarceration absent conviction, and their right to the competency evaluations

3   which form the basis for their detention.  Class members have "legitimate interest[s] in

4   mitigating the harm caused to detainees who languish in jail awaiting a competency

5   determination and in reducing the impact of solitary confinement and other conditions often

6   imposed on mentally ill detainees who are awaiting evaluation." Trueblood, 822 F.3d at 1045.

7       10.  The State's primary governmental interest in regard to class members awaiting in-jail

8   evaluations is to bring those accused of a crime to trial.  In furtherance of that goal, the state has

9   a legitimate interest in evaluating a potentially incompetent defendant's competency so as to

10  determine whether he or she may stand trial, and in restoring the competency of those found

11  incompetent so that they may be brought to trial.  The state has a corresponding interest in an

12  efficient and organized competency evaluation and restoration system, the administration of

13  which uses public resources appropriately.  The state also has interests in "accurate evaluations,

14  preventing the stigma of an incorrect determination, avoiding undue separation of a detainee

15  from her counsel and family, and protecting the detainee's rights to counsel and against self-

16  incrimination." Trueblood, 822 F.3d at 1044-45.

17      11.  A permanent injunction requiring the provision of timely in-jail competency

18  evaluations remains the most appropriate remedy for Defendants' constitutional violations.  Id. at

19  1046.  In refashioning the permanent injunction, the Court must consider not what is "reasonable

20  and achievable," but instead "whether the state's present fourteen-day requirement bears the

21  constitutionally requisite reasonable relationship." Id. at 1045; see also Jackson, 406 U.S. at

22  733-38 (due process requires, at a minimum, some rational relation between the nature and

23  duration of confinement and its purpose).

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 24

12. The Court must consider Washington's statutory fourteen-day maximum time limit for competency evaluations, even though wait times at trial were far in excess of fourteen days, because federal courts "have often looked to a state's own policies for guidance because 'appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.'" Trueblood, 822 F.3d at 1045-46 (quoting Rizzo v. Goode, 423 U.S. 362, 379 (1976) and citing Lewis v. Casey, 518 U.S. 343, 362 (1996)); see also Katie A., ex rel. Ludin v. Los Angeles Cnty., 481 F.3d 1150, 1155 (9th Cir. 2007) ("Where an injunction is issued against state officials, a district court will be deemed to have committed an abuse of discretion . . . if its injunction requires any more of state officers than demanded by federal constitutional or statutory law.") (citation and internal quotation marks omitted). At oral argument before the Ninth Circuit, Defendants "proposed that, if there had been a Fourteenth Amendment violation, the best remedy would be to order Washington to comply with its own law." Trueblood, 822 F.3d at 1046 n.6.

13. After weighing the interests of class members and of the state, and having considered the deference due to Washington's policy judgments stemming from principles of federalism, the Court concludes that there is a reasonable relation between the nature and duration of Washington's statutory maximum of fourteen days to incarcerate class members while completing an in-jail competency evaluation and the purposes for which class members are incarcerated. See Trueblood, 822 F.3d at 1043-44 (district court should have considered "whether there was some reasonable relation between the timing and the confinement"); see also Jackson, 406 U.S. 715. Therefore, the Court finds Defendants' proposed fourteen-day standard constitutionally acceptable and rejects Plaintiffs' request for a stricter ten-day standard. (See Dkt. Nos. 259 at 2, 279 at 1-3.) However, as explained below, the Court concludes that it cannot

1    simply "order Washington to comply with its own law" and instead must impose an injunction

2    that is appropriately enforceable and does not provide a non-exhaustive list of exceptions to the

3    fourteen-day standard because the statutory exceptions function to swallow the rule.

4         14.  The Court finds Washington's statutory maximum of fourteen days constitutionally

5    acceptable because the Court concludes that fourteen days is the maximum justifiable period of

6    time to incarcerate a class member waiting for an in-jail competency evaluation absent an

7    individualized finding of good cause to continue incarcerating that class member.  The Court

8    arrives at this conclusion having balanced the legitimate interests of class members and of the

9    state, and having considered Washington's policy judgment that fourteen days provides an

10   appropriate amount of time in which to conduct an in-jail evaluation and should be the

11   "maximum time limit" for completion of that evaluation unless there is individualized good

12   cause to extend that time limit.  See RCW 10.77.068.

13        15.  Wait times beyond fourteen days are not constitutionally permissible in this case

14   because longer wait times destroy the reasonable relation between the nature and duration of

15   confinement and its purpose.  See Trueblood, 822 F.3d at 1043-44; see also Jackson, 406 U.S.

