UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CASSIE CORDELL TRUEBLOOD, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, et al.,<br><br>Defendants. | CASE NO. C14-1178 MJP<br><br>ORDER ON PLAINTIFFS' SECOND MOTION FOR CIVIL CONTEMPT: JAIL-BASED EVALUATIONS |

The Court has received and reviewed:

1. Plaintiffs' Second Motion for Civil Contempt of Court-Ordered In-jail Evaluation Deadlines (Dkt. No. 427);

2. Defendants' Response to Plaintiffs' Second Motion for Civil Contempt of Court-Ordered In-jail Evaluation Deadlines (Dkt. No. 442);

3. Plaintiffs' Reply on Motion for Civil Contempt of Court-Ordered In-jail Evaluation Deadlines (Dkt. No. 449);

including all attachments and declarations, plus relevant portions of the court record; additionally, the Court heard in-court testimony and oral argument related to Plaintiffs' motion.

**Summary**

On April 2, 2015, the Court wrote the following summary at the conclusion of the trial in this matter:

> The State of Washington is violating the constitutional rights of some of its most vulnerable citizens. The State has consistently failed to provide timely competency evaluation and restoration services, services needed to determine whether individuals understand the charges against them and can aid in their own defenses, which is required in order for them to stand trial. By failing to provide competency evaluation and restoration services within seven days of a court order,[1] the State fails to provide both the substantive and procedural due process required by the Constitution. Our jails are not suitable places for the mentally ill to be warehoused while they wait for services. Jails are not hospitals, they are not designed as therapeutic environments, and they are not equipped to manage mental illness or keep those with mental illness from being victimized by the general population of inmates. Punitive settings and isolation for twenty-three hours each day exacerbate mental illness and increase the likelihood that the individual will never recover.
>
> The Department of Social and Health Services has been hampered in providing these required services by insufficient funding for beds and personnel. Without these resources, they cannot collaborate and coordinate with the other agencies and courts involved in the criminal mental health system.

Dkt. No. 131, Findings of Fact and Conclusions of Law ("FOFCOL") at 2.

The Court ordered the Defendants to cease violating the constitutional rights of class members by reducing wait times. The Defendants were given nine months to comply. The Court further stated:

> The Department of Social and Health Services has failed to change its procedures to respond to this ongoing crisis, and has routinely defied the orders of Washington's state courts, a practice that has resulted in hundreds of thousands of dollars in contempt fines. The Department continues to fail to make significant progress in implementing any of the

---

[1] This was later amended to fourteen days for in-jail evaluations. (*See* Dkt. No. 304.)

reforms recommended by auditors and experts.  The Department has failed to plan ahead for growth in the demand for competency services, which has increased every year for the last decade, and has failed to show the leadership and capacity for innovation that is required to address the crisis.  Other states and counties have been able to meet the constitutional requirements, and so can the State of Washington.

Id. at 3.

Since the time of trial, the Court has modified its time for evaluations to be completed.  It extended the time for compliance based upon the Defendants' negotiated agreements with the Plaintiffs, and based upon Defendants' representations and promises.  The Defendants have failed to meet all deadlines, including those set by themselves.  Their excuses remain the same and their planning remains inadequate.  They were given every opportunity to adopt steps that would ameliorate this crisis by doing the following:

(1) Expanding the pool of professionals who can do evaluations for competency.

(2) Developing a certification process to train the expanded pool of professionals.

(3) Setting up a cadre of contract professionals who could respond to increases in demand and adequately paying reasonable rates in order to attract them.

(4) Utilizing newly-hired staff to meet the demand.

(5) Developing programs to divert class members out of the criminal justice system.

The Court continues the order of contempt and increases the fines.  The Department's lack of effort is frustrating, particularly in light of multiple studies and consultants offering concrete solutions that have not been acted upon, and in light of deadlines and other promises which Defendants themselves have made and not kept.  As a result of these failures, Defendants continue to amass fines for their contempt, fines which are funneled into a fund in the Registry of the Court.  The Defendants' contempt payments are being used to fund programs agreed to by

the parties providing services for and benefits to the class members which Defendants (despite statutory, constitutional and court mandates) have been unable to furnish.

Our most vulnerable population, those with mental health needs, deserve the protection of the Constitution and the provision of services to which they are entitled, not the ongoing foot-dragging and rationalizing which Defendants have exhibited to date. The question of why DSHS prefers to pay millions of dollars to the court treasury rather than honor the constitutional rights of the mentally ill population it is mandated to serve remains unanswered.

