Declaration of Nicholas Williamson

Attachment A



Washington State
**Department of Social & Health Services**

*Transforming lives*

# Trueblood Implementation Plan

Final

June 27, 2019

**Declaration of Nicholas Williamson**
**Attachment A - Page 1 of 30**

# Background

All criminal defendants have the constitutional right to understand the nature of the charges against them and assist in their own defense.  If a court believes a mental disability may prevent a defendant from understanding the charges against them or assisting in their own defense, the court puts the criminal case on hold while an evaluation is completed to determine the defendant's competency.

If the evaluation finds the defendant competent, they are returned to stand trial.  However, if the evaluation shows the person is not competent, the court may order the defendant to receive care and treatment to restore competency.

In April 2015, the court found the Department of Social and Health Services (DSHS) was taking too long to provide these competency evaluation and restoration services.  On December 11, 2018 the court approved a Settlement Agreement related to the contempt findings in this case. The settlement is designed to move the State closer to compliance with the Court's injunction.  This is the Final Implementation Report as required by the Settlement Agreement.

The parties recognize that this plan sets forth markedly ambitious timelines to implement agreement elements within Phase 1.  Many of these elements require the development of programs and services that have never existed in the state of Washington.  Throughout this document, timelines have been proposed that will challenge the State, and leave little room for unforeseen roadblocks to implementation.  As a consequence, the parties agree that the failure to meet these timelines will not constitute material breach, provided that the state has made all reasonable efforts to meet the timelines herein.  Rather, the timelines outlined for specific elements should be considered in light of all other evidence in any future dispute as to whether the elements of the settlement agreement have been timely implemented within Phase 1.

# Phased Implementation

The Trueblood Settlement Agreement (Agreement) includes a plan for phasing in programs and services. In each phase, the state will focus its efforts within specifically identified and agreed upon regions.  The Agreement includes three phases of two years each, and can be expanded to include additional phases. Phases run parallel to the Legislative biennia beginning with the 2019-2021 biennium.

| Phase 1: | July 1, 2019 – June 30, 2021 | Pierce, Southwest, and Spokane regions |
| Phase 2: | July 1, 2021 – June 30, 2023 | King region |
| Phase 3: | July 1, 2023 – June 30, 2025 | Region to be determined |

# Regional Collaboration

Following the onboarding of the additional Project Managers to support the Trueblood Settlement Agreement implementation, the project management team will develop a collaboration model for regional implementation. The goal of the collaboration model is to ensure consistent implementation and communication across all regions.

While developing that plan, the team will ensure it:
- Encourages the surfacing of barriers and challenges
- Supports the efficient resolution of problems and addresses decision making processes
- Facilitates the sharing of information
- Engages appropriate members of the various Implementation Teams

The collaboration model will be included in the first semi-annual Monitoring Report.

# Regional Stakeholder Engagement

Following the onboarding of additional Project Managers to support the Trueblood Settlement Agreement implementation, project managers will work with assigned agencies to develop stakeholder engagement plans targeted to each effort.

In advance of that activity, DSHS and the Health Care Authority convened regional Summits in the three Phase 1 Regions in March and April of 2019. These summits were intended to start conversations with regional partners about the work that lies ahead; both to solicit their participation and engagement and foster understanding about the content of the settlement agreement. Invitees covered a broad range of partners including behavioral health groups, law enforcement, courts, attorneys, jail leadership, community leaders, elected officials, housing partners, tribes, and many more. All three Summits were very well attended and attendees were appreciative of the opportunity to begin conversations.

Detailed plans and supporting documents prepared for the Summits have been shared with the Trueblood Executive Committee.

Additional engagements with the regions are also planned for June and July including:

- A webinar on SB 5444 and the budget passed to support Trueblood
- A webinar on the Final Implementation Plan
- In person meet and greets between the Project Management team and stakeholders and partners in all three regions.

# Reporting

The status of the Agreement will be provided to the General Advisory Committee (GAC) via the semi-annual Monitoring Report required within the Agreement. That report will include:

Declaration of Nicholas Williamson
Attachment A - Page 3 of 30

- Data reporting
- Data analysis
- Updates on status of the phased programs
- Areas of concern in implementation and any resulting recommendations
- Areas of positive impact or programming in implementation

In order to support data reporting and analysis for Trueblood, a Data Workgroup comprised of data and Information Technology members from DSHS and the Health Care Authority (HCA) has been convened. The workgroup will:

- Identify business requirements around data for each of the elements
- Assess existing data collection and data storage processes and programs within DSHS and HCA to evaluate whether they will support the new data necessary for Trueblood
- Provide recommendations to agency management on data collection processes for Trueblood which can include manual tracking and/or programatic changes to existing data collection processes and database systems, development of new data collection processes and database systems, etc. to support data collection and evaluation for Trueblood.

The first Monitoring Report will be provided to the GAC in March 2020, six months following the first GAC meeting, which is anticipated in September 2019.

# Agreement Elements

## 1 Competency Evaluation – Additional Evaluators

### 1.1 Assigned Owner

The Department of Social and Health Services' Behavioral Health Administration's Office of Forensic Mental Health Services (OFMHS), is responsible for hiring and employing Forensic Evaluators and associated staff.

### 1.2 Statewide vs. Regional

Evaluators support the entire state of Washington and staff additions are part of the statewide effort with an emphasis on both placement in outstation and inpatient settings.

### 1.3 Requirements from the Agreement

a. DSHS will post and hire thirteen (13) evaluators, one supervisor, and two support staff between July 1, 2019 and June 30, 2020.
b. DSHS will post and hire five (5) evaluators and one support staff between July 1, 2020 and June 30, 2021.
c. Note: supervisor and support staff were not specified as a requirement in the agreement.

### 1.4 Education and Outreach

DSHS will notify regions impacted when newly hired evaluators are on-boarded via the agency's listserv.

**Declaration of Nicholas Williamson**
**Attachment A - Page 4 of 30**

Communication with identified outstation areas will occur once a determination of an outstation placement is made. Placement will be based on areas with the highest referrals through calendar year 2018 and half of the calendar year for 2019.  Furthermore, in the event that resources are diverted in order to respond to an increase or spike in referrals, the areas impacted will be notified of this shift to Trueblood services using the DSHS listserv.

## 1.5 Action Plan and Timeline

Completed:

1. Updated existing position description forms for the evaluator, support staff, and supervisory positions by April 1, 2019
2. Submitted required documentation (request to hire/personnel action requests, updated organization charts, etc.) to human resources by April 30, 2019
3. Advertised the established positions by May 15, 2019
4. Began recruitment activities including screening and interviewing by May 30, 2019

Pending:

5. Hire and onboard the new employees, including expedited work with jails for jail clearances, beginning July 1, 2019 until all positions are filled.

# 2   Competency Restoration – Legislative Changes

## 2.1 Assigned Owner

Legislative changes affect multiple agencies.  For this reason, this initiative is assigned to the Governor's Office, with secondary support from the Department of Social and Health Services and the Health Care Authority.

## 2.2 Statewide vs. Regional

Legislation impacts the state of Washington and is part of the statewide effort.

## 2.3 Requirements from the Agreement

1. The state will pursue changes in the 2019 legislative session with the intent to reduce the demand for competency services.  This includes advancing requests for legislative changes through bill proposals, and could include supporting legislation proposed by others.
2. The state will seek statutory changes to implement a phased rollout of community outpatient restoration services in targeted areas, including residential supports as clinically appropriate.

