The Honorable MARSHA J. PECHMAN

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

A.B., by and through her next friend
CASSIE CORDELL TRUEBLOOD, et al.,

                Plaintiffs,

    v.

WASHINGTON STATE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES,
et al.,

                Defendants.

NO. 2:14-cv-1178 MJP

THE DEPARTMENT'S RESPONSE
TO PLAINTIFF'S MOTION FOR
MATERIAL BREACH OF
CONTEMPT SETTLEMENT
AGREEMENT AND MOTION FOR
CIVIL CONTEMPT

## I.     INTRODUCTION

In 2018 the State, the Plaintiffs, and the Court charted a multi-phased course that would govern the State's efforts to reach compliance with an underlying permanent injunction, over many years. The fundamental bargain of this Contempt Settlement Agreement (Agreement) is that the State would focus its efforts "upstream" of class members, while forgoing the expansion and use of certain facilities like Yakima and Maple Lane. This path to compliance would be longer, and as such, would certainly leave the State in contempt for a longer period of time. Accordingly, the Agreement suspended contempt fines for inpatient services, and created an opportunity for the State to instead spend that money implementing diversion services and class member supports.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

1

1    The State is accomplishing what it promised through investment of hundreds of millions

2    of dollars, partnering with various stakeholders, and relentless efforts to implement the

3    requirements of the Agreement. Remarkably, and despite a global pandemic and its resulting

4    challenges, the State honored every one of these commitments during the first phase of the

5    agreement. Additional substantial investments continue to come online during Phase Two,

6    proceeding largely "on track." The recently planned Phase Three ambitiously plans to both

7    improve the programs already implemented and expand programs to new geographic regions.

8    Plaintiffs' motion conflates unfinished work with a breach of the commitments

9    made through the Agreement. The motion focuses on a novel problem – a recent flood of

10   civil conversion patients being court ordered into the Department's custody, and taking up room

11   that would otherwise serve forensic restoration patients, thus hindering the current efforts to

12   reduce wait times for restoration and inpatient evaluation. But Plaintiffs fail to give full credit to

13   the State's efforts to respond to this particular problem, fail to identify any reasonable solutions

14   that the State is refusing to pursue, and fail to appreciate the likelihood that massive investments

15   made by the State, both within the scope of this litigation and beyond it, will one day bear fruit.

16   The Plaintiffs, like the State, are understandably frustrated with delays and increased

17   wait times for competency restoration treatment. The State believes the current path, continuing

18   to honor its obligations under the Agreement, while also transforming behavioral healthcare

19   access and availability state-wide, is the best path forward. Plaintiffs offer no better path forward,

20   and instead boldly request disproportionate additional fines and entanglements, without any

21   recognition of the State's work thus far. Plaintiffs' motion should be denied accordingly.

22                              **II.    FACTS**

23   **A.    The State Has Implemented All of the Numerous Programs Required by the**
         **Contempt Settlement Agreement, of Which the Western State Hospital (WSH) Bed**
24       **Construction Was Only a Small Part**

25   The Settlement Agreement contains five "Substantive Elements," containing

26   commitments towards improvements in Competency Evaluation, Competency Restoration,

RESPONSE TO PLAINTIFF'S                                    2
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

Crisis Triage and Diversion, Education and Training, and Workforce Development, Dkt. No. 599-1, at 9– 36, all to be implemented in "phases." *Id.* at 9, 37. These five elements are further divided into sub-parts. Dkt. No. 599-1, at 9– 36. The commitment to build additional forensic bed capacity, to which Plaintiffs refer, is one of five sub-parts under the second Substantive Element, dedicated to Competency Restoration. Dkt. No. 599-1, at 20. The other sub-parts of *this* element describe commitments to seek legislative change, to create an outpatient competency restoration option, to establish new in-court diversion positions called forensic navigators, and to close available competency restoration bed space at the Yakima and Maple Lane competency restoration facilities. Dkt. No. 599-1, at 10-21.

### 1.        The State successfully implemented Phase One during a global pandemic

To further guide the establishment of these five substantive elements and all their sub-parts, the Settlement Agreement also directs the State to develop implementation plans, describing with more particularity how the State will fulfill the commitments made through the Settlement Agreement. Dkt. No. 599-1, at 45. The Final Implementation Plan for Phase One further divides the five primary "Substantive Elements" into fourteen distinct obligations, while also memorializing the Parties' mutual recognition of two primary challenges related to implementation. Dkt. No. 679-1, at 3. First, the "markedly ambitious timelines" contained within the plan, and second, that many of the commitments made "require the development of programs and services that have never existed in the state of Washington." *Id*. The commitment to build additional forensic beds is one of the Implementation Plan's fourteen distinct obligations.

During the course of Phase One, and allowing for only a few extensions of time from the Court on account of the severity of the early stages of the COVID-19 pandemic, the State honored every one of its commitments under the five Substantive Elements, including the requirement to build additional bed capacity. Dkt. No. 830-1, at 6 (May 2021 Joint Report reporting completion of bed construction); Dkt. No. 924-1 (September 2022 Joint Report, noting completion of the final Phase One commitments). A close review of each and every sub-part of

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

3

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

the fourteen distinct obligations, as embodied in the Phase One Implementation Plan, demonstrates that the majority of all required tasks were completed timely, if not ahead of schedule, except where the Department received a grant of additional time from the Court to complete. Declaration of Titus Butcher (Butcher Decl.) at 2.

### 2. Phase Two implementation is ongoing, and largely "on track"

Phase Two of the Agreement, focuses on implementation of these initiatives in King County, and is ongoing. Dkt. No. 599-1, at 37. The Final Implementation Plan for Phase Two details fifteen service components to be implemented, and was created with the benefit of hindsight from "Lessons Learned" during Phase One. Dkt. No. 838-1. Of these fifteen components, only one project, related to identifying partners for the creation of two sixteen-bed crisis stabilization facilities, is delayed. All other projects are completed, or "on-track," including outpatient competency restoration in King County, which began services on October 31, 2022 after a delay in identifying a suitable provider. Butcher Decl. at 3. Phase Two continues through June 30, 2023. Dkt. No. 599-1, at 37.