16   715.  This is so because once the system provides for sufficient time to allow for an accurate

17   evaluation (i.e., one that will not incorrectly identify class members as incompetent or mentally

18   ill, thereby stigmatizing them and inappropriately moving them away from their family and

19   counsel) in a manner that uses public resources appropriately and does not force class members

20   to abandon their rights to counsel and against self-incrimination, each additional day of delay

21   actually works against the interests of all Parties, as explained below.

22        16.  For class members who are found incompetent, each additional day spent in jail

23   waiting is an additional day spent without access to desperately needed medication and

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 26

1  treatment, incarcerated in a place that cannot provide the environment or type of care needed by

2  incompetent class members.  Each additional day spent in jail increases the risk of suicide and of

3  other types of self harm, and increases the risk that a class member will be victimized by other

4  inmates.  Class members who are incompetent due to reasons other than mental illness, such as

5  those with intellectual disabilities or traumatic brain injuries, are less likely to regain competency

6  with treatment, making their prolonged incarceration tragically unnecessary and inhumane.[2]  For

7  class members suffering from mental illness, each additional day spent incarcerated—especially

8  in solitary confinement—makes that class member's mental illness more habitual and harder to

9  cure, resulting in longer restoration periods or in the inability to ever restore that person to

10  competency.  Longer restoration treatment periods increase the cost to the state and therefore to

11  the public of treating that individual, and longer restoration periods stymie the efficient use of

12  restoration bed space.

13        All of these results contravene the state's interest in swiftly bringing the accused to trial,

14  and none are the necessary results of an efficient and organized competency system that uses

15  public resources appropriately.  Because the state has determined that fourteen days is sufficient

16  to safeguard its interests in accurate evaluations, in preventing the stigma and separation that

17  result from an incorrect evaluation, and in protecting a class member's right to counsel and

18  against self incrimination, none of these interests weigh in favor of a standard longer than

19  fourteen days.  As explained in more detail below, the Court's good cause exception to the

20  fourteen-day requirement provides the flexibility DSHS needs to accommodate cases in which an

21  evaluator needs more information or time, or where the class member asserts a right to counsel

22  _____

23        [2] Prolonged incarceration is also tragically unnecessary and inhumane for the sixty
    percent of individuals charged with misdemeanors who have their criminal charges dismissed
24  after the completion of a competency evaluation.

that requires scheduling beyond fourteen days.  The delays in these cases bear a rational relation to the purposes of the confinement, whereas delays in cases without any reason for delay do not.

Finally, it must be noted that in-jail competency evaluations are only one piece of an interconnected system.  As described above, fifty percent of those evaluated in Washington are found incompetent.  For these class members, a finding of incompetence will result most immediately in their placement on another waiting list, and they will continue to wait, incarcerated in the same conditions described above, until a restoration bed becomes available.

17.  For class members who are found competent, each additional day spent waiting is an additional day spent incarcerated that is excluded from their speedy trial rights under the Sixth Amendment.  If a class member was charged only with a misdemeanor, the total length of incarceration experienced may exceed the maximum jail term available for that offense. There remains no attempt by DSHS to sort class members by the nature of their charges to avoid this problem.  The state, and the taxpayers, must spend considerable resources paying for the incarceration, in direct contravention of the state's interest in rapidly bringing the accused to trial and ensuring the efficient administration of justice.  As described above, wait times in excess of fourteen days—the amount of time necessary for an accurate evaluation while also safeguarding the state's other interests—contravene the interests of both the state and class members, and therefore do not bear a reasonable relation to the purpose of the confinement.  See Jackson, 406 U.S. at 733-38.

18.  While Washington's fourteen-day maximum time limit for the completion of in-jail evaluations bears the constitutionally requisite reasonable relation to the purpose of confinement, the remainder of RCW 10.77.068 does not.  The remainder of RCW 10.77.068 provides a non-exhaustive list of exceptions to the fourteen-day "maximum time limit," exceptions which alter

1    the duration of the confinement without the constitutionally requisite reasonable relation to the

2    purpose of confinement.  For example, the statute provides an exception to the maximum time

3    limit when there is an "unusual spike" in evaluation referrals, and appears to excuse all delays

4    "until the unexpected excess demand for competency services can be resolved."  RCW

5    10.77.068(1)(c)(vi).  The Constitution cannot be so pliable.  First, the statute does not define

6    "unusual spike," which is troubling considering the evidence presented that the volume of

7    referrals regularly fluctuates over time, between years and by season.  Therefore, this exception

8    would appear to be available quite frequently.  Allowing DSHS to invoke this exception to

9    excuse delays "until the unexpected excess demand for competency services can be resolved" is