**Findings of Facts**

1. Defendants have failed to come into compliance with the timelines for in-jail evaluations for each and every month since the Court's original order was issued on April 2, 2015.
2. The Court allowed the Defendants time to comply and repeatedly allowed them to set new timelines and plans for compliance. (*See* Dkt. Nos. 186, 329, and 408.)
3. Each and every deadline was missed, resulting in a total of $30,696,500 being collected in fines and penalties to date.
4. As of June 2017, only 46.2% of the class members waiting in jail received timely service (*See* Dkt. No. 442, Department's Response to Plaintiffs' Motion for Civil Contempt of Court-Ordered Jail Evaluation Deadlines, at 11); the remainder of the class members waited beyond the mandated time for services in jail, increasing their distress, slowing the criminal justice system, and increasing the costs for the counties housing these inmates.
5. At the time of trial, the Court found the following: "From 2001 to 2011, Washington has seen an eighty-two percent increase in the demand for competency evaluations. Demand for competency services has grown, and is expected to continue to grow, at a rate of eight to ten

percent per year. In addition to yearly growth, there are seasonal fluctuations in the demand for services each year." (Dkt. No. 131, FOFCOL at 2.)

6. The Defendants claim that their inability to comply is explained by the increase in the demand for competency orders generated by the judges of this state and seasonal "spikes." Yet this was anticipated in 2015 at the time of trial and each study following the trial forecast continuing increases.

7. While the Defendants have hired a number of evaluators, they have not adequately predicted the need and the new staff has not been productive enough to meet the increasing demand.

8. In 2015, the average number of evaluation orders per month (jail-based and inpatient) signed by the courts was 240.4. In 2016, the average number of orders signed by the courts was 295.1. In 2017 (through August of 2017), the average was 322.4. Office of Forensic Mental Health Services September 29, 2017 Monthly Report to Court Monitor; Tables 3A and 3B at 10-11.[2]

9. When data regarding monthly averages is limited to in-jail evaluations – the subject of this motion and order – the figures are as follows: In 2015, the average number of in-jail evaluation orders per month issued by the courts was 222.3. In 2016, the average number of in-jail evaluation orders signed by the courts totaled 268.3. In 2017 (through August of 2017), the average number of in-jail evaluation orders issuing from the courts was 291.6. At the time of the August 11, 2017 hearing, the number of evaluators totaled thirty-eight. (Testimony of Dr. Kinlen; August 11, 2017.) If each evaluator were accomplishing the modest goal of completing 10 evaluations a month, it would be sufficient to meet current

---

[2] This report is routinely prepared and delivered to the Court Monitor for inclusion her quarterly reports to the Court. Since the latest quarterly report has not yet been filed, the Court appends the September 29, 2017 Monthly Report to this order as Attachment A.

demand. While the increase is more than expected based on 2015 estimates, it does not explain why the percentage of evaluations completed in a timely manner has decreased so significantly. A projection of a 10% increase per year (starting at the 2015 figure of 222 in-jail evaluation orders/month) would have lead one to expect that the number of anticipated orders signed for in-jail evaluations would increase to 268 per month by August of 2017. The current average of an extra 23 in-jail evaluations per month (based on the 291/month average reported by DSHS) would not account for the dramatic decrease in the percentage of evaluations completed in a timely manner.

10. The Department offers no explanation and no projections for the number of staff that will be needed to meet this increased demand. Defendants are not optimizing the resources they currently possess by using the staff they do have efficiently. The Department has no satisfactory explanation for its inability to do so, even at current staffing levels. Nor is the Department able to explain why simple human resources calculations concerning vacations, sick leave and other indicators of availability could not be tracked and anticipated. No competent human resources planning has been done to respond to increases in demand for services. Nor are Defendants scheduling their current evaluators at times which would synchronize with the availability of other necessary players in the system such as defense attorneys, translators, and pretrial service officers; i.e., nights and weekends.

11. In January 2017, this Court conducted a three-day evidentiary hearing to gather information regarding Defendants' compliance. Defendants provided conflicting testimony regarding whether hiring additional evaluators would ensure compliance with in-jail evaluation requirements.

12. Andi Smith from the Governor's Office conceded that their own data "suggested that getting more evaluators" was part of coming into compliance with the Court's orders. (Dkt. No. 428, Cooper Decl. Ex. G at 35.) Interim DSHS Secretary Lashway testified, "[hiring evaluators] is an area that we probably need to over-hire" to timely respond to spikes in demands for services. (Cooper Decl. Ex. H at 523.) Dr. Ward testified that two years after trial there are still not enough evaluators to respond to the demand for competency evaluations. (Cooper Decl. Ex. I at 244.) Dr. Ward went on to testify, "there is a number of evaluators that we could hire on the jail-based evaluations that would absolutely solve the jail problem." (Id. at 235.) However, Dr. Ward admitted that he has not asked for more evaluators. (Id. at 247.)