## 2.4 Education and Outreach

N/A – The State completed this element prior to first semi-annual Monitoring Report submission.

## 2.5 Action Plan and Timeline

N/A – The State completed this element prior to first semi-annual Monitoring Report submission. SB 5444 passed by legislature and signed by the Governor on May 8, 2019. Part of the legislative work that occurred included joint department and OFM work to ensure sufficient investment by the legislature to support the implementation of the programs and services contemplated by the Settlement Agreement.

# 3 Competency Restoration – Community Outpatient Services

## 3.1 Assigned Owner

Competency restoration is a coordinated effort between the Department of Social and Health Services and the Health Care Authority.

## 3.2 Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 3.3 Requirements from the Agreement

a.  The state will seek funding for outpatient competency restoration (OCR) services in targeted areas (including residential supports as clinically appropriate) and a broader package of treatment and recovery services (including mental health treatment, substance use screening and treatment).

b.  The state will identify and seek necessary statutory changes, and develop policies to fully implement outpatient restoration services in targeted areas.

c.  Eligibility for outpatient restoration will be decided by the criminal court ordering restoration services.

d.  For criminal defendants waiting in jail, an offer of admission to the community outpatient restoration services program will occur within the timelines for restoration as outlined by the Federal Court.

e.  The process for outpatient restoration will provide sufficient information for the court to create tailored conditions for release.

f.  Outpatient restoration providers will:

  i.  Accept referrals from OFMHS in accordance with an algorithm that prioritizes the intake of class members.

  ii.  Monitor the individual's compliance with the court order in conjunction with the Forensic Navigator.

  iii.  Provide residential support solutions to those identified by a Forensic Navigator as unstably housed for the duration of their outpatient participation and up to 14 days following transmission of the competency evaluation that occurs at the end of restoration.

  iv.  Have flexibility in providing residential support solutions which may include capital development through the Department of Commerce (COM) or third party source, housing voucher programs, existing housing programs, and/or scattered site housing programs.

g.  The state will provide outreach and technical assistance upon request to support the implementation of community outpatient restoration services.

## 3.4 Education and Outreach

**Initial Education and Messaging Stage:**

The OCR workgroup will partner with DSHS and HCA communications staff, as well as an HCA contract oversight team, to begin collaboration with the Managed Care Organizations (MCOs), Administrative Service Organizations (ASOs), and Community Behavioral Health providers in the targeted areas.

**Declaration of Nicholas Williamson**
**Attachment A - Page 6 of 30**

The OCR workgroup will support the establishment of a stakeholder group with representation from each targeted regional area.  Initial outreach to potential stakeholders and partners will include, but not be limited to, regional judges, attorneys, prosecutors, jails, courts, peer counselors, consumers, consumer advocacy groups, general public, managed-care entities, crisis providers, and community behavioral health providers.

**Action Stage –Contracting:**

DSHS and HCA will coordinate with stakeholder groups, MCOs, ASOs, and behavioral health administrative service organizations (BHASOs) to conduct outreach to the provider network. Education about new programs will be provided, as well as alerting potential contractors on upcoming contract opportunities.

In partnership with DSHS, HCA will execute a direct provider contract or will communicate the Request for Application (RFA) procurement process. If leveraging existing contracts, HCA will negotiate amendments to existing contracts.

DSHS and HCA will coordinate with stakeholder groups, MCOs, ASOs, and BHASOs to announce final contracts and contracting language.

**Implementation Stage – Targeted Education and Technical Assistance:**

DSHS and HCA, in partnership with the Forensic Navigator workgroup, will conduct outreach and provide technical assistance to criminal courts and other stakeholders, upon request, to support community outpatient restoration services.  They will assist with issues such as:

- Determining eligibility for community outpatient restoration;
- The conditions of the class member's participation in outpatient restoration;
- Community outpatient restoration services; and,
- Using Residential Supports and other services to encourage community outpatient restoration services.

The OCR workgroup will partner with the Forensic Navigator workgroup, the Housing Supports workgroup, and the DSHS/HCA communications team to provide information to the key stakeholders, community partners, and program participants in the targeted regions.

**Monitoring Stage:**

HCA will monitor the early phase of implementation and contract adherence.

In partnership with DSHS, HCA will complete quality assurance monitoring of fidelity to the competency restoration treatment model.

DSHS/HCA will utilize information obtained from monitoring efforts to complete ongoing and targeted technical assistance.

## 3.5 Action Plan and Timeline

Completed:

1.  Finalized the OCR workgroup charter by May 31, 2019.

**Declaration of Nicholas Williamson**
**Attachment A - Page 7 of 30**

Pending:

2. The OCR workgroup reviews applicable reports to include Groundswell Services' 2017 and other relevant national models by July 1, 2019.
3. The OCR workgroup collaborates with DSHS/HCA communications team to develop an outreach plan for stakeholders and partners by August 30, 2019.
4. Stakeholder groups established with representation from each of the targeted regions by October 1, 2019.
5. Using stakeholder and partner input, the OCR workgroup will finalize the program model, core elements and referral criteria by February 29, 2020.
6. Metrics will be determined in conjunction with data staff by March 31, 2020.
7. In partnership with HCA contracts team and DSHS, the OCR workgroup solidifies necessary contract language and processes by March 31, 2020.
8. The OCR workgroup coordinates with Forensic Navigator and Residential Support workgroups to coordinate contract efforts, if required, from January 1 – March 31, 2020.  Note:  Forensic Navigators will need to be hired and onboard before Outpatient Competency Restoration services can begin.
9. DSHS and HCA will provide ongoing messaging and technical assistance to the target areas May 1, 2019 – June 30, 2021.  The OCR program providers will be given targeted training and technical assistance.
10. HCA will provide contract monitoring and oversight. OCR contracts will be finalized and operational within the Phase 1 regions by July 1, 2020. Note:  As this is a brand new program in these regions, there may need to be a ramp-up period by the contracted providers before services are fully available.

# 4   Forensic Navigators

## 4.1 Assigned Owner

The Department of Social and Health Services is responsible for hiring and employing Forensic Navigators.

## 4.2 Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 4.3 Requirements from the Agreement

a. The state will seek funding to implement forensic navigators.
b. Forensic Navigators:
   i. Will be assigned a caseload of no more than 25.  Assignment will occur at the time a competency evaluation is ordered.
   ii. Upon assignment and before the hearing, the Forensic Navigator (FN) will gather and provide information to the criminal courts to assist with:
      - Understanding treatment options to divert members from the forensic mental health system.