### 3. The Parties have jointly negotiated the Phase Three commitments for the period of 2023-2025

At the time of the Agreement in 2018, the scope of Phase Three was indeterminate, though the Agreement provided a process by which the Parties would recommend reinvestment in the Phase One and Two regions, expansion to new regions, or both. Dkt. No. 599-1, at 37. That process has since occurred, with the Parties negotiating at great length to come to terms on a proposed scope for future implementation efforts. Butcher Decl. at 3. As proposed, Phase Three will increase investments in the many *Trueblood* initiatives already in place in the Phase One and Two regions, and also recommend geographic expansion to two more regions: the Salish Region (Kitsap, Jefferson, and Clallam Counties) and the Thurston-Mason Region, with these efforts set to begin July 1, 2023, and conclude on June 30, 2025. Butcher Decl. Ex. C.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

4

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

**B.**    **Competency Service Demand Continues To Increase at Alarming Rates.**

Spiraling upward demand continues to be the primary factor behind long wait times.



As a Court-funded analysis concluded in 2018, these increases in court orders continue to outpace all other relevant factors, such as population growth, prevalence of mental illness and substance abuse, homelessness, and even arrests. Declaration of Dr. Thomas J. Kinlen (Kinlen Decl.) Exs. A-B. The State's own analysis reached the similar conclusions. Kinlen Decl. at 2. The State has continued to invest substantial resources in building beds, implementing diversion programs under the Agreement, and making massive investments in the larger behavioral health system—all detailed further below—but these investments have been outstripped by demand. Kinlen Decl. at 3.

**C.**    **The State Continues To Develop and Build New System-Wide Bed Capacity**

In an effort to achieve compliance with the permanent injunction, the State has deployed hundreds of new beds for class members, as well as for other populations that are court-ordered

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

5

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1  into State custody. By focusing on the forty-two beds at WSH, Plaintiffs' argument fails to

2  acknowledge all of the other capacity the State has opened to provide treatment.

| Project Name | Beds | Target Population | Projected Opening |
|---|---|---|---|
| *Past Openings* | | | |
| Yakima Competency Restoration Center RTF | 24 | Competency restoration | Opened 2016, closed at direction of Federal Court |
| Maple Lane Competency Restoration Center RTF | 30 | Competency restoration | Opened 2016 |
| Civil to forensic ward renovation at WSH | 30 | Competency restoration and evaluation patients | Opened 2018 |
| Fort Steilacoom Competency Restoration Center RTF | 30 | Competency restoration | Opened 2019 |
| ESH major construction and renovation project | 50 | Competency restoration and evaluation patients, overflow from WSH | Opened summer 2020 |
| Renovation of E3/E4 wards at WSH | 40 | Competency restoration and evaluation patients | Opened February 2021 |
| *Future Openings* | | | |
| Emergent Community Hospital Contracts | 50+ | Felony conversion patients | 1st Quarter, 2023 |
| New construction of F9 and F10 wards at WSH | 58 | Competency restoration and evaluation patients | February for F9 and March/April for F10,2023 |
| Maple Lane Oak Cottage | 16 | Felony conversion patients | February, 2023 |
| Maple Lane NGRI program | 30 | Not guilty by reason of insanity patients | Late 2023/early 2024 |
| Three Clark County facilities | 48 | Felony conversion patients | Late 2024/early 2025 |
| New forensic hospital | 350 | Competency restoration and evaluation, NGRI, and hard to place felony conversion patients | Construction commencing in 2023, completion estimated 2027-2029 |

20  Declaration of Kevin Bovenkamp (Bovenkamp Decl.) at 2. These bed projects are only those

21  most closely linked to *Trueblood* class members, because they either created treatment space

22  beds, or make more beds available by transferring other patient populations out of beds that can

23  then serve class members. WSH has also converted other physical space at its civil center to

24  increase bed capacity, including repurposing treatment spaces on C9 into ward space and

25  increasing the census of small specialty wards into a full-census treatment wards on C1 and C4.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

6

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

Bovenkamp Decl. at 7-8. These actions are creating an additional fifty to sixty beds of civil capacity beyond the projects listed above. *Id.*

The State, through funding appropriated to the Department of Commerce, also continues to develop numerous facilities that will improve the greater behavioral health system, and to provide new facilities that can serve existing state hospital patients, and patients who could otherwise be court-ordered to a state hospital. Since 2015, and parallel to the efforts previously reported to the Court, the Department of Commerce has provided over $193 million for the construction of over 1600 behavioral health beds of various types. Kinlen Decl. at 4.

Certain facilities among these, like the intensive behavioral health facilities, are specially designed for treating patients that would otherwise need state hospital level of care. Declaration of Teesha Kirschbaum (Kirschbaum Decl.) at 3. Outside the scope of the specific investments within Phase One and Two of the *Trueblood* Agreement, the State has invested over $1.7 billion into the larger community mental health system during just the 19-21 and 21-23 biennia. Kirschbaum Decl. at 3, Ex. A (showing a breakdown of this funding). In 2022, the Legislature appropriated more than $520 million in *additional* funding for Washington's housing and homeless system, Dkt. No. 907-1, at 9-10. The State also provided funding for a seven percent Medicaid provider rate increase that took effect in January 2023[1], and the 2022 supplemental budget also included over $100 million in workforce funding designed to stabilize the behavioral health workforce.[2] The Governor's current proposed budget for 2023-2025 includes a request for a bond-supported $4 billion budget for housing and behavioral health capital investments, and hundreds of millions of dollars in additional behavioral health funding, including an additional seven percent Medicaid provider rate increase to address workforce ($208.2 million), crisis services investments ($101.4 million), and more.[3] Included in these

---

[1] https://www.hca.wa.gov/about-hca/news/announcements/hca-increases-managed-care-behavioral-health-rates
[2] https://www.hca.wa.gov/about-hca/news/news-release/hca-sends-provider-relief-workforce-stabilization-funds-behavioral-health-treatment-agencies
[3] https://ofm.wa.gov/sites/default/files/public/budget/statebudget/highlights/budget23/202325PolicyBudgetHighlights.pdf, at 45, 28-29.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

7

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

investments are the development of 520 long term community civil beds. Kirschbaum Decl. at 3, Exs. B- C. These community long-term beds are designed to replace civil capacity that will close at the state hospitals. Kirschbaum Decl. at 3. Since 2018, the State has already contracted for almost 200 of these beds in facilities across Washington. *Id.* The Intensive Behavioral Health Facilities are opening right now, with fifteen beds having already opened and a total of 111 to be opened throughout 2023. *Id.* Further, state hospital patients are already being discharged to these facilities, and plans are underway to transition state hospital patients that have been previously difficult to place. *Id.*

Similar to the commitment under the Agreement to open crisis triage facilities in Phase One and Two regions, the State has also funded ten additional crisis triage facilities to be built around Washington State, above and beyond the requirements and commitments of the Agreement. Kirschbaum Decl. at 4, Ex. D. The State has also embarked upon major investments in the mobile crisis and crisis response systems and housing support. *Id*. At 4, Ex E. While this demonstrates that large scale investment the State is making in adding treatment capacity to the behavioral health system, even this is not a complete description of the full scale of the investments being made by the State to address behavioral health, housing, and homelessness. *Id*. at 4; Kinlen Decl. at 4.