10   unacceptable because DSHS has <u>for years</u> been unable to handle the demand for competency

11   services and has failed to plan for growth in demand, resulting in hundreds of contempt orders by

12   state court judges and a contempt finding by this Court last month.  Therefore, invocation of this

13   exception would excuse all delays for an unknown and unbounded period of time.  Finally,

14   allowing DSHS to use this exception would amount to canceling the fourteen-day requirement

15   whenever DSHS subjectively determines that the quantity of referrals represents an "unusual

16   spike."  This is troubling considering DSHS's demonstrated history of valuing internal policy

17   preferences and administrative convenience over court orders for timely competency services—

18   even when held in contempt—which suggests DSHS may consider invoking this exception as a

19   financial defense to contempt orders while continuing to value internal policy preferences and

20   administrative convenience over the constitutional rights of class members.

21         Exception (iv) eliminates the fourteen-day maximum time limit when DSHS "does not

22   have access to appropriate private space to conduct a competency evaluation for a defendant in

23   pretrial custody."  RCW 10.77.068(1)(c)(iv).  This exception does not pass constitutional muster

24

because, as discussed above, this is the type of structural barrier that justifies a fourteen-day

timeframe to conduct the ten to fourteen hours of work an evaluation requires, rather than a

shorter seven-day or ten-day timeframe.  The evaluation consists primarily of a thirty-to-ninety-

minute face-to-face interview, and requires about ten to fourteen hours of work by an evaluator.

Allowing an evaluator sufficient time to perform these tasks bears a reasonable relation to the

purpose of the confinement; eliminating the maximum time limit altogether because jail space is

booked during an evaluator's first or second preferred time slot during ordinary business hours

Monday to Friday does not bear a constitutionally reasonable relation.  When easily

surmountable barriers hamper timely services without reasonable cause, the State must attempt

to overcome the barriers, not move the goalposts and throw out the rules.

The remaining statutory exceptions are either covered by the Court's good cause

exception, discussed below—exceptions (ii) (more information needed for accurate evaluation),

(iii) (defense counsel availability), and (v) (criminal defendant's assertion of legal right requires

scheduling outside of fourteen-day period)—or are irrelevant to the considerations here

(exception (i), medical clearance needed for transport to a state hospital).  For any exceptions not

listed, the Court is unable to evaluate whether they bear the constitutionally requisite reasonable

relation, and therefore cannot condone them.

Significantly, the Court also finds the manner in which the statute presents the

exceptions—as affirmative defenses to allegations of untimeliness brought by the criminal

defendant—and the statute's explicit unenforceability, see RCW 10.77.068(5), to be

inappropriate considering the Ninth Circuit's determination that the best remedy to ensure that

class members' constitutional rights are protected is a permanent injunction through which this

Court can monitor DSHS's efforts to provide timely competency services.  See Trueblood, 822

1    F.3d at 1046.  DSHS is the party that for years has violated the constitutional rights of vulnerable

2    citizens and ignored the orders of courts attempting to protect those rights; the burden to

3    demonstrate that there is good cause for delays beyond the "maximum time limit" inside the

4    injunctive framework sits squarely on DSHS's shoulders, not on the shoulders of criminal

5    defendants suspected to be incompetent, fifty percent of which are in fact incompetent.

6           19.  The Court's injunction requires Defendants to complete in-jail competency

7    evaluations within fourteen days of the signing of a court order, not within fourteen days of

8    DSHS's receipt of the court order and other documents, for several reasons.  First, as discussed

9    above, wait times of longer than fourteen days destroy the reasonable relation between the nature

10   and duration of the confinement and the purposes of the confinement.  Second, the date of the

11   court order provides a clear, ascertainable beginning date for tracking the fourteen-day period,

12   tracking necessary to determine whether DSHS has achieved compliance with the injunction.

13   Given DSHS's longstanding struggle to produce accurate, consistent data, and considering

14   DSHS's past inability to determine which decision makers made a certain decision and when or

15   why that decision was made—for example, with the strip search policy at the Maple Lane

16   alternative restoration facility, (Dkt. No. 289 at 15)—the Court finds it necessary to maintain a

17   fixed, easy-to-track starting date to monitor compliance.  Finally, the rationales presented at trial

18   and before the Ninth Circuit as to why the fourteen days should begin at DSHS's receipt of the

19   court order and other documents are no longer relevant.  As discussed above, court clerks and

20   prosecuting attorneys are now legally required to provide DSHS with all necessary documents

21   within twenty-four hours of the signing of a court order.  RCW 10.77.075.  Although this law is

22   relatively new and DSHS has only just begun doing outreach to the counties concerning the

23   requirement, the necessary documents are provided to DSHS on the same day the court order is

24

1  signed in at least seventy-one percent of cases.  The necessary documents are provided to DSHS

2  in three days or less in ninety-five percent of cases.  DSHS's community outreach liaison has

3  testified that she intends to continue to contact courts and prosecuting attorneys around the state

4  to inform them of the new legal requirements, and that DSHS expects the percentage of cases in

5  which all necessary documents arrive within twenty-four hours to increase.  (Dkt. No. 289 at 11.)