13. When asked when DSHS will reach compliance, Assistant Secretary Reyes testified she did not know nor had she conducted a study to determine how many evaluators would be needed to come into compliance. (Cooper Decl. Ex. G at 100, 114.) When asked by this Court regarding why more evaluators had not been requested, Dr. Kinlen testified that he did not believe that additional staff are needed. (Cooper Decl. Ex. H at 385-386.) Dr. Kinlen was also uncertain regarding what number of evaluators were necessary to come into compliance. (Id.)

14. The understanding on the part of the Department of what is needed to comply with the requirements of the Constitution and the orders of this Court is no better currently than it was in January 2017.

15. The Court Monitor has submitted three reports. (Dkt Nos. 171, 180, 414-6.) In each of these reports she has proposed recommendations to reduce wait times for in-jail evaluations including: hiring a cadre of evaluators to reduce backlog, diversifying the pool of clinicians who can perform evaluations, and increasing the reimbursement amount to create more

incentives for county-based panel of evaluators. (Dkt. 171 at 32-33; Dkt. 180 at 8-10, 33; Dkt. 414-6 at 11-12.) Defendants have failed to implement these recommendations from the Court Monitor and her experts.

16. At the January status hearings, Dr. Kinlen testified that while he was aware of the Court Monitor's recommendation, he did not hire a contracted cadre of evaluators to address the backlog. (Cooper Decl. Ex. I at 331-332.) Dr. Kinlen also testified that he had been unable to hire the evaluators to which the parties stipulated in September 2016 to help Defendants reach compliance. (Id. at 355-356.) Ultimately, he testified that Defendants also failed to meet the stipulated benchmarks to achieve compliance. (Id. at 357-358.)

17. On February 1, 2017, Defendants submitted a proposed compliance plan. (Dkt. 361-1.) Under the section entitled "Increase Competency Evaluation Capacity," Defendants explained that they were still in the process of hiring additional evaluators. (Id. at 3.) Defendants note that twelve additional evaluators may increase its "capacity to meet evaluation timeliness standards" as well as "manage future spikes" in demand for competency evaluation. (Id. at 4.)

18. Defendants' compliance plan also explains that they were conducting additional outreach to panel evaluators in counties eligible for DSHS reimbursement due to failure to provide timely in-jail competency evaluations. (See Id.) A review of the memo sent to counties reveals the reimbursement rate remained at $800. Dkt. 383-8. Defendants have conceded "most counties have indicated lack of interest in pursuing this option at current rates." (Dkt. 384-1.)

19. The Department has failed to even find out what a competitive market rate is in the area for evaluations so that a cadre of reserve evaluators could be utilized to perform these tasks when demand peaks or seasonal fluctuations occur.

20. Defendants' attempts to contract for competency evaluators through a Request for Information (RFI) Defendants was flawed. (Dkt. 361-1 at 4.) The RFI asked bidders to complete in-jail evaluations within seven days, not the fourteen days required by this Court's injunction. (Dkt. 303.)

21. All parties have cooperated with the Court and the Monitor to find and fund, from the contempt payments, programs designed to benefit the class members and reduce the demand for jail-based evaluations.

22. Plaintiffs have not produced evidence establishing that requiring the assignment of an evaluator within 24 hours of the evaluation order would improve the timeliness of the evaluations.

23. Plaintiffs have not produced sufficient evidence for the record regarding what would be a reasonable rate of payment to attract qualified temporary evaluators.

**Applicable Law**

In order for the Court to find a party in civil contempt, the "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." F.T.C. v. Affordable Media, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting Stone v. City and County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir.1992)). "The contempt 'need not be willful,' and there is no good faith exception to the requirement of

obedience to a court order." In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (citation omitted).

Civil contempt is defined as "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." Inst. of Cetacean Research v. Sea Shepherd Conservation Society, 774 F.3d 935, 945 (9th Cir. 2014) (citing In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993)).

Substantial compliance with a court order is a defense to an action for civil contempt. Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986). "If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." Id. A party's inability to comply with a judicial order also constitutes a defense to a charge of civil contempt. F.T.C. v. Affordable Media, 179 F.3d at 1239. The emphasis here is on "*all* reasonable steps." The Department has made modest changes that have improved the wait times for class members. It is in the improvement on the most pressing of the recommendations that it has failed.

A district court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court. Shillitani v. United States, 384 U.S. 364, 370 (1966). *See also* United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947). Courts also have a "wide latitude" in determining whether a party is in contempt of its orders. Gifford v. Heckler, 741 F.2d 263, 266 (9th Cir. 1984). As such, it is up to the court to determine whether an entity is in contempt, and that decision is subject to abuse of discretion review. FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999). Once finding a party in contempt, federal courts also have broad remedial powers to address noncompliance. Stone v. City and County of San Francisco, 968 F.2d 850, 861-62 (9th Cir.1992) (affirming court's power to

authorize sheriff to override state law). *See also, e.g.*, Brown v. Plata, 563 U.S. 493 (2011) (imposing prison population limit); Nat'l Org. for the Reform of Marijuana Laws v. Mullen, 828 F.2d 536 (9th Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. Stone, 968 F.2d at 861 (citing Hutto v. Finney, 437 U.S. 678, 687 n.9 (1978)).