**Declaration of Nicholas Williamson**
**Attachment A - Page 8 of 30**

- Determining whether a defendant is appropriate for community outpatient restoration services. This is not a clinical recommendation. Standardized tools or assessments for those not known to the system may be used.
- Recommending tailored release conditions for those ordered to community outpatient restoration services.

iii. Will prioritize their caseload to focus on diversion of high utilizers (as known to the system) and may provide less-intensive levels of service to those unknown and/or not yet found incompetent.

iv. Will conclude forensic navigator services when a client is found competent or incompetent but **not** ordered by the court into community outpatient restoration services.

v. For those clients assigned to community outpatient restoration, the FN will:
  - Monitor compliance (in partnership with community outpatient providers) and provide periodic updates to the court. This may include appearing at court hearings.
  - Inform providers if an assigned client is unstably housed and needs residential supports.
  - Coordinate access to housing.
  - Assist client with attending appointments and classes related to competency restoration.
  - Meet individually with clients regularly; perform outreach as needed to stay in touch.
  - Coordinate client access to community case-management services, mental health services, and follow up.
  - Assist clients with obtaining and encourage adherence to prescribed medication.

vi. For those found incompetent and ordered into community outpatient restoration services, forensic navigator services will conclude and the FN will complete a coordinated transition when:
  - Charges are dismissed pending a civil commitment hearing.
  - Client receives a new or amended order directing inpatient admission.
  - Client declines further services after restoration treatment ends.
  - Client regains competency, is found guilty, and is sentenced to serve time.
  - Community outpatient restoration order is revoked or new criminal charges cause a client to enter or return to jail.
  - In any other situations not listed above, at the discretion of the state.

vii. A coordinated transition will include:
  - Facilitated transfer to a case manager in the community mental health system using standards for coordinated transition as established through care coordination or similar agreements.
  - Attempt to confirm meeting between client and community-based case manager following transition.
  - Creation of summary of treatment provided during community outpatient restoration (including earlier-identified diversion options for the individual).
  - Attempt check-in with client at least once per month for up to 60 days. During this period, the client **does not** count towards the Navigator's caseload.
  - Attempt to connect identified high utilizers with available high-utilizer services.

viii.   The state, through training and technical assistance, will encourage third parties (like jails and prisons where class members are serving sentences) to request the summary of treatment and related treatment records as allowed by RCW 10.77.210.

## 4.4  Education and Outreach

**Educational Materials**

Partner with DSHS/BHA Communications staff to develop the below materials:

- Program One-Pager
  - High level overview of the program
- Presentation driving "Train-the-Trainer" style seminars for relevant parties
  - May need multiple versions geared towards specific stakeholder groups

**Relevant Parties**

- Accused
- Potential clients and those at risk of arrest/re-arrest (Mental Health and related Social Service Agencies, CIT programs, individuals who have previously refused FN services, or are known to the system)
- Prosecutors
- Defense counsel
- Judges
- Administrative Office of the Courts (AOC)
- Legislators and staff
- General public
- Families of the accused and client advocates working on behalf of class members

**Outreach**

- Targeted communications to relevant parties
- Build database of key contacts and relevant parties for continued outreach and education
- Schedule and execute trainings at least annually
  - Solicit feedback on both the training itself, and the program overall
- On an ongoing basis, use feedback and program-evaluation analytics for constant program improvement

## 4.5  Action Plan and Timeline

Completed:

1. Submitted necessary human resource paperwork to create the FN Program Administrator by March 8, 2019.
2. Advertised the Administrator position by April 15, 2019.
3. Completed recruitment activities including screening, interviewing, and job offers by June 15, 2019.
4. Hired and completed new employee onboarding process by July 31, 2019.

**Declaration of Nicholas Williamson**
**Attachment A - Page 10 of 30**

Pending:

5. The Forensic Navigator Administrator will convene a workgroup and hold the first meeting by August 31, 2019.
6. Forensic Navigator (FN) Workgroup will complete final draft of Forensic Navigator Program Charter by September 30, 2019.
7. FN Workgroup will review other state and national models related to data and metrics for evaluation of program performance outcomes and quality control by November 30, 2019.
8. FN Workgroup will collaborate with DSHS/HCA communications team to develop a plan for stakeholders to identify and provide challenges and barriers with the workgroup by December 31, 2019.
9. The FN Workgroup will consult with RDA to ensure that the desired data and metrics for evaluation of program performance and quality control can be obtained through the proper database or reporting tool by December 31, 2019.
10. Submit necessary human resource paperwork to create the FN program positions in each region by January 31, 2020.
11. Advertise the forensic navigator positions by February 29, 2020.
12. Meet with partners (courts, AOC, jails, etc.) to develop processes and associated documentation and forms to be used by Forensic Navigators in the court system.  Includes adjusting existing forms by March 31, 2020.
13. Meet with partners (newly established outpatient competency providers, evaluators, etc.) to develop processes and associated documentation needed for those in outpatient restoration. Includes treatment summary, release orders/conditions, etc. by March 31, 2020.
14. Complete recruitment activities including screening, interviewing, and job offers by April 30, 2020.
15. Hire and complete new employee onboarding process by June 15, 2020.
16. Day one of FN Program operations in all three Phase 1 regions expected July 1, 2020.

# 5  Competency Restoration – Additional Forensic Beds

## 5.1 Assigned Owner

The Department of Social and Health Services is responsible for managing forensic-bed capacity.

## 5.2 Statewide vs. Regional

Forensic beds are used by patients across Washington.  Adding or converting beds is part of the statewide effort.

## 5.3 Requirements from the Agreement

a. Convert two wards at Eastern State Hospital into forensic wards containing a total of 50 beds by December 31, 2019.
b. Convert two Western State Hospital civil geriatric wards to two forensic wards containing a total of 42 beds by December 31, 2019.
c. If extensions are needed to either timeline, provide the Executive Committee information on the delay to receive an additional six months of time.  If the state needs additional time beyond this six-month period, they may request a further extension of time from the court.

**Declaration of Nicholas Williamson**
**Attachment A - Page 11 of 30**

## 5.4 Education and Outreach

- Provide updates during Executive Leadership Team meetings
- Quarterly updates from the Project Manager and Sponsor
- Maintain a Project Team SharePoint or Website for communication
- Schedule, prepare for, and attend job fairs to advertise coming positions

## 5.5 Action Plan and Timeline – ESH Beds

Completed:

1. Evaluated contract bids and award contract by February 15, 2019.
2. Construction began by March 1, 2019.

Pending:

3. Create position description forms for program positions by August 1, 2019.
4. Submit required documentation (request to hire/personnel action requests, updated organization charts, etc.) to Human Resources by August 15, 2019.
5. Positions created and allocated by Class and Compensation Unit by October 1, 2019.
6. Develop equipment and supply list, obtain fiscal approval, and purchase necessary items by November 15, 2019.
7. Substantial completion of construction of 1N3 and 3N3 will occur between April 1 and May 1, 2020.
8. Final completion of construction and installation of furniture, equipment and supplies by June 1, 2020.

Note: This timeline will require notice to the Executive Committee because it is beyond the currently set deadline.  This estimated completion is within the six-month grace period allowed under the Agreement. In the event there are any delays related to the development of these beds beyond the six-month period identified in the settlement agreement, defendants will consult with the Executive Committee and file a motion for an extension of time.

## 5.6 Action Plan and Timeline – WSH Beds

Completed:

1. Contract bids opened for E3 and E4 by June 20, 2019.

Pending:

2. If bids are within funding constraints, construction begins by July 15, 2019.
3. Create position description forms for program positions by August 1, 2019.
4. Submit required documentation (request to hire/personnel action requests, updated organization charts, etc.) to Human Resources by August 15, 2019.
5. Positions created and allocated by Class and Compensation Unit by October 1, 2019.
6. Develop equipment and supply list, obtain fiscal approval, and purchase necessary items by November 15, 2019.
7. Substantial completion of construction by March 11, 2020.