**D.    Felony Conversion Civil Patients Are Class Members Who Become Conversion Cases Upon Dismissal of Their Criminal Charges**

"Felony conversions" or "felony flips" are persons whose felony criminal charges have been dismissed for reasons of incompetency, and where the criminal court then decides to "order the defendant to be committed to a state hospital . . . for the purpose of filing a civil commitment petition under chapter 71.05 RCW." Wash. Rev. Code § 10.77.086(5). This statute mandates state hospitals to accept these patients, with no statutory discretion for alternate placements. *Id*. Only those patients facing a felony charge may be ordered to a state hospital. *Id*. Misdemeanors are instead directed to evaluation and detention within the local civil commitment systems in

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

8

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

each region. Wash. Rev. Code § 10.77.088(5). Any felony charge is eligible for such an order, and the Department receives patients who have very serious charges dismissed, such as murder, sexual violence perpetrated against children, sexual assaults, and serious physical violence. Bovenkamp Decl. at 3. Historically, the Department has also received less serious felonies through this process, such as malicious mischief and theft, for example. *Id*. The civil commitment hearing for these patients includes a factual question as to whether the individual "committed acts constituting a felony," Wash. Rev. Code § 71.05.280(3), meaning that the underlying criminal conduct is an issue to be proven by admissible evidence at the civil commitment hearings.

For many of these cases, the criminal court enters the dismissal while the class member remains at the state hospital for restoration treatment, without the patient ever leaving the treatment bed they are in. It is not uncommon for a patient to start the day as a class member undergoing restoration treatment, but end the day as a civil conversion patient.



Bovenkamp Decl. at 3. The number of former class members who have been court-ordered into state hospitals as conversion cases has risen dramatically in the last several years. *Id*. This places even more demand on the state hospital system. *Id*. Unlike restoration cases, which have strict time limits on how long a patient can be committed to a state the hospital, conversion cases are subject to extended commitment under Wash. Rev. Code 71.05 until they can be safely

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

9

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1  discharged to the community, and have a much higher average length of stay, often a year or

2  longer. *Id.*

3  **E.    The Department Does Not Control Felony Conversions Court Orders, and Is**
       **Mandated by Law and Court Order to Accept These Patients**

4

5        Felony conversion patients are directed specifically to the state hospitals

6  under current law, unlike other commitments who go into the custody of the Department.

7  Wash. Rev. Code § 10.77.086(5). With no discretion for the Department under this statute, the

8  Department has been explaining to criminal courts and parties the link between conversion

9  admissions and the deteriorating competency wait times, but court orders have only increased.

10 Bovenkamp Decl. at 3. To the extent that the state hospital has, when no other choice is possible,

11 attempted to decline felony conversion admissions and encourage diversion into other care

12 systems, the Department has received strong push back and has even been court-ordered to

13 continue to accept such patients. For example, following notice to system partners that not all

14 conversion cases could be admitted under current circumstances, Bovenkamp Decl. Ex. A,

15 notification was sent to King County regarding the Department's inability to admit a conversion

16 case resulting from a felony harassment charge, and encouraging referral to a local designated

17 crisis responder. *Id.* at 4-5, Exs. B-C. The Superior Court then entered an order directing the

18 Department to admit that conversion, and made findings that the court's orders "do not provide

19 authorization for DSHS and WSH to decline to admit." *Id.* at 4-5, Ex. D. The King County

20 Executive's Office then followed up with a letter demanding admission of that patient, and

21 others. *Id.* at 4-5, Ex. E. Because the Department had already filled those beds by other serious

22 cases, including a class member facing a Murder 1 charge, the Department was still unable admit.

23 *Id.* at 4-5, Ex. F. More litigation is expected. *Id.* at 4-5

24 **F.    The Felony Conversion Challenge Raised by the Plaintiffs Is a Recent Development**

25       Ensuring that felony conversion patients are regularly transitioned to the civil side of the

26 hospitals has always been part of managing beds at the state hospitals. Bovenkamp Decl. at 5.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP                    10              ATTORNEY GENERAL OF WASHINGTON
                                                        7141 Cleanwater Dr SW
                                                        PO Box 40124
                                                        Olympia, WA 98504-0124
                                                        (360) 586-6565

The hospitals have been largely successful in limiting the presence of these conversion patients in beds that could otherwise serve class members. *Id*. As Plaintiffs point out, as of December 2021, thirteen months ago, the number of felony conversion cases at WSH who were in forensic beds was as low as sixteen patients. Dkt. No. 938, at 7. This was the result of concerted efforts, including a policy change that increased transfers before a patient had their Wash. Rev. Code 71.05 civil commitment hearing. Bovenkamp Decl. at 5.

In spite of these efforts, this status quo began to change over the last ten to twelve months, with the number of conversion patients in forensic beds growing from sixteen patients to 136 patients in September, and over 160 in December 2022. Dkt. No. 938, at 4 (Plaintiffs stating this patient population "has increased dramatically over the past year"). Several factors have combined over the last 10 months to create this issue, including the Omicron wave, the transition of long-term bed capacity into the community, and the dramatic rise in the number of conversion court orders.