6  And, it is DSHS's responsibility to develop systems that can interface with courts' electronic

7  dockets to improve efficiency, not individual class members' responsibility to make the system

8  work.  The Ninth Circuit's concern about delays in providing the documents to DSHS is no

9  longer relevant.

10          20.  The good cause exception to the fourteen-day requirement shall be expanded to

11  include not just the clinical good cause exception contained in the Court's original injunction,

12  but also a good cause exception that accounts for the non-clinical interests of class members.

13  See Trueblood, 822 F.3d at 1045.  As discussed below, the non-clinical good cause exception

14  shall allow extensions for good cause based on the availability of (1) defense counsel, (2) a

15  defense expert, or (3) an interpreter.

16          **Accordingly, the Court hereby ORDERS that the permanent injunction be**

17  **MODIFIED as follows:**

18          Paragraph (1) of this Court's April 2, 2015 permanent injunction concerning in-jail

19  evaluations, (Dkt. No. 131 at 22), vacated by the Ninth Circuit, is hereby amended to state:

20          (1) Defendants must provide in-jail competency evaluations within fourteen days of the

21  signing of a court order calling for an evaluation.  Where an in-jail evaluation cannot be

22  completed within fourteen days of a court order, Defendants must secure an extension from the

23  ordering court for individualized good cause, or must immediately admit the individual to a state

24

1    hospital to finish conducting the evaluation.  Individualized good cause encapsulates both

2    clinical good cause—meaning good cause based on the unique medical or psychiatric needs of

3    the particular individual, including the continued presence of intoxicants but not including

4    DSHS's lack of resources or the system's inability to administratively accommodate the needs of

5    the individual within fourteen days—and good cause based on class members' non-clinical

6    interests, i.e., where having their defense counsel, an interpreter, or an expert of their choosing

7    present at the evaluation is not possible to arrange within the fourteen-day timeframe.

8           As stated above, in order to invoke the individualized good cause exception, Defendants

9    must seek an extension from the ordering court.  Defendants are ORDERED to track each

10   request for an individualized good cause extension made by DSHS evaluators, and whether the

11   request was granted or denied.  This information shall be included in Defendants' monthly

12   reports to the Court Monitor.  Where the request is based on the unavailability of a class

13   member's defense counsel, Defendants must include in their report to the Court Monitor: (1)

14   defense counsel's name, and the county in which he or she practices, (2) how long it took for

15   DSHS to assign an evaluator to the case after it received the court order, charging documents,

16   and discovery, (3) how long it took the assigned evaluator to contact defense counsel after

17   assignment, and (4) a statement explaining what efforts were made to schedule the evaluation

18   during the fourteen days, including whether or not defense counsel was offered an evaluation

19   time slot outside of ordinary court hours.  Where the request is based on the unavailability of an

20   interpreter, Defendants must include in their report to the Court Monitor: (1) the names of the

21   interpreters contacted by DSHS, their locations in Washington state, and the language(s) for

22   which interpretation was required for that case, (2) how long it took for DSHS to assign an

23   evaluator to the case after it received the court order, charging documents, and discovery, (3)

24

ORDER MODIFYING PERMANENT
INJUNCTION AS TO IN JAIL COMPETENCY
EVALUATIONS- 33

1  how long it took the assigned evaluator to contact the interpreters after assignment, (4) a

2  statement explaining what efforts were made to schedule the evaluation during the fourteen days,

3  and (5) a statement explaining why DSHS did not contract with another interpreter directly.

4     Defendants are ORDERED to reduce wait times for in-jail competency evaluations in

5  accordance with this injunction as soon as practicable, but no later than **thirty (30) days** from the

6  date of this order.  Defendants will continue to report compliance efforts to the Court Monitor as

7  set out in previous orders of the Court.  All other portions of this Court's orders not explicitly

8  vacated by the Ninth Circuit remain in place unless stated otherwise by the Court.

9     SO ORDERED.

10

11     The clerk is ordered to provide copies of this order to all counsel.

12

13     Dated this 15th day of August, 2016.

14

15

16                       Marsha J. Pechman

17                       United States District Judge

18

19

20

21

22

23

24