Civil contempt sanctions can be imposed for one or both of two distinct purposes: to compel or coerce the defendant into compliance with a court's order, and to compensate the complainant for losses sustained as a result of the contemnor's noncompliance. Shuffler v. Heritage Bank, 720 F.2d 1141, 1147 (9th Cir. 1983). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994).

Civil contempt fines can take the form of per diem fines imposed for each day a contemnor fails to comply with an affirmative court order, or of fixed fines imposed and suspended pending future compliance. *See* Int'l Union, United Mine Workers of Am.*,* 512 U.S. at 829. A court, in determining the amount and duration of a coercive fine, must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired. Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 516 (9th Cir. 1992). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Id*. at 517.

**Conclusions of Law**

1. The Court has jurisdiction over the parties.

2. Plaintiffs have demonstrated by clear and convincing evidence that Defendants are in contempt of court. Defendants have failed to comply with the specific and definite portions of this Court's orders requiring the timely completion of in-jail competency evaluations within fourteen days of receipt of a court order or twenty-one days from the date of the court order. Defendants have failed to take all reasonable steps to reduce wait times for in-jail competency evaluations, and therefore have not taken all reasonable steps to comply and have not demonstrated substantial compliance. Defendants have not demonstrated that they were unable to comply with the Court's orders.

3. Defendants failed to hire sufficient staff to timely respond to the demand for in-jail competency services. Defendants failed to diversify the types of medical professionals serving class members, and failed to secure sufficient temporary contracted staff to respond to unanticipated increases in evaluation orders.

4. DSHS has repeatedly failed to meet the deadlines it sets for itself, including every wait time benchmark leading up to the compliance deadline.

5. In determining the amount and duration of a coercive fine tailored to this situation, the Court is mindful of the grave harms suffered by class members while incarcerated waiting for services. *See* Dkt. No. 131 at 9-11. The Court is also mindful of Defendants' lengthy history of failing to comply with court orders, and Defendants' inability to provide the Court with a date by which compliance can be achieved. There is no other conclusion but that Defendants have chosen not to prioritize the constitutional rights of class members when making decisions as to how many evaluators are necessary to reach compliance and cease violating the constitutional rights of the class, and how much compensation to offer those evaluators such that the position is enticing enough to attract qualified applicants in sufficient numbers.

The Court concludes that the fines now imposed, as detailed below, are the minimum sanction necessary in order to obtain compliance.

6. The Court is hopeful that the Defendants will stop their procrastination and false promises and heed the advice of every expert to advise them. They must increase the number of evaluators, expand the pool of types of professionals used to perform evaluations, increase their productivity, and pay outside professionals a competitive rate for assistance.

7. The Court continues to hold Defendants in contempt, and imposes monetary sanctions in order to compel compliance with its orders. The monetary fines will increase and be paid into the court registry as per the Court's previous order.

The fines are imposed on a per class member, per day basis. For each class member, Defendants shall pay a fine for each day spent waiting in-jail beyond the shorter of a) fourteen days from their receipt of the court order for in-jail competency evaluation, or b) twenty-one days from the date the court order for in-jail competency evaluation was signed. The daily fine under either the fourteen or twenty-one day standard shall be $750 for each of the first six days of delay and $1500 starting the seventh day and every day thereafter.

The fines shall be deposited into the Registry of the Court after they are reduced to judgment, and shall remain in the Court's Registry until further order from the Court. The fines shall be reduced to judgment once per month, or more frequently if the Court in its discretion so orders. The judgments shall bear interest at the federal statutory rate until satisfied.

In order to facilitate payment of the contempt fines, the Court also imposes a reporting requirement. On the fifteenth day of every month, beginning with the month of October, 2017, Defendants shall submit to the Court wait time data in a manner identical to the inpatient competency services data. Additionally, Defendants shall submit a proposed calculation of

contempt fines along with the wait time data. The proposed calculation shall specify the amount of the fine to be imposed, and shall contain all calculations performed by Defendants in order to reach the proposed number. As with the monetary sanctions, this monthly reporting requirement shall terminate upon Defendants' achievement of substantial compliance with the in-jail competency standard.

It is ordered that the Court will hold a further hearing on **Tuesday, November 21, 2017 at 9 a.m.** for the Director of DSHS and a representative of the Governor's Office to appear and report on the Department's progress in person.

It is further ordered that, prior to the November 21, 2017 hearing, the Defendants research the current rate for evaluators in comparable locations and in this region and report back to the Court at the hearing.

The clerk is ordered to provide copies of this order to all counsel.

Dated: October 18, 2017.

Marsha J. Pechman
United States District Judge