8.  Final completion of construction and installation of furniture, equipment and supplies by April 8, 2020.

Note: This timeline will require notice to the Executive Committee because it is beyond the currently set deadline.  This estimated completion is within the six-month grace period allowed under the Agreement. In the event there are any delays related to the development of these beds beyond the six-month period identified in the settlement agreement, defendants will consult with the Executive Committee and file a motion for an extension of time.

# 6   Competency Restoration – Ramp Down of Maple Lane & Yakima RTFs

## 6.1 Assigned Owner

The Department of Social and Health Services is responsible for Residential Treatment Facilities (RTFs). The Office of Forensic Mental Health Services oversees the facilities.

## 6.2 Statewide vs. Regional

Maple Lane and Yakima RTFs support patients across the state of Washington and the closure of those facilities is part of the statewide effort.

## 6.3 Requirements from the Agreement

a.  Yakima RTF will be ramped down when Class Member wait times for inpatient competency services reaches a median of 13 days or less for four consecutive months based on mature data or no later than December 31, 2021.
b.  Maple Lane RTF will be ramped down when Class Member wait times for inpatient competency services reaches a median of 9 days or less for four consecutive months based on mature date or no later than July 1, 2024.

## 6.4 Education and Outreach

**At Start of Phase 1 – June 30, 2019**

A letter to community partners and stakeholders will be sent explaining the closure dates for each facility and the median that would need to be met for an earlier closure.  The letter, which will also be available online, will outline when the notification process will start.

The CRS will conduct staff meetings and information will be provided about the settlement, the metrics required for an earlier closure, what an earlier closure means, and the set closure date. Multiple meetings will occur to reach all line staff that work at both facilities and want to participate.

The OFMHS Website would include a section on the impending ramp down under the RTF section. The Competency Restoration Specialist (CRS) will work with DSHS Communications to determine if other outreach would be beneficial.

**At Onset of Ramp Down (occurs when data has met threshold for two consecutive months)**

At the onset of ramp down, a pre-planned e-mail would be delivered to key partners and stakeholders.  The letter would outline the date of closure.  A separate letter would be sent to parents/guardians of the patients currently at the facility, only as allowed by either releases of information signed by patients or court assigned guardianship.

CRS will work with the communication team on a press statement regarding the closure and the impacts for both staff and patients.

In-person meetings will occur (with a WebEx option for the facility and stakeholders) and be led by the CRS and the OFMHS leadership.

For the Maple Lane Program, coordinate with Human Resources and the Union to meet facility staff and answer questions regarding the closure and what rights they will have.

**Other stakeholder groups that will need to be informed at the on-set of the implementation committee:**

- Comprehensive Mental Health – they currently have the contract for the Yakima Facility. They will have representation on the ramp down team.
- Well Path Recovery Solutions – they currently have the contract for the Maple Lane Facility They will have representation on the ramp down team.
- Department of Corrections (DOC) – currently both facilities are leased from DOC.  Maple Lane is leased from Washington State DOC and the Yakima Facility is leased from Yakima County DOC.
- Washington State Federation of Employees (WFSE) – For Maple Lane only.  The union will need to be involved once the settlement is signed due to Maple Lane employing represented employees.  The CRS will communicate with Kelly Rupert and ask for a union representative to be on the ramp down team.  There will need to be clear timelines outlined from the union specifying when they need to be notified so the required notifications are sent timely for the represented employees at Maple Lane.
- Human Resources will work with the Residential Services Manager at Maple Lane and the union to ensure all represented employees receive the proper notifications.  Depending on project length, per the contract, represented employees in project status longer than five years will have specific layoff rights outlined in Article 34.17.  HR will have a representative on the ramp down team.
- Green Hill School (GHS) – For Maple Lane only.  Currently the MOUs for food, laundry, maintenance, and the vehicle are through GHS.  The CRS or designee will need to coordinate the impending closure with the facility.  DSHS employs eight represented staff at GHS or on site through the project who will require union notification.
- Capital Projects – will need to be involved because DOC may require that we return both facilities to their original floorplan.
- Budget – will need to plan for restoration funds to return the facilities back to their original condition.  A representative from Budget will serve on the ramp down team.
- Contracts Manager– Both contracts for the upcoming year should address the impending early closure if the required median is met.  The CRS will work with the contract manager on this task.
- The Forensics Admission Coordinator (FAC) - will work with the CRS and serve on the ramp down team tapering down before they close.  The FAC would be notified by the CRS if the median wait-time data met the requirements for two consecutive months.

- Western and Eastern State hospitals – will be kept informed as the closure dates get closer in case some patients in the RTF facilities need different placement upon facility closure. In event that were to happen, Western and Eastern State hospitals would work with the Forensic Admissions coordinator.
- All courts and county jails, defense attorneys, and prosecutorial attorneys – will receive the initial letter crafted by the CRS and the communication team. If the required median were met by a facility, a second letter would be sent preparing them for the earlier closure date and when to expect admissions to stop for that facility.
- Families of patients at both facilities where a signed release of information is in place or court assigned guardianship. – four months prior to closure, a form letter would be sent to the families of patients at the affected facility informing them of the closure and possible placement options for their family member. This letter would be crafted by the CRS and communications team.

## 6.5 Action Plan and Timeline

Completed:

1. Identified members and send invitations to potential ramp down team members by April 1, 2019.
2. Convened the first meeting for the ramp down team in April to provide an overview of the draft implementation plan by April 30, 2019.
3. Met with leadership at both sites to review the settlement and compile questions they may have for OFMHS and/or the AG's; complete by April 30, 2019.
4. Identified settlement stakeholders and community partners impacted by ramp down (starting list is above in Education and Outreach section) by May 1, 2019.
5. Organized meetings with DOC at Maple Lane and Yakima to discuss the condition they want the facilities returned to after closure; complete by May 31, 2019.

Pending:

6. Adjust contracts 1512-48444, Comprehensive Competency Restoration Services, 1612-55044, Correct Care Competency Restoration Services, 1561-52933, DOC, Use of Facilities at Maple Lane and 16-DBHR-001, Rehab Administration, Green Hills School Services for ML CR Program during next negotiation period to allow for ramp down during the extension process; complete by June 30, 2019.
7. Meet with budget and Capital Projects to discuss DOC's requirements and develop an estimated cost and timeline; complete by June 15, 2019.
8. Contact Labor Relations within Human Resources to plan for union notification for Maple Lane; triggered by meeting two months' of the median data threshold set by the Settlement Agreement.
9. Contact human resources for help messaging staff at Maple Lane; triggered by meeting two months' of the median data threshold set by the Settlement Agreement.
10. Develop adjusted intake and admission procedures and timelines for each RTF based on anticipated closure dates; complete by August 1, 2019.
11. Once mature data threshold met or no later than June 30, 2021, initiate adjusted intake procedures for Yakima.
12. Once mature data threshold met or no later than January 31, 2024, initiate adjusted intake procedures for Maple Lane.

13. For Maple Lane, contact the union and human resources once mature data is met or no later than January 31, 2024, initiate notification to all DSHS employees.

14. Once mature data is met or no later than six months prior to the established final closure date, all courts, jails, and families of patients will be sent a letter notifying them of the impending closure, only as allowed by either releases of information signed by patients or court assigned guardianship.

15. Prior to closure each facility should have a plan regarding where the equipment is to go.  The plan should be complete six months prior to closure.