The Omicron wave of COVID-19 dramatically impacted all Department treatment facilities, by creating long backlogs of patients awaiting admission, and slowing discharges. Bovenkamp Decl. at 5-7. During this same period the Department began preparing for the construction of the new forensic hospital on the WSH campus, which will provide 350 new forensic beds for class members. In order to build the new hospital it is necessary to demolish certain older buildings on campus to make room while also preserving other units like the recently renovated Fort Steilacoom Competency Restoration Treatment Center in Building 27[4]. *Id*. This demolition will result in the closure of approximately 180 long-term civil beds on the WSH campus, though these beds are replaced in the system by the almost 200 contracted long-term community civil beds already in place, and the 520 total that will be opened by 2025. Kirschbaum Decl. at 3. Because the of dramatic increase in felony conversion patients ordered

---

[4] This is the Building 27 treatment space renovated using contempt fines, and currently providing restoration treatment to class members, preserving it is preferable to the antiquated space being demolished.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

11

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

to the state hospitals by state superior courts, however, on top of the class member backlog created by Omicron, the Department was left with an increasing number of felony conversion cases in beds that it had intended to serve class members. Further, and because conversion cases occupy beds for much longer periods of time, this situation is leading to an increase in wait time for class members. This is not the outcome the Department planned or intended, and the Department is taking action to adjust its plans to account for this relatively recent flood of conversion demand.

**G.      The State Is Securing Emergent Bed Capacity for Conversion Patients, and Triaging Admissions into Limited Beds**

As the number of felony conversion court orders climbed to over 670 orders in 2022, and the number of conversion patients in forensic beds grew from sixteen in December 2021 to over 160 in December 2022, the Department has reacted by developing new plans to respond to the challenge. In addition to already existing plans for developing long-term civil treatment beds and facilities, the State is taking immediate action to create additional bed space on an emergent basis, rather than waiting for its longer term plans to be realized. Bovenkamp Decl. at 8-9.

First, the Department began identifying opportunities at WSH to increase civil treatment beds to mitigate the necessary closure resulting from demolition. *Id*. at 8. This resulted in the conversion of the treatment mall on C9 into a patient ward (a renovation project currently in progress), and the repurposing of small specialty units on C1 and C4 to normal treatment wards with a full patient census (completed in the fall of 2021). *Id*. These three projects combined, will result in fifty to sixty additional civil treatment beds. *Id*. The former civil commitment courtroom located within the WSH civil center, which cannot be used for housing patients, is being repurposed to make up for the treatment space lost as a result of the C9 conversion. *Id*.

Second, the Department and Health Care Authority (HCA) began engaging with community hospitals and treatment providers that could potentially serve the civil conversion population with existing beds. *Id*. They met with multiple hospitals across Washington State to

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

12

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1  identity psychiatric treatment space that could receive transfers from state hospitals. *Id*. This

2  effort included a direct appeal out to hospitals through the President and CEO of the Washington

3  State Hospital Association. *Id*., Ex. G. Through this effort, two projects were identified as viable

4  options. *Id*. at 8-9. Combined, the two projects are estimated to provide up to fifty treatment

5  beds. *Id*. These two projects are in established psychiatric hospitals that already provide care to

6  patients, and the State has an agreement in principle with these two facilities. *Id*. Further, and in

7  order to shorten timeframes associated with contracting and procurement law, the Department

8  and HCA are partnering on this project, with HCA to leverage contracts already in place with

9  these two hospitals. Kirschbaum Decl. at 5. The Department has finalized a transfer criteria and

10 transfer process that can be used as soon as beds become available. Bovenkamp Decl. at 9. The

11 Department and HCA are moving expeditiously to complete these projects. *Id*. Transferring up

12 to fifty civil patients out of WSH will allow the Department to admit more class members for

13 restoration and evaluation. *Id*.

14         Third, the Department has continued aggressive discharge planning efforts to ensure that

15 civil patients are being discharged from the state hospital whenever that can accomplished safely.

16 In the 2017-2019 biennium, ending July 1, 2019, the Aging and Long Term Support

17 Administration (ALTSA) assisted in transitioning 579 civil patients out of state hospitals into

18 community settings. Declaration of Bea Rector (Rector Decl.) Ex. A. Since July 1, 2019, through

19 August 31, 2021, an additional 632 patients were transitioned out of state hospitals. *Id*. An

20 additional 340 patients were transitioned to other care settings in 2022. Rector Decl. at 1. Data

21 kept by the Department shows how many civil conversion patients were among these transitions,

22 and also shows additional discharges may not have involved ALTSA. Kinlen Decl. Ex. F.

23         However, the civil population of WSH has greatly changed in recent years. Seventy-five

24 percent of the population is now made up entirely of felony conversion patients who were

25 admitted from the criminal justice system, instead of civil patients arriving purely under

26 Wash. Rev. Code 71.05 civil commitments. Bovenkamp Decl. at 10. While the State continues to

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

13

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

aggressively discharge civil patients, the discharges are now more complex than ever because of the level of acuity and criminal history of the civil patient population. *Id.* To the extent discharges could be done differently or more expeditiously, the State and Disability Rights Washington have entered into an agreement governing changes to the state hospital discharges. *Id.* Ex. H.

Fourth, the state hospitals have been reviewing patient acuity and room assignments to ensure that double rooms in the civil centers are utilized whenever possible. Bovenkamp Decl. at 9-10. Acutely ill or violent patients often must be roomed alone, sometimes in a room that could otherwise house two patients. *Id.* To co-house this population invokes risk of serious consequences—recently an NGRI is alleged to have murdered his roommate at the state hospital. *Id.* But, and with careful considerations towards patient safety and compatibility in mind, the Department is carefully evaluating more patients for fully using double rooms, to find further bed space, where safely possible. *Id.*

Fifth, wherever possible, the Department has delayed ward closures in order to lessen impacts and better match those closures up to the opening of the long-term civil capacity. *Id.* Those delays also bring the State closer to the opening of new projects on the Maple Lane campus, and other projects throughout the state. *Id.* To date, the Department has been able to delay two ward closures, providing more than three additional months of operation as a result. *Id.* A third closure is being delayed from March 2023 until June 2023.

Sixth, the Department developed a protocol for its Residential Treatment Facilities (RTFs) to periodically reassess patients for suitability for outpatient competency restoration treatment, for subsequent treatment orders. Bovenkamp Decl. at 9-10. Though no such transfers have yet to occur, this process has identified several suitable candidates for such transfer, each of whom improved to the level of being found competent before any such transfer could occur. *Id.* The Department is making adjustments to this process to identify more patients that could be eligible earlier in the restoration period, and making plans to expand this program to WSH. *Id.*

Finally, in order to identify every possible treatment option that could lead to

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

14

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

compliance and mitigate harm to class members, the Department has engaged with the South Correctional Entity facility (SCORE) on a possible project. This facility has flexibility for single, double and dorm style occupancy and, while it is a jail, the environment can be modified to provide for a more therapeutic environment. The Department has, so far, considered this as a place to create a triage and stabilization center, meaning that class members would have access to better services such as a prescriber and other clinical professionals. Patients could be better assessed as candidates for RTFs or OCRP, be better positioned for short and speedy restoration treatment at other facilities, and, most importantly, the Department could mitigate some of the harms that class members experience when they don't receive proper care in county and municipal jails. Plaintiffs, however, have told the Department they are strongly opposed to the use of this space for a class member program.