16. Four months prior to closure the RTF will work with the Forensic Admissions coordinator and the contractor to establish an end date for intakes and determine when the staffing pattern will begin to decrease.  This will include a detailed flow chart.

17. One month prior to closure the RTF should be at minimum capacity of patients as defined by the adjusted intake procedures.

18. Closure will occur at least two weeks prior to the established date to allow remaining staff time to pack equipment and empty the building.

19. On the closure date, Capital Projects will begin restoring the building to the condition agreed upon by DOC.

# 7   Crisis Triage & Diversion – Additional Beds & Enhancements

## 7.1 Assigned Owner

The Health Care Authority (HCA) is responsible for Crisis Triage and Stabilization facilities in the state of Washington.

## 7.2 Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 7.3 Requirements from the Agreement

a. Seek funding to increase crisis stabilization units and/or triage facilities by 16 beds within the Spokane Region.  Beds will address both urban and rural needs.

b. Solicit requests for and make funds available to community providers of crisis stabilization and/or triage facilities for enhancements.

c. Complete an assessment of need for Crisis triage and stabilization capacity in King County and gaps in existing capacity in Pierce, Southwest, and Spokane regions.  Provided report of assessment to the General Advisory Committee with recommendations to address any gaps found.

## 7.4 Education and Outreach

**Initial Education and Messaging:**

Crisis triage and diversion supports workgroup will partner with DSHS and HCA communications staff, as well as HCA contract oversight team, to collaborate with the MCOs, BHASOs, and community behavioral health providers in the targeted areas.

**Request for Application (RFA) and Contracting:**

HCA to coordinate with stakeholder groups and managed care entities to communicate to provider network.  Education about upcoming increase to capacity provided, as well as preparation to potential contractors for upcoming opportunities.  Ongoing technical assistance provided to target areas.

In partnership with DSHS, HCA to communicate RFA procurement process.

HCA to coordinate with stakeholder groups and managed care entities to announce successful bidders.

**Needs Assessment:**

HCA will work with partners to evaluate the gap analysis completed by the Public Consulting Group (PCG) and develop a plan for increasing capacity in the phased regions.

The PCG gap analysis report will be shared with the General Advisory Committee and with key stakeholders.

## 7.5 Action Plan and Timeline – Gap Analysis and Response

Completed:

1. Crisis triage and diversion supports workgroup charter finalized by May 31, 2019.

Pending:

2. Crisis triage and diversion supports workgroup, in collaboration with HCA Communications team and DSHS partners, will collaborate with key stakeholders, to include the Behavioral Health Administrative Service Organizations (BHASOs) and their contracted crisis facility providers for the targeted regions, on the goals of this element by October 31, 2019.
3. Crisis triage and diversion supports workgroup will share the PCG report at the first General Advisory Committee meeting.
4. HCA will develop recommendations on how to increase crisis capacity in phased regions. Recommendations will be shared with the General Advisory Committee and key stakeholders by March 30, 2020.
5. [GAP] HCA to seek funding for next biennium budget to increase capacity by October 31, 2020.

## 7.6 Action Plan and Timeline – Enhancements

Completed:

1. Crisis triage and diversion supports workgroup charter finalized by May 31, 2019.

Pending:

2. Crisis triage and diversion supports workgroup, in collaboration with HCA Communications team and DSHS partners, will collaborate with key stakeholders, to include the Behavioral Health Administrative Service Organizations (BHASOs) and their contracted crisis facility providers for

the targeted regions, on the goals of this element by October 31, 2019. Throughout this process, the State will be:

    a. Identifying objectives that align with the requirements of the Trueblood contempt settlement.

    b. Exploring the known needs of each community and available resources, including completing an inventory of existing providers and facilities

    c. Identifying community agency(s) that will be willing to provide services as defined by the agreement and by the core objectives established by the internal work group.

    d. Scheduling and holding separate core meeting for each region and identifying needs based on the strengths and weakness of each site within those regions.

    e. Provide an update to the Executive Committee about the status of the stakeholdering work, including whether existing providers are likely able to meet the need.

3. By March 1, 2020, HCA will make a determination whether the desired outcomes can be accomplished by amending contracts with existing providers, or if a RFP process will be necessary, or whether some combination of an RFP and amendment is necessary.

4. Using stakeholder input, crisis triage and diversion supports workgroup will coordinate with the HCA contracts team to develop RFP language and/or amend current MCO/ASO contracts to allocate the funds by March 31, 2020. The timelines for each approach are:

    f. **Amendments with Existing Providers:** In regions with existing providers who are willing to enhance crisis triage/stabilization services, completion of contract amendments based on workgroup recommendations will occur by March 31, 2020.  Funds deployed through contract amendments will also be complete by this date.

    g. **RFP Process:** If no current service provider is able to provide the necessary enhancements, HCA will complete a procurement through an RFP process, incorporating the requirements developed by the workgroup. The RFP process will be completed as required by RCW 39.26, and will take approximately three months. The RFP procurement process will be completed for enhancements and money deployed by July 1, 2020. Examples of why the RFP process could be used include:

        1. the sites identified do not meet the requirements of the Trueblood settlement;

        2. no physical site can be identified that can be enhanced to accomplish the objectives,

        3. no agency is willing to contract to be the provider for service.

5. Based on the enhancements identified in either the amendment process or the RFP process (4.a or 4.b), the State will propose to the Executive Committee timelines for implementation of the enhancements.  The timelines will be set according to the time necessary to implement the specific contracted enhancements.

## 7.7 Action Plan and Timeline – 16 Bed Facility in Spokane Region

Completed:

1. Crisis triage and diversion supports workgroup charter finalized by May 31, 2019.

Pending:

2. Crisis triage and diversion supports workgroup, in collaboration with HCA Communications team and DSHS partners, will collaborate with key stakeholders, to include the Behavioral Health

Administrative Service Organizations (BHASOs) and their contracted crisis facility providers for the targeted regions, on the goals of this element by October 31, 2019.

3. Crisis triage and diversion supports workgroup will partner with Department of Commerce behavioral health facilities program to solidify how capital funding will be included in RFA and procurement process by October 31, 2019.

4. Using stakeholder input, crisis triage and diversion supports workgroup coordinates with HCA contracts team to develop RFA language or amend current MCO/ASO contracts to allocate the funds by March 1, 2020; this will be used in the July 2020 amendment window.

5. Communication plan – HCA to develop a plan by coordinating with stakeholder groups and managed care entities on how to reach entities within the provider network.  The plan will include education about upcoming increases to capacity, as well as information for potential contractors about upcoming opportunities April 1 – July 1, 2020.

6. RFA procurement process completed for contracts amended or issued by July 1, 2020. The operating funds to support the increased bed capacity will be provided upon the completion of the capital construction phase of the project, with services provided no later than July 1, 2021.

# 8 Crisis Triage & Diversion – Residential Supports

## 8.1 Assigned Owner

The Health Care Authority (HCA) is responsible for crisis triage including housing and residential supports in the state of Washington.