**H.     The COVID-19 Omicron Wave Created a Large Backlog of Patients Waiting for Admission and Continues To Have Impacts Under the "New Normal"**

As previously reported to the Court, COVID-19 has complicated efforts to be responsive to the challenges associated with admitting class members. Dkt. No. 924-1, at 1; Dkt. No. 907-1, at 1-3; Dkt. No. 880-1, at 1-3; Dkt. No. 855-1, at 1-3. While the Department continues to implement Department of Health and CDC approved strategies that effectively mitigate infections and the spread of the disease within treatment facilities, the impacts of this disease are a "new normal" that did not exist prior to the pandemic. The number of defendants waiting for admission grew rapidly during the Omicron wave, and the Department has not yet been able to catch up.

Prior to Omicron, the Department was making positive progress on admission wait times. The summer of 2021 saw the number of class members waiting in jail drop to historical lows, with wait times improving and suspended fine amounts dropping to the lowest amounts in years. Dkt. Nos. 829, 833, 841. Unfortunately, the factors described above combined to create a new

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

15

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

challenge in the State's efforts to lower wait times, but a challenge that the State is reacting to by appropriately adjusting its plans.

### III.    ARGUMENT

Plaintiffs' motion should be denied because the State has substantially complied with the Agreement, and is not in contempt beyond the contempt that was contemplated by the Agreement itself. Even though the ultimate goal is not yet achieved, the State has taken all reasonable steps to implement the Agreement and continued other efforts to achieve compliance. The Court should decline Plaintiffs' invitation to throw these efforts into chaos, and allow the State's plans to proceed.

**A.    The State Has Not Materially Breached the Agreement**

    **1.    The controlling language of the Agreement requires consideration of the State's efforts to successfully implement all aspects of the Agreement**

Because of the "scope and breadth" of the Agreement, the Court and the Parties agreed that "a material breach of a particular element does not necessarily constitute material breach of the entire Agreement, unless otherwise specified." Dkt. No. 599-1, at 48. Any material breach analysis must not focus exclusively on any one part of the Agreement, but rather on the State's efforts towards the myriad requirements under the whole of the vast Agreement, including the hundreds of distinct actions and commitments contained within the Agreement and its related Implementation Plans.

The language of the Agreement controls the analysis of the State's compliance:

> Given the scope and breadth of this Agreement, the Parties agree that a material breach of a particular element does not necessarily constitute material breach of the entire Agreement, unless otherwise specified herein. For purposes of this Agreement, and unless otherwise specified herein, "material breach" is defined as a failure to be in "substantial compliance" with the Agreement, and substantial compliance means something less than strict and literal compliance with every provision of this Agreement. Rather, deviations from the terms of the Agreement may occur, provided any such deviations are unintentional and minor, so as not to substantially defeat the object which the Parties intend to accomplish, or to impair the structure of the Agreement as a whole.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

16

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1   Dkt. No. 599-1, at 48-49. Plaintiffs cite to case law and the Restatement 2d of Contracts,

2   Dkt. No. 938, at 9, 11, but because the language of the Agreement itself sets forth a standard,

3   that standard should be applied. The Court does not need to resort to external case law or other

4   resources in interpreting terms such as material breach and substantial compliance because they

5   are terms defined in the Agreement. Dkt. No. 599-1, at 48.

### 2. Plaintiffs' material breach argument confuses compliance with the Agreement with compliance with the injunction

8       Non-compliance with the injunction for a longer period of time was contemplated by the

9   Contempt Settlement Agreement, and cannot be a basis for a finding of breach of the same

10  Agreement. While it is true the Agreement is intended to bring the State into compliance,

11  Dkt. No. 599-1, at 3, Plaintiffs ask for a breach finding on this basis well before the initial phases

12  of the Agreement have been completed. The Agreement contemplated at least three initial phases

13  over six years, and the State is still implementing Phase Two, having just passed the half-way

14  mark of the initial three phases. The Agreement also contemplates additional phases after the

15  initial three, with the commitment essentially being indefinite in nature until compliance with

16  the injunction is achieved. Dkt. No. 599-1, at 37 ("The Parties have agreed to at least three

17  phases" and "This process shall continue until the termination of this Agreement."). Phase Three

18  is also a critically important one because it includes modifications to the programs implemented

19  in the first two phases in order to increase their effectiveness. Plaintiffs, having designed and

20  agreed to a long-term Agreement process that focuses on a slower route towards ultimate

21  compliance with the injunction, have prematurely alleged that the State has breached the

22  Agreement based on the non-compliance with the injunction. This argument should be rejected.

### 3. The State's efforts demonstrate that the State has achieved substantial compliance with Agreement, not a material breach

25      The substantial compliance definition within the Agreement demonstrates that an

26  argument directed toward the single requirement in § III(B)(4) must fail because the State's

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

17

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1   efforts must be considered as a whole—especially in light of the fact that Plaintiffs concede the

2   State did, in fact, construct and open the required beds between WSH and ESH. Dkt. No. 938,

3   at 9. Because Plaintiffs cannot argue that the State violated the express terms of the Agreement,

4   their theory of material breach argument instead resorts to the spirit and goals of the Agreement.

5   In doing so, Plaintiffs focus exclusively on the current civil conversion population—a topic not

6   contemplated at all by the Agreement—and exclude any discussion of the State's numerous

7   accomplishments which were actually required by the Agreement.

8        As required by the Agreement, the State developed implementation plans for each phase

9   of the agreement. Each of these implementation plans were thoroughly negotiated with Plaintiffs,

10  and then the Parties jointly submitted the plans to the Court Monitor and the Court as agreed

11  plans. The State was then obligated under the terms of the Agreement to comply with each and

12  every requirement of those plans, including the hundreds of "milestone tasks" that were set forth

13  in the plans. Dkt. 599-1, at 46. The Final Implementation Plan for Phase One, Dkt. No. 679-1,

14  set forth 137 discrete milestone tasks[5] that the State was obliged to accomplish—and the State

15  achieved all 137 tasks. Butcher Decl. at 2. The Final Implementation Plan for Phase Two of the

16  Agreement, Dkt. No. 838-1, contains ninety-one milestone tasks[6]. Butcher Decl. at 2. While

17  implementation of Phase Two is ongoing through June 30, 2023, to date, the State has completed

18  seventy-three of the ninety-one milestone tasks. *Id*.