## 8.2 Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 8.3 Requirements from the Agreement

a. Technical assistance will be provided to criminal courts and other stakeholders and includes using residential supports and other services for Community Outpatient Restoration Services.

b. If a Forensic Navigator assesses someone participating in Community Outpatient Restoration Services as "unstably housed," that person is eligible for residential supports for the duration of their participation in outpatient competency services.  This will cease if referred to inpatient services.  For those opined as competent it may continue for up to 14 days following transmission of the competency evaluation.

c. The state will develop Residential Supports using procurement.  Providers procured through this process could deliver residential supports in a way that met the community needs which might have included capital development through Department of Commerce or a third party, housing voucher programs, leveraging existing local housing programs, or scattered site housing programs.

d. The state will seek funding to provide short-term housing vouchers for use in Crisis Triage and Stabilization facilities. Vouchers cover a maximum of 14 days but, at the discretion of the facility, could be extended an additional 14 days.

e. The state will seek funding to provide residential support capacity associated with Community Outpatient Competency Restoration in each region.

f. The state will seek an additional 10 percent more funding as described in e. to be used for funding g.

**Declaration of Nicholas Williamson**
**Attachment A - Page 19 of 30**

g. The state will implement residential support capacity per the phased schedule. This capacity offers housing support options that target individuals who are clinically assessed to need more intensive support immediately following discharge from Crisis Triage and Stabilization facilities. Eligibility requirements include:
- Have had at least one prior contact with the forensic mental system in the past 24 months, or, were brought to a Crisis Triage or Stabilization Facility via arrest diversion under RCW 10.31.110 as determined by the crisis triage and stabilization provider;
- Need assistance accessing independent living options and would benefit from short term housing assistance beyond the 14-day vouchers;
- Are diagnosed with an acute behavioral health disorder and are assessed to need housing support beyond what is offered through the Crisis Triage and Stabilization Facilities or the short term voucher as described in § III.C.2.a;
- Are unstably housed;
- Are not currently in the community outpatient competency restoration program, and;
- Do not meet Involuntary Treatment Act (RCW 71.05) commitment criteria.

h. The Housing and Recovery through Peer Services (HARPS) program is available to individuals clinically assessed to benefit from the HARPS program in Community Outpatient Restoration.
i. High Utilizers are provided access to residential supports.

## 8.4 Education and Outreach

- Coordination with the Washington State Department of Commerce will be conducted to leverage local coordinated entry, deed recording fees, and housing and essential needs resources.
- Principles of the SAMHSA Permanent Supportive Housing (PSH) model will be disseminated throughout all projects including Forensic Navigators.
- Training on PSH principles for all HARPS teams will be conducted prior to any services being provided.

## 8.5 Action Plan and Timeline

1. Identify regional forensic programs currently in existence in Pierce, SW Region and Spokane BHO Region by August 1, 2019.
2. Develop draft RFP by August 1, 2019
3. Hire HCA HARPS Program Manager by August 31, 2019.
4. Post finalized RFP by September 1,2019
5. Develop draft contracts and send out to potential providers for review and signature by December 1, 2019.
6. Short term housing voucher dollars will be available to existing crisis triage facilities beginning December 1, 2019.
7. HARPS teams hire staff and services are available by March 1, 2020.
8. PSH Principles training to all HARPS staff by June 30, 2020.
9. Ten (10) percent housing supports tied to outpatient competency restoration will be integrated into contracts by July 1, 2020.
10. Complete initial testing and modeling evaluation for effectiveness by October 1, 2020.

# 9  Crisis Triage & Diversion – Mobile Crisis & Co-Responders

## 9.1 Assigned Owner

The Health Care Authority (HCA) is responsible for community health care including mobile crisis and co-responder programs.  The Washington Association of Sheriffs and Police Chiefs will administer the co-responder program.

## 9.2 Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 9.3 Requirements from the Agreement

Co-responders

a.  The state will seek funding to provide law enforcement agencies with dedicated qualified mental health professionals that assist officers in field response by diverting people experiencing mental health crisis from arrest and incarceration.
b.  Within the 2019-2021 biennium, seek $3 million funding for Washington Association of Sheriffs and Police Chiefs (WASPC) to expand the mental health field response program they administer. This includes funding to cover reasonable administrative costs requested by WASPC to enable it to meet the requirements of III.C.3.a.2 and III.C.3.b.3.
c.  Within Phase 1, assess law enforcement agency co-responder mental health staffing needs to guide future funding requests.
d.  The state's implementation plan (as described in IV.D.) describes how the state supports and encourages integration of these programs in to the other elements of the agreement.

Mobile Crisis Response (MCR)

a.  The state will request a recommendation from WASPC and regional MCR providers on reasonable response times for each region.
b.  The state will seek funding to increase MCR services for each phased region.
c.  The state will request from each phased region a plan for providing MCR services.  This includes new MCR services and should include proposing numbers, credentialing and location of mental health professionals.  Each plan was tailored to meet the needs of the region, considering the need for timely response throughout the region.
    - The plans and any resulting contracts for services, required providers make MCR services available 24/7.
    - Services are accessible without fully completing intake evaluations and/or other screening and assessment processes.
    - Contracting entities include response time targets, after considering the WASPC and regional MCR providers' recommendations.
d.  During Phase 1, the state will institute reporting requirements to gather data on MCR response times.
e.  In Phases 2 and 3, parties use this reported MCR data to inform future funding requests and potentially added contractual requirements to meet response-time targets.

f.  Co-response teams of law enforcement and mental health professionals are encouraged to rely on MCRs to accept individuals identified as needing mental health services.

## 9.4 Education and Outreach

For each region, the following entities will require written education and outreach materials, webinars and regional presentations:

- Crisis teams
- Behavioral health providers
- Law enforcement agencies
- Emergency departments
- Crisis settings, such as: E&Ts, CSUs, Respite, Triage
- Tribes
- DSHS administrations (DDA and ALTSA) and other social service providers
- Ombudsmen and consumer-run organizations
- First responders and ambulance companies

Outreach and education will focus on creating awareness of the Mobile Crisis Response service and how to request those services.  The HCA will include outreach and education expectations in their contract with the BHASO for the MCR service and provide oversight of outreach materials and community engagement strategies.  These will commence at the start of the MCR contracts.  The HCA will assist with messaging about MCR services in advance of the regional MCR contracts.

## 9.5 Action Plan and Timeline

1.  WASPC will be invited to participate in the implementation process by July 1, 2019.
2.  The state will conduct quarterly check-ins with WASPC to collaborate on integrating these programs within appropriate elements of the settlement agreement beginning August 1, 2019.
3.  Selected regional partners will identify participants to collaborate in developing regional timeliness expectations by August 31, 2019.
4.  Begin holding regional meetings by September 30, 2019.
5.  Draft Request for Plans with timeliness standards for each region and post for BHASO response by November 30, 2019.
6.  Develop Mobile Crisis Response draft contract language by December 30, 2019.
7.  BHASO response to Request for Plan is due January 31, 2020.
8.  HCA, DSHS, and WASPC delegates review Request for Plans by February 28, 2020.
9.  BHASOs receive feedback and submit changes by April 30, 2020.
10. Negotiate MCR contract language with BHASO and execute contracts by May 31, 2020.
11. BHASOs hire MCR staff and begin providing services by July 1, 2020.
12. BHASOs and HCA provide outreach and education campaigns within the region to ensure local system partners are aware of the service and how to seek it by September 30, 2020.
13. First reporting of MCR data submitted to HCA by January 31, 2021.

# 10 Crisis Triage & Diversion – Intensive Case Management

## 10.1   Assigned Owner

The Health Care Authority (HCA) is responsible for community health care including intensive case management (ICM) for high utilizers of the forensic mental health system.