19       In sum, the State has accomplished 204 of the 208 tasks due to date, and it has done so

20  during the course of a global pandemic, during a period of massive supply chain disruptions,

21  during a nation-wide staffing crisis, and during a time of increasing costs. The State has

22  performed these tasks because, like the Plaintiffs, it has a good faith belief that taking these steps

23  will accomplish the goals of diverting future class members from the criminal justice system,

24

25       [5] Three of the tasks were voided during Phase One taking the total number of tasks from 140 to 137.
     Butcher Decl. at 2.

26       [6] Two of the tasks have been voided during Phase Two taking the total number of tasks from ninety-three
     to ninety-one. Butcher Decl. at 2.

RESPONSE TO PLAINTIFF'S                           18          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR MATERIAL BREACH                                          7141 Cleanwater Dr SW
AND CIVIL CONTEMPT                                                       PO Box 40124
NO. 2:14-cv-1178 MJP                                              Olympia, WA 98504-0124
                                                                      (360) 586-6565

and by decreasing demand will help the State to provide constitutionally timely services to class members.

> **4.     Even considering the language of § III(a)(4) in isolation, the Department is meeting and exceeding its obligations under the Agreement not materially breached that obligations**

The obligation at the core of Plaintiffs argument is this one:

> a.     The State will open additional forensic beds at Western State Hospital and Eastern State Hospital, pursuant to existing funding authorized in the 2018 capital budget. The projected availability of additional forensic beds is as follows:
>
> > (1)     Develop two forensic wards at Eastern State Hospital by December 31,     2019 (25 beds each for total of 50 beds)
> >
> > (2)     Convert two Western State Hospital civil geriatric wards to two forensic         wards by December 31, 2019 (21 beds each for a total of 42 beds).

Dkt. No. 599-1, at 20. Plaintiffs argument in support of breach immediately resorts to the "purpose" of the Agreement because Plaintiffs cannot demonstrate that the Department failed to open the bed space contemplated under the Agreement. This obligation was completed in 2021, and that completion was jointly reported to the Court. Dkt. No. 830-1, at 6.

The Department has actually gone further than what was required by the Agreement. The Department sought and received funding to build two more forensic wards, from the ground up. These two wards, F9 and F10, have been under construction for several years and will open on the WSH campus in the coming months. Bovenkamp Decl. at 2. This additional bed capacity, which the Department will use to admit class members for competency services, will provide an additional fifty-eight beds in addition to the forty-two beds contemplated under the Agreement in § III(a)(4).

Plaintiffs' argument also presumes a requirement into the Agreement that is not present: that specific beds be used for specific patients for some period of time. While the State agrees with the goal of using these beds to provide services to class members—and is making plans to

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

19

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

adjust to the evolving circumstances that have made that difficult—the Court should consider whether there is a clear and express requirement under the Agreement that is being violated. The Parties knew how to implement such a clear restriction, as evidenced by the requirement that was included in the precursor agreement that led to the Building 27 project:

> For three years following approval of this Agreement by the Court, the Department agrees to use the Building 27 space as intended in this Agreement, and during that time the Department shall seek leave of the Court if it wishes to use the Building 27 space for a purpose other than that intended by the Agreement.

Dkt. No. 535-1, at 2. No such language or requirement was included in the Agreement. Plaintiffs' attempt to argue a material breach on language that is not even present in the Agreement should fail accordingly.

Finally, while Plaintiffs claim that treating civil conversion patients in forensic beds violates the goal and intent of the Agreement, this argument does not account for the reality that many class members, occupying a forensic bed, become a civil conversion patient without ever leaving the hospital. Even if the Department had unlimited bed space, it would always take *some* amount of time to transfer the former class member from the forensic ward into a civil ward.

## B.   The State Should Not Be Held in Further Contempt When It Complied With the Terms of the Contempt Settlement Agreement

### 1.   The State is in compliance with the terms of the Agreement and, therefore, the Court should find an additional finding of contempt is not ripe

Plaintiffs' argument that the State should be found in contempt is confounding, when the essence of the Agreement is a plan for what the State is obligated to do *while the State remains in contempt of court*. Ongoing contempt of the Court's orders was presumed for the life of the entire Agreement; once the State reaches compliance with the permanent injunction and would no longer be in contempt of that injunction, the terms of the Agreement itself terminates any further obligation. Dkt. No. 599-1, at 49-50. The Parties entered into the Agreement in 2018 and that agreement was approved by the Court. Dkt. No. 623, at 2. In doing so, the Court made it clear what the State was obligated to do while the previously found contempt findings remained

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

20

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

in place: perform all obligations under the Agreement. *Id*. The State has never disavowed, repudiated, or otherwise refused to carry out any aspect of the Agreement. Further, because Phase Two of the Agreement is not complete until the end of June 2023, any motion for contempt on the basis of the Phase Two obligations would not yet be ripe under the terms of § V(A)(1)(a) of the Agreement. Dkt. No 599-1, at 47-48. The Court should conclude additional contempt is unwarranted considering that the Contempt Settlement Agreement mapped out what was expected of the State in the context of ongoing contempt.

> **2.** **The State has made all reasonable efforts by pursuing a systemic plan to address all populations and Plaintiffs fail to identify what other reasonable steps have not been taken, which means their argument should fail**

The State made reasonable plans that should have avoided the excessive presence of civil conversions in forensic beds, but a record number of referrals for both class members and conversion patients have frustrated this plan. The State is in the middle of a system-wide transformation of its behavioral health system. This plan includes moving long-term civil capacity off of the state hospital campuses, developing new types of community facilities, and opening new State facilities to treat specialized populations. The State has invested billions of dollars in this plan over a number of years, and the plans are still coming to fruition. Despite Plaintiffs arguments that the State created this crisis, Dkt. No. 938, at 21, the State's plans were designed to adequately provide capacity for various populations based on reasonable estimates of the size of those populations—until the record flood of demand grew to the point of outpacing the major initial investments across the entire system.