## 10.2    Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 10.3    Requirements from the Agreement

a.    Develop a model that identifies those most at risk of near-term referral for competency restoration (aka high utilizers).  The model should use available data including factors such as prior referrals for competency evaluation or restoration, prior inpatient psychiatric treatment episodes, criminal justice system involvement, and homelessness.

b.    Contract with community providers to provide ICM services to high utilizers. Develop strategies for assertive outreach and engagement.  Develop a community collaboration effort to identify and coordinate services for those most at-risk.

c.    Offer the following services to those identified as high utilizers for a six-month period:

- Intensive case management (including outreach and engagement activities occurring outside a competency referral)
- Engagement activities
- Housing supports using the HARPS model which includes securing and maintaining housing, peer support, and rent or other housing subsidies in the amount of up to $1,200 per month for up to six months
- Transportation assistance
- Training or accessing resources and other independent living skills
- Support for accessing healthcare services and other non-medical services

d.    Create effective data tracking system and reporting structure to Trueblood coordinator for tracking coordination activities.

e.    Reduce forensic referrals for competency evaluations.

## 10.4    Education and Outreach

Starting with state partners (DSHS, MCOs, BHASO, regionally funded forensic programs, HCA Trueblood Program contacts) determine appropriate integration of programs.

Outreach will be needed to community behavioral health and forensic service providers in Pierce County, SW Region and Spokane RSA who may be interested in providing services for this program. Targeted outreach will be done to current providers of outreach and engagement services once funding is allocated to the program.

The state will contact each agency and local consortiums  to request participation in a stakeholder workgroup or conversation about becoming an ICM provider for high utilizers.  In addition, the Health Care Authority will issue a public announcement in the event a RFA will be issued if sufficient agencies to deliver the services are not identified.

A program brochure will be available to contracted providers and community partners for disbursement.

Depending on the location of the high utilizer data from RDA, providers may have access to a remote site with information on potential participants.

HCA will coordinate with those entities who have access to the high utilizer list to assist with outreach and engagement services, coordinate services, and make appropriate referrals.

A sampling of participants will complete a satisfaction survey at program completion. Additionally, quarterly interviews will be conducted with contracted providers to assess program needs and observed program trends.

### 10.5    Action Plan and Timeline
1. Identify regional outreach and engagement programs currently in existence in Pierce, Southwest, and Spokane regions by July 1, 2019.
2. RDA finalizes the high utilizer algorithm and provides the first reports by July 1, 2019.
3. Assess the need to develop an RFP to contract directly with a provider in the region or with the BHASO by August 1, 2019.
4. Identify existing regional or community workgroups that can be used to strategize, communicate, and problem solve implementation challenges by August 1, 2019.
5. If able to contract with existing outreach and engagement programs, develop contracts to include Intensive Case Management services by October 1, 2019. If unable to contact with existing programs, RFP will be posted by October 1, 2019.
6. Identify existing regional/community workgroups to identify referral pathways, communicate information and problem solve implementation challenges by October 1, 2019.  Communication with these workgroups will continue beyond October 1, 2019.
7. Contractors need to hire staff to include at least one peer support person no later than January 1, 2020. If RFP is required this date will need to be extended.
8. HCA will conduct specialized training for staff hired within all three regions by the end of February 2020. Training will focus on effective outreach and engagement strategies.
9. Complete initial testing and evaluation of modelling for effectiveness by October 1, 2020.

## 11 Education & Training – Crisis Intervention Training (CIT)

### 11.1    Assigned Owner
The Criminal Justice Training Center (CJTC) is responsible for conducting CIT training for law enforcement entities.

### 11.2    Statewide vs. Regional
The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

### 11.3    Requirements from the Agreement
a. The State will seek funding so that the CJTC provides the 40-hour enhanced Crisis Intervention Training (CIT) courses to 25 percent of officers on patrol duty in law enforcement agencies within the phased regions.
b. The State will seek funding so that the CJTC provides all corrections officers and 911 dispatchers employed by governmental entities within each phased region, except those employed by the Department of Corrections or federal entities, at least eight (8) hours of CIT.

## 11.4    Education and Outreach

Law enforcement agencies are already familiar with Crisis Intervention Team (CIT) training. The CJTC will contact agencies in Phase 1 areas to provide education on additional training opportunities, funding and the goal to send 25 percent of patrol officers to the enhanced CIT training.  The 40-hour Enhanced CIT training is regionally specific and includes local resources, contacts and procedures for dealing with individuals in a behavioral or substance abuse emergency.  We will meet with police chiefs, sheriffs and agency training managers to assist with coordinating training, budget and staffing needs for this settlement.

The CJTC has already reached out to the training unit of the state office of 911 telecommunications about how the settlement agreement will impact 911 training during the coming fiscal year.

County and local jail personnel need to complete at least 8 hours of CIT training as well. The 8-hour course focuses on signs, symptoms, and intervention strategies related to behavioral emergencies that they are most likely to come into contact with.

## 11.5    Action Plan and Timeline

Completed:

1. Contacted Law Enforcement Agency administrators in the Phase One areas by February 1, 2019.
2. Contacted state 911 training unit to plan FY 2020 trainings by April 1, 2019.
3. Contacted county and local jail administrators in Phase 1 regions by June 1, 2019.

Pending:

4. Finalize training deployment plan for each of the three regions in Phase 1 by July 10, 2019.
5. Review training deployment plan and evaluate staffing needs by December 1, 2019.
6. Conduct and complete a training audit of every LE agency in the Phase 1 regions by December 1, 2019.
7. Complete a minimum of 14 CIT for Dispatch/911 courses by June 30, 2021.
8. Complete a minimum of nine 40-hour enhanced CIT courses in the Phase 1 regions by June 30, 2021.
9. Complete a minimum of 24 CIT for Corrections courses by June 30, 2021.

# 12 Education & Training – Technical Assistance for Jails

## 12.1    Assigned Owner

The Department of Social and Health Services, Behavioral Health Administration, Office of Forensic Mental Health Services, is responsible for providing technical assistance to jails as part of the Trueblood agreement.

## 12.2    Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 12.3    Requirements from the Agreement

a. The state will seek funding for positions to provide educational and technical assistance to jails.

**Declaration of Nicholas Williamson**
**Attachment A - Page 25 of 30**

b.  The state will include the involvement of peer support specialists in providing this educational and technical assistance.
c.  The state works with Disability Rights Washington, law enforcement agencies, and peer support specialists to develop guidance on mutually agreeable best practices for diversion and stabilization and produced a manual.  This manual addressed:
- Pre- and post-booking diversion, identification of need and access to treatment, guidelines for involuntary medication administration, continuity of care, use of segregation, and release planning.
d.  In Phase 1, OFMHS will conduct a combination of on-site and tele video trainings for jails. DSHS will provide a website for jails that includes resources and a mailbox that jail staff can use to submit questions.

## 12.4    Education and Outreach

OFMHS team leads will solicit and approve workgroup membership from jails. As part of this work, the workgroup will develop a communications plan to inform the jails (and other stakeholders) of the status and availability of training and technical assistance materials.

## 12.5    Action Plan and Timeline

Completed:

1.  Updated existing position description forms for two technical assistance positions by June 1, 2019.
2.  Submit to human resources required documentation (request to hire/personnel action requests, updated organization charts, etc.) by June 15, 2019.