The construction preparations at WSH for the 350-bed forensic hospital will ultimately result in the closure of 180 long-term civil treatment beds this biennium. The State has funded the development of 520 long-term beds in the community, and almost 200 of those have already opened—more beds than will close on the WSH campus by the end of the biennium. To the extent that there are high-need populations that cannot be served in the types of beds that previously existed in the community, the State developed 111 beds at intensive behavioral health

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

21

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

facilities, and will also open long-term civil beds at state-run facilities like Oak Cottage at Maple Lane (sixteen beds) and the Clark County facility (forty-eight beds). The State has a plan to serve civil patients outside of the state hospitals, and it has already developed more long-term civil beds than will be closed this biennium—with hundreds more already coming. The State also continues major investments across other parts of the system to increase treatment capacity, and address issues of housing and homelessness. Dkt. No. 907-1, at 9-11 (June 2022 joint report detailing the State's additional investment in Washington's housing and homeless system of over $520 million).

But despite this new community capacity, the Department continues to see record levels of demand sent to the state hospitals: including class members and as civil conversion patients. Referrals for inpatient competency services have not yet declined in these regions—contrary to the design of the Agreement and the hopes of the Parties. While the Agreement has begun to show nascent positive impacts in the Phase One regions, including fewer referrals for competency evaluations and better engagement in mental health services, demand for inpatient services as not declined as the Parties planned. Dkt. No. 942-2, at 17-20. When demand spirals upward in unanticipated ways, and despite major investments being made in commensurate civil capacity, the result is a system that is out of balance: too many civil conversion patients on forensic wards resulting in longer wait times for all patients ordered to state hospitals.

Again, and recognizing that the plans are being frustrated by increasing demand, the State is reacting swiftly to adjust its plans by contracting for up to fifty additional beds and transferring patients who cannot yet be discharged directly into the community, in order to augment existing plans for Intensive Behavioral Health Facilities, Maple Lane, and eventually, Clark County—in addition to the fifty-eight beds in F9 and F10, and the thirty-bed NGRI facility at Maple Lane. The State's approach as it was designed years ago—and the adjustments currently being made to account for the spiraling increases in demand that occurred in 2022—represent reasonable

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

22

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1    steps towards compliance and a comprehensive approach to serving class members and all
2    patients ordered in the State's custody.

3         Plaintiffs' challenge to these plans is that more investments should be made in the
4    community. Dkt. No. 938, at 17. But, as detailed above, the State is already doing this by building
5    many more beds in the community than will close at the state hospitals, even if these investments
6    are not necessarily directly related to *Trueblood*. But even without this direct tie, the evidence
7    presented here shows that the State has been engaged in a multi-year concerted effort to build
8    other resources that are absolutely capable of benefitting class members, or potential
9    class members, by providing needed behavioral health care options for individuals well before
10   they deteriorate to the point of crisis and criminal justice involvement. The State is already doing
11   what Plaintiffs suggest; all of it and more.

12        Plaintiffs also argue that the State could have simply chose to not close civil wards at
13   the state hospital. But these closures will directly lead to a major investment of treatment space
14   for class members through construction of a 350-bed forensic hospital. Even though Disability
15   Rights Washington continues to oppose this project[7], the State's investment in a new 350-bed
16   hospital to provide services to class members represents a major investment in the future with
17   the Court's injunction.

18        Ultimately, Plaintiffs offer no credible ideas for bettering wait times for competency
19   restoration services for class members that the State has refused to pursue. To the extent Plaintiffs
20   point to perceived gaps in the work the State plans to do in the upcoming legislative session, it
21   is premature to judge the outcome of a session that just began a few days ago on January 9, 2023.
22   Plaintiffs have been kept abreast of the States actions through regular meetings, opportunity to
23   comment, negotiation, and the like, and so it cannot be said credibly that the State's behavior
24   has not been in good faith. The State has acted reasonably to improve wait times for class

25

26        [7]https://www.disabilityrightswa.org/publications/612-million-new-forensic-hospital-unjustified-by-washingtons-own-analysis/

RESPONSE TO PLAINTIFF'S                                    23          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR MATERIAL BREACH                                                   7141 Cleanwater Dr SW
AND CIVIL CONTEMPT                                                                PO Box 40124
NO. 2:14-cv-1178 MJP                                                         Olympia, WA 98504-0124
                                                                                  (360) 586-6565

members and improve the overall behavioral health system, even if a flood of demand has frustrated those plans, and is implementing plans to better serve class members and transform the entire system. These are not the actions of an entity who is seeking to breach the intent of the Settlement Agreement, as Plaintiffs claim.

**C.    The Relief Requested by Plaintiffs Would Imperil the Agreement, and Create Unworkable Outcomes**

> **1.    The Department lived up to the fundamental deal to fund Agreement programs and implement them—it is fundamentally unworkable to require payment of contempt fines if the State is to continue funding and implementation of the Agreement and making investments in diverting class members**

It is unclear how the State could pay contempt fines, and continue funding its obligations under the Agreement that allowed for the State to avoid payment of those fines. If the suspended fines are reduced to judgment, or new contempt fines are imposed, the State should be released from all obligations of the Agreement. Each year, all state agencies compete for limited budget dollars, with only so much anticipated revenue available. The contempt fines proposed by Plaintiffs would represent significant sums that would otherwise be spent on investments in the Agreement, the behavioral health system, and building beds for class members. If the Department must request that Legislature allocate funding for the payment of fines, the finite amount of funding available necessarily means that funds to pay fines will be reallocated from other sources. If the contempt fine relief Plaintiffs request is granted, the future of the programs created by the Agreement is uncertain at best.

Underlying this concern is also a matter of fundamental fairness. The State entered into the Agreement, and committed to the Agreement's system improvement initiatives, in exchange for contempt funds to be held in abeyance. It is true that the State believes many of the Agreement's initiatives to be wise, and beneficial to class members, and potential class members, and the State will endeavor to continue these programs no matter the fines. But the State also made commitments in the Agreement to *not do* certain things. The State agreed to not treat

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

24

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

competency restoration patients at Yakima and at Maple Lane past certain dates, for example. The State agreed to forgo expansion at the Yakima facility. Accordingly, and were the Agreement to dissolve, the State submits it should regain some discretion to move forward with such initiatives. This includes: using space at SCORE to provide triage and treatment to class members as a means to pursue compliance with the injunction; exploring further in-reach to jails, and providing other behavioral health care treatment in those spaces; exploring the reopening of bed space at Yakima, and especially while bed space is so scarce; maintaining treatment of class members at Maple Lane; and other initiatives that the State has not pursued in favor of the plan laid out in the Agreement. If the State is to be compelled into compliance through severe contempt fines, the State should be free to pursue any lawful means to achieve compliance.