Pending:

3.  Advertise the established positions by August 1, 2019.
4.  Complete recruitment activities including screening, interviewing, and job offers by August 31, 2019.
5.  Hire and onboard new employees by September 30, 2019.
6.  By December 31, 2019, begin work with HCA to develop a plan to integrate peer support specialists into technical assistance.
7.  Convene first workgroup by November 1, 2019.
    a.  Conduct work groups with Washington's Designated Protection and Advocacy Agency and law enforcement entities to develop guidance on mutually agreeable best practices for diversion and stabilization of class members.
    b.  Ensure HCA membership includes subject matter expert on peer support specialists.
8.  Meet monthly, or as needed, to complete work on training manual and website.
9.  Develop and conduct training needs assessments as part of the manual completion on best practices by November 1, 2019.
10. Training manual and website completed, trained on, and running by June 1, 2020.
    a.  The peer support specialist enhancement curriculum will be reviewed as part of this process to ensure any and all technical assistance areas are addressed sufficiently.
11. As applicable trainings are finalized they will be made available, with all applicable trainings available beginning July 1, 2020.

# 13 Enhanced Peer Support

## 13.1    Assigned Owner

The Health Care Authority (HCA) is responsible for Peer Support Programs in the State of Washington.

## 13.2    Statewide vs. Regional

The state will implement this element of the settlement in selected regions in phases according to the plan outlined in the agreement.

## 13.3    Requirements from the Agreement

a.  The state will create a peer counselor continuing education enhancement program for certified peer counselors that includes specialized training in criminal justice.
b.  The state will provide ongoing training for these peer support specialists and targets the training and support to assist in establishing these positions in the programs outlined in the settlement agreement.
c.  These enhanced peer support specialists are integrated into the following programs:
    • Technical assistance to jails.
    • Intensive case management for high utilizers.
    • Community outpatient competency restoration.
    • HARPS program.
d.  The state will explore the possibility of federal funding for peer support specialists to encourage wider use of this role.

## 13.4    Education and Outreach

Outreach and education will focus on providing information about enhanced CPC roles and activities. The Enhanced Peer Supports Program Administrator will work in partnership with the regions and other Trueblood implementation teams to develop a FAQ, Factsheet, DBHR peer support webpage, Office of Consumer Partnership (OCP) distribution list, recorded webinars, and other communication materials as needed.

For each region, the following entities will require written education and outreach materials, webinars and regional presentations:
• Discussions on operationalizing enhanced certified peer counselors will occur with the technical assistance to jails, intensive case management, and community outpatient competency restoration teams.
• HARPS program
• Inform the peer community, stakeholders, jails, forensic navigators etc. about enhanced CPCs' roles and activities.
• WASPC.
• BHAs/BHASOs/MCOs.
• Other groups as needed and identified during initial outreach and education.

## 13.5    Action Plan and Timeline

1.  Hire 1 staff (Program Administrator) by September 1, 2019.

   a. Develop position description.
   b. Recruitment.
   c. Interviewing.
   d. Candidate selection/background check/ reference check.
   e. Candidate accepts and or repost.
2. Meet with partners (OFMHS, providers, etc.) to develop processes, education campaign, and associated documentation and forms to use by November 1, 2019.
   a. Environmental scan and key informant interviews.
   b. Integrate training components specific to serving individuals with prior criminal justice system contact.
3. Develop Curriculum by March 1, 2020.
   a. Train the trainers with new curriculum.
4. Implement and roll out trainings by May 1, 2020.
   a. Foundational enhancement training.
   b. Ongoing continuing education.
   c. Operationalizing enhanced peer support to host organizations.

# 14 Workforce Development

## 14.1 Assigned Owner

The Department of Social and Health Services is responsible for providing workforce development for DSHS staff and providing limited training resources to the forensic mental health community.  HCA will be responsible for developing the enhancement curriculum for the certified peer counselors.

## 14.2 Statewide vs. Regional

Workforce development evaluation and support will be implemented as part of the statewide effort.

## 14.3 Requirements from the Agreement

   a. Hire or contract workforce development specialists assigned to the functional areas of community, inpatient, and law enforcement.  Duties include:
      I. Participate in workgroups
      II. Conduct training needs survey/gap analysis
      III. Develop master training plan(s)
      IV. Develop and coordinate training including standardized manuals and guidelines
      V. Collaborate with community-based organizational workforce development staff
      VI. Evaluate training programs
   b. Prepare an annual report on a. above that includes recommendations about specific workforce development steps needed to ensure success of the Trueblood agreement.  Distribute the report to Executive Committee, key and interested legislators.
   c. Assess the need for and appropriate target areas of training, certification and possible degree programs. Include:
      I. Existing training, certification, and degree programs in WA for relevant professions
      II. Programs for relevant professions in other states
      III. Statewide staffing needs for all programs covered by this agreement for a period of ten years

d.  Prepare a one-time report on c. above that is distributed to the appropriate legislative committees and includes:
    I.  High, medium, and low cost recommendations
    II.  Long, medium, and short-term recommendations for future actions regarding training and certification programs

## 14.4    Education and Outreach

Work with workgroup membership from various stakeholder groups to identify best communication pathways.  Wherever possible, make recommendation reports public.

## 14.5    Action Plan and Timeline

Completed:

1.  Updated existing position description forms for remaining Workforce Development position by June 1, 2019.
2.  Submitted required documentation to human resources (request to hire/personnel action requests, updated organization charts, etc.) by June 15, 2019.

Pending:

3.  Advertise the established positions by August 1, 2019.
4.  Complete recruitment activities including screening, interviewing, and job offers by August 31, 2019.
5.  Hire and onboard new employees by September 30, 2019.  Onboarding will include orientation to the Trueblood Settlement Agreement and how their role is necessary to carrying out the objectives of the Agreement.
6.  Begin organizing and conduct the first stakeholder workgroup meeting in each functional area by November 1, 2019.
7.  Develop surveys to assess training needs in the identified functional areas by February 1, 2020.
8.  Send surveys by February 15, 2020.
9.  Evaluate survey results and develop training plans including requirements by May 1, 2020.
10.  Develop training materials which can include guidebooks, presentations, etc. by June 1, 2020.
11.  Deliver trainings through Phase 1 regions and complete by June 30, 2021.

**Jail Training Needs Assessment Survey**

In October 2018, DSHS developed and conducted a state-wide county jail training needs assessment survey.  The survey included categories of training needs including psychiatric crisis de-escalation, general mental health awareness (for the jail setting), suicide risk assessment, management, and prevention, early admission (to state hospital) referral process, videoconferencing capabilities (for forensic evaluation services), competency restoration process, medication/involuntary medications.  A total of eight jails responded to the survey.  All jails indicated training needs in the aforementioned areas.  The survey also provided information on training delivery preferences, including in-person and webinars.

**Triage Training**

In November of 2018, DSHS developed a webinar training for the Triage System.  This training is presently under review and planned to be scheduled in the first half of 2019.

# In Closing

The purpose of this Final Implementation Plan is to lay the foundation for implementation and overall planning. Because the plan sets out ambitious timelines, and because many of the elements of the plan embody new systems and programs never before used in the State of Washington, the Parties expect to learn as implementation proceeds.  Any necessary changes or adjustments to the plans and timelines included in this document will be fully addressed with the committees created by the settlement agreement, as well as the Court.

**Declaration of Nicholas Williamson**
**Attachment A - Page 30 of 30**