Finally, the requests for relief that Plaintiffs' request are not without consequences. If the State is pushed into transfers and discharges that are not adequately supported by services, the results will include risks to public safety, stresses on other systems, and poor patient outcomes that will lead patients back into the criminal justice system. Bovenkamp Decl. at 10-11; Kirschbaum Decl. at 5-6.

**2.    Given the Plaintiffs' apparent request to repudiate the Agreement, the State should be free to utilize available space to provide services to class members, and to develop jail-based restoration programs**

If contempt fines are re-imposed, and the fundamental bargain of the Agreement is abandoned, the State should be free to pursue treatment in all lawful settings. This includes the use of jail based restoration programs. The State has thus far forgone the use of such programs in the past, instead agreeing to invest funds in other settings and the Agreement. But this is a viable and lawful approach that is being utilized in other states and approved by other Federal Courts.

All, or substantially all, states have seen a sharp increase in the need for competency restoration services. Kinlen Decl. at 6. Many states have either begun pilot projects or have implemented a jail based restoration program as one of an array of tools to combat this problem.

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

25

*Id.* These states use jail based restoration as one part of a continuum of care ranging from outpatient restoration in the community to traditional inpatient restoration at state operated hospitals. *Id.* Georgia is one example of a state using a jail based restoration unit to good effect and the ongoing results of the seven year project were recently published in the Journal of the American Academy of Psychiatry and the Law. Kinlen Decl. Ex. D. California created its own jail based competency restoration program because of the increasing referrals the state was experiencing.[8] Texas began a pilot project in 2021 which restored thirty-three of fifty-six defendants to competency.[9]

Utah is one of the more recent additions to this group and the Federal District Court of Utah has directly approved one such program as part of a case similar to *Trueblood*. *Disability Law Center v. State of Utah*, U.S.D.C. (D. Utah), Case No. 2:15-cv-00645-RJS. Jail based restoration is a lawful treatment option that, as a *policy choice*, is disfavored by Plaintiffs and the Court Monitor here in Washington. But if this litigation is to return to a posture where the State must pursue any and all options for capacity, then the State will want to develop all lawful options, including programs like Yakima and jail-based restoration—even if those policies are disfavored by those in this litigation. The Agreement, by limiting the treatment space that the State could use for class members, inevitably left the State in contempt for a longer period of time and accrued hundreds, if not millions, of dollars of additional fines. It is fundamentally unfair for the State to be punished for failing to achieve a successful outcome when the Agreement anticipated that it could take much longer to achieve compliance.

The Department should also be free to include the use of jail space to mitigate harm to class members. As part of the efforts to locate usable space for programs, the Department has been approached by multiple jail settings who have space to offer. Kinlen Decl. at 6-7. To date, the Department has not worked to develop jail-based restoration but it has pursued development

---

[8] https://www.dsh.ca.gov/publications/docs/ADA2017AnnualRept.pdf
[9] https://www.hhs.texas.gov/sites/default/files/documents/jail-based-competency-restoration-pilot-program-2021.pdf

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

26

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

1  of a possible triage and stabilization center at SCORE jail facility. Kinlen Decl. at 6-7. While

2  wait times for admission to a state hospital remain high, a possible program at SCORE represents

3  an opportunity to help class members, and also help to stabilize the overall system in a way that

4  would benefit all class members. *Id*. Even if it is not the favorite policy choice of the Plaintiffs,

5  if further findings of contempt are to be made, the Department must pursue these lawful options

6  that provide services and mitigate harms to class members.

7  ## IV.    CONCLUSION

8          The relief sought by Plaintiffs would imperil the State's ongoing work under the Agreement.

9  Nor should the Court find either breach, or additional contempt, where the State has honored all of

10  its obligations under the Agreement.  Additionally, and despite Plaintiffs contentions, the State has

11  a plan to address the recent rise in civil conversions. This plan should be allowed some time to unfold,

12  and should include the leeway to engage with partners like SCORE, and to further explore options

13  like in-jail restoration, at least until the rise in civil conversions can be abated. The Court should deny

14  Plaintiffs motion accordingly, instead finding that the State met its obligations during Phase One,

15  and affirming what the State believes – that the Agreement and its goals remain worthy of pursuit.

16          RESPECTFULLY SUBMITTED this 11th day of January 2023.

17          ROBERT W. FERGUSON
           Attorney General
18

19          *s/ Nicholas A. Williamson*
           NICHOLAS A. WILLIAMSON, WSBA No. 44470
20          ANTHONY W. VAUPEL, WSBA No. 47848
           MARKO L. PAVELA, WSBA No. 49160
21          Assistant Attorneys General
           Attorneys for Defendants
22

23          Nicholas.Williamson@atg.wa.gov
           Anthony.Vaupel@atg.wa.gov
24          Marko.Pavela@atg.wa.gov

25

26

1

## CERTIFICATE OF SERVICE

2        I, *Christine Townsend*, state and declare as follows:

3        I am a citizen of the United States of America and over the age of 18 years and I am

4   competent to testify to the matters set forth herein. I hereby certify that on this 11th day of

5   January 2023, I electronically filed the foregoing document with the Clerk of the Court using the

6   CM/ECF system, which will send notification of such filing to the following:

7        David Carlson: davidc@dr-wa.org

8        Kimberly Mosolf: kimberlym@dr-wa.org

9        Elizabeth Leonard: bethl@dr-wa.org

10        Christopher Carney: Christopher.Carney@CGILaw.com

11        Sean Gillespie: Sean.Gillespie@CGILaw.com

12        I certify under penalty of perjury under the laws of the state of Washington that the

13   foregoing is true and correct.

14        Dated this 11th day of January 2023, at McCleary, Washington.

15

16

17   CHRISTINE TOWNSEND
     Legal Assistant

18

19

20

21

22

23

24

25

26

RESPONSE TO PLAINTIFF'S
MOTION FOR MATERIAL BREACH
AND CIVIL CONTEMPT
NO. 2:14-cv-1178 MJP

28

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565