The Honorable MARSHA J. PECHMAN

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| A.B., by and through her next friend CASSIE CORDELL TRUEBLOOD, et al., <br><br>Plaintiffs, <br><br>v. <br><br>WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, et al., <br><br>Defendants. | NO. 2:14-cv-1178 MJP <br><br> THE STATE'S RESPONSE TO COUNTIES' AMICUS BRIEF |

## I.   INTRODUCTION

Through their Amicus Brief, King, Pierce, and Snohomish Counties (Counties) advance a misguided theory about demand for state hospital services, ignore their own role in creating this demand, propose no meaningful solutions to the skyrocketing demand occurring, and ultimately demonstrate why the Department is between a rock and hard place with an incessant stream of state court orders directing patients into the beds constructed by the Department.

While the State shares some of the concerns about the relief that the Plaintiffs have requested from this Court, the brief of the Counties mostly serves to illustrate one of the reasons that the State has had such a difficult task in coming into compliance with the permanent injunction: the State does not control input into its state hospitals. Over 250 criminal court

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

1

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

jurisdictions across Washington are entering competing orders for the beds available at state facilities, including orders for forensic evaluation and restoration as well as civil felony conversion orders. With only so much physical space available to it, the Department is left to try and manage the beds it has constructed while minimizing harm to class members, minimizing risk to public safety, and trying to move the entire system forward to compliance with this Court's orders. This has become a tragedy of the commons, with the Counties' brief demonstrating how each and every jurisdiction expects full compliance with all orders, without recognizing that spiking demand for these resources has become untenable, and that a previous court-funded analysis has identified county-level practices as part of the problem.

The Counties' brief also largely ignores the primary issue currently before the Court: Did the State substantially comply with its obligations under the Contempt Settlement Agreement? Given that the Agreement was the road map to compliance set out by the Parties and the Court, the view provided by the Counties is incomplete because of its failure to acknowledge this plan, and the State's progress in implementing what was designed. Because neither Plaintiffs nor the Counties contest that the State complied with the obligations set forth in the Agreement, and on the basis that the State's compliance is essentially conceded, the State's response focuses instead on the Counties' data inaccuracies and the shortcomings of their narrow view of the forensic treatment landscape.

## II.    ARGUMENT

Competency evaluation outcomes cannot explain the spiking demand for forensic services, and especially not in the manner the Counties suggest. The Counties also neglect the State's efforts to develop new capacity for all patients, and ignore the fact that the State is opening capacity that exceeds all previous predictions of what capacity would be needed. The Counties add little to inform analysis of the fundamental question before the Court, which is whether the State has breached the Agreement, but the Counties do help to illustrate some of the pitfalls associated with the relief requested by Plaintiffs.

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

2

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

A.   **The Counties' Theory That Competency Findings are Driving Demand is Unpersuasive**

The Counties' theory that the Department's evaluators have created the crisis in competency demand is based on a bad data analysis, and fails to account for the obvious fact that competency evaluations are ordered before any competency determination is ever made. Accordingly, the State has great concerns with the Counties' misrepresentation as to the rate at which the Department's evaluators find a criminal defendant to be competent or not. The alarming claim that there has been a "whopping 82% increase in 'not competent' findings" by the Department, based on the comparison of the chart at Ms. Vitalich's Ex. 13 to the one at her Ex. 14, Dkt. No. 951 at 59–65, is thus problematic in several ways. First, and as the charts indicate, Ex. 13 data is statewide and for calendar years, where Ex. 14 is for King County only, and for fiscal years. Next, and in part because the chart at Ex. 14 was created ad-hoc, the data measured within each of the two charts is different, with each chart taking a different approach to duplicate orders, withdrawn orders, and dismissed cases. Declaration of Alice Huber Ph.D. (Huber Decl.) ¶ 3-5. Altogether this prevents any meaningful "apples to apples" comparison. While the State expects the Counties to retort that they are merely using State-provided data, the comparability of this data was discussed with representatives of at least two of the three counties with an offer of more comparable data to be provided following the discussion. Declaration of Dr. Thomas J. Kinlen Re Counties' Amicus Brief (Kinlen Decl.) ¶ 6. Finally, the eighty-two percent growth figure ignores that *all* findings, including findings of competency, have increased, because the overall demand has increased. Using a similar approach, one could say that evaluations that did not find a person incompetent, either competent or "other," grew ninety-six percent during the same period.[1]

---

[1] By comparing the number of 2013 evaluations that resulted in competent or "other" findings in Huber Decl., Attach A, with the same numbers reported for 2022 in that same chart, you can determine that approximately 1590 evaluations did not reach a conclusion of incompetent in 2013, while 3124 did not reach a conclusion of incompetent in 2022. That is an increase of 96%.

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO. 2:14-CV-1178 MJP

3

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

More complete data, analyzed using a consistent approach, shows more stability in the rate at which the Department's evaluators find a criminal defendant incompetent. Huber Decl. Attach. A. While findings of incompetency did increase statewide over the past nine years, they essentially remained flat in King County. *Id*. at 2. But any such claim or analysis should also consider all the intervening changes to the forensic evaluation landscape since 2013, with changes in law, more client service programs available, more evaluators available, and the like, and not to mention any changes in our broader society. *See* Huber Decl. at 3. Further, the Counties offer no explanation of how the findings of the evaluator, which come *after* an evaluation has been ordered, are linked to the overall rise of competency evaluation orders, which more than doubled in the same period.

To elaborate, the updated data shows how orders for felony evaluations in King County rose from 221 in fiscal year 2013 to 539 in fiscal year 2022, greater than doubling the amount of felony evaluations to be done in King County on any given year. Huber Decl. Attach. A. Statewide, court orders for evaluations during this period increased from 2701 to 6198. *Id.*; *See also* Dkt. No. 947, at 3 (Declaration of Thomas J. Kinlen, Chart: Statewide Court Orders for Competency Services). In reviewing earlier rises in referrals for evaluations, the court-funded TriWest report did not identify anything similar to what the Counties suggest, and instead concluded that "[a]n increased incidence of substance misuse and homelessness may be linked to the rise in referrals but is unlikely to be the primary causes of their recent rapid growth" and that "[t]he data do suggest that causes internal to the competency service process might be the source of the rapid growth in referrals. Using monthly referral data for each county, we were able to identify an increase in the percentage of arrests that resulted in referrals, primarily outpatient, and in the percentage of evaluations that resulted in referrals for restoration." Dkt. No. 947-2, at 35. In other words, TriWest identified changes in local practices within the referring county and city jurisdictions as the likely primary driver behind the growth, with increasing substance use and homelessness being a contributing factor.

The Counties also completely fail to acknowledge the role of the criminal trial courts as the ultimate arbiters of a defendant's competency, operating under a statutory scheme that provides for

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO. 2:14-CV-1178 MJP

4

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

full and fair litigation of the issue before those courts. Wash. Rev. Code § 10.77.084(1)(a); Wash. Rev. Code § 10.77.086(4) (allowing for the question of competency to be decided by a jury); Wash. Rev. Code § 10.77.020(2) (allowing for the defendant to retain their own expert for their own competency opinion). If Department evaluators were inappropriately reaching determinations of incompetency in statistically meaningful numbers, the criminal courts would serve as a check against this following litigation of the competency issue. Notably, the viewpoint presented in the Counties' brief is that of only the prosecuting authority, not those who represent the criminal defendants themselves, who would likely provide a different viewpoint from the Counties. Ultimately, the evaluator's report is only a recommendation to the criminal courts; courts are free to make their own rulings on competency and override Department evaluations where necessary.

It is not a credible claim that the Counties alone have identified the real reason for the spiking competency demand when this case has been subject to extensive oversight by this Court, the Court Monitor and her team, analysis by court-appointed experts like the TriWest Group, and years of analysis and problem-solving by State staff and agencies. If the rate at which competency evaluations found defendants to be incompetent was the true root cause of non-compliance in this case, it is difficult to believe that this would have gone overlooked after years of close scrutiny and oversight. To conclude that the problem is as simple as forensic evaluators being too quick to find incompetency does a disservice to the complexity of the underlying problem, and ignores the role played by referring jurisdictions, including the Counties themselves. The Court should reject their incorrect oversimplification of the cause for rising demand.

**B.    Current Challenges Facing the Forensic System, like Insufficient Capacity to Fully Serve Explosive Demand for Class Members and Civil Conversions, is Not "Self-Created" by the State**

How new bed capacity fits into the State's pursuit of compliance with the Courts permanent injunction has been one of the most vexing challenges involved in this case. While the Counties argue that the Department should have long ago come into compliance with the injunction, they fail

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

5

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

to recognize that the State has added more capacity than even the Court-funded TriWest report predicted was necessary, and they fail to acknowledge the impact of unforeseen circumstances like the COVID-19 pandemic, and overwhelming rises in demand that continue to defy logic and explanation. A closer examination of the TriWest report's prediction for needed capacity illustrates why the Court should reject the Counties' overly-simplistic argument.

In late 2018, the TriWest Group completed their analysis of demand and bed need, as directed by the office of the Court Monitor. Dkt. No. 947-2, at 4, 6. Importantly, the TriWest analysis attempted to encompass all populations at the state hospitals, including not guilty by reason of insanity (NGRI) patients as well as civil conversions. *Id*. at 11-13. Although the State also conducts its own bed-need analyses, the TriWest report provided an opportunity for an outside group of experts to provide an independent analysis about what level of capacity was needed to come into compliance. *Id*. At the time the report was completed in late 2018, the report concluded that the Department needed to add "23 beds at ESH and 93 beds at WSH" and that adding these 116 beds "would eliminate future class member over-seven-day waitlists." Dkt. No. 947-2, at 4. The report also concluded that "[r]eferrals for both restorations and outpatient evaluations appear to have leveled off between 2016 and 2017, suggesting that the demand for competency services is beginning to subside." *Id*. at 53. The TriWest analysis also did not account for the Contempt Settlement Agreement, which as designed and approved, should have resulted in curbing rises in demand for competency services. The analyses of TriWest and the State aside, at no prior point has anyone put other predictions or analysis before Court that would have cast doubt on prior forecasts and plans, much less one that the State has ignored.

At time of this report, in 2018, the State was implementing plans to open ninety beds of capacity between the two state hospitals, and working with the Court to develop thirty beds of additional capacity at Building 27 on the WSH campus. Although that capacity alone exceeded the 116 beds that TriWest predicted as necessary to come into full compliance, the State did not stop there. The State sought funding for the additional fifty-eight beds that will soon open at WSH as

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

6

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

wards F9 and F10, and numerous other projects that would continue to move other populations off of state hospital campuses. The State also began to implement plans that would lead to investment in a new 350-bed state forensic hospital.

The Counties' accusations of "self-created" problems do not account for the realities of the State's efforts in light of the analysis provided by Court-funded experts. The State has funded and opened bed capacity that should have *exceeded all predicted need for forensic services*. Further TriWest's analysis also concluded that demand should level out in the coming years—but the subsequent years have proven exactly the opposite. Demand, including from the Counties themselves, continues to increase at a pace that outstrips all relevant predictors. Viewed in this important context, the State's capacity plans were reasonable in 2018 and leading up to the COVID-19 pandemic, and provided a reasonable basis for the State to implement plans for the future forensic hospital.

This hospital, a modern 350-bed forensic treatment space built from the ground up, is the centerpiece of the State's vision for future forensic capacity. But building this hospital comes with necessary trade-offs on the WSH campus: in order to comply with land use limitations and to preserve a recently renovated Building 27, the only viable plan for a new hospital required demolition of some wards to coincide with the transition of long-term civil capacity to the community. These plans were sound at the time they were formalized – the State had built more capacity than TriWest had predicted was necessary, the Contempt Settlement Agreement was being implemented to lower demand, and large community investments were secured to open new community based civil beds to replace civil capacity at the state hospitals. Only by ignoring this important historical context, including the impacts of an unprecedented pandemic and new unexpected spikes in demand for both class member and civil conversion services, can the Counties argue that the present circumstances are a self-inflicted problem.

The scope of the State's future investments is large. The State is in the process of adding 552 additional beds that can be used for competency restoration, felony conversion, and NGRI patients.

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO. 2:14-CV-1178 MJP

7

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

Dkt. No 944, at 2. This is in addition to the 204 beds already created by the Department for class members (with twenty-four since closed at Yakima). Further, to focus on hospitals and forensic capacity disregards the holistic approach being utilized by the State, which is also steadily building out a diverse and robust community mental health system. In that regard, the State has added 188 long term civil commitment beds in the community since 2018, and is working toward adding another 332 community placement beds. Dkt. No. 946, at 3; Dkt. No. 946-2. The State *is* building out capacity at a steady pace but the process is expensive, difficult and more than anything else, time consuming.

**C.   Besides the Well Formed Plans for Additional Capacity, the Department Is Also Doing Everything It Can to Bring Online Short Term Temporary Capacity, to Respond to the New Problem**

Despite working diligently to identify available capacity options, the State has not identified any suitable "vacant hospitals, [or] mothballed secure facilities," which the Counties characterize as silver bullets for achieving compliance with the permanent injunction or solving the civil conversion problem. Dkt. No. 950-1, at 10. It is important to remember that the particular issue of civil conversion patients has emerged only within the past twelve months, and no new facilities could have been built, staffed, and opened within that time frame. The Department and its partners have gone to great lengths to respond to this novel problem and identify short term bed capacity, all more fully detailed in the State's earlier-filed response. Dkt. No. 943, at 12-15.

Towards the specific recommendation that the State consider emergent bed options, the State has done this by surveying existing State facilities for any vacant space that might be used. Declaration of Kevin Bovenkamp (Bovenkamp Decl.) at 2-3. But the repurposing of facilities is not a quick process, when these programs must not only house individuals for months at a time, but also provide a therapeutic environment capable of safely treating acute behavioral illness and providing competency restoration services, while also ensuring public safety through sufficient facility security. Each "vacant or mothballed" site considered by the State was ultimately deemed to be not worth further investment, due to need for extensive renovation before they could become suitable

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

8

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

for patients. Bovenkamp Decl. at 3. And even if renovated facilities could be brought online quickly, hiring and staffing new locations would also be a substantial challenge, *id.*, if not a barrier altogether.

It is not helpful for the Counties to continue to demand that the Court ensure that the state hospitals continue to serve any and all populations that their county courts will order into state hospital beds, while offering only the false hope of unidentified facilities that "should have" been opened and "would have" solved the demand problem, rather than acknowledge their role in creating this demand. The Counties' brief demonstrates that it is easy to leverage hindsight to point the finger and suggest solutions that seem simple, but fail to account for the complexities of the problem before the Parties and this Court. The Counties even go as far as suggesting that additional fines to the State; fining state officials personally, or putting the Department into receivership are options for this Court to consider. Dkt. No. 950-1, at 11. But because they fail to explain how these actions will actually lead to compliance in the face of explosive demand, and the reality of how long it takes to build new and adequate physical capacity, the Court should reject the false promise of their "easy solutions."

**D.     Principles of Federalism Should Give the Court Pause About the Relief Requested, Especially Considering That the State Is Pursuing Changes to the Law in the Legislature**

The Counties are right to point out that the Court should be careful in granting relief that could lead to public safety risks, or create chaos in other court systems. In 2022 alone, county superior courts entered 660 felony conversion orders directing patients into state hospital beds. These orders are consistent with state laws that require these patients to be admitted into a state hospital. Wash. Rev. Code § 10.77.086(5). Court orders that send patients to the state hospitals for misdemeanor competency restoration and low level felonies are also consistent with existing state law. While the State might acknowledge that some of the relief requested by Plaintiffs' could positively impact *class member wait times*, these requests for relief can have dire consequences elsewhere in the broader system, and implicate public safety. These are complex policy issues that the State believes should be pursued through the legislative process.

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

9

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

To that end, the State has worked to put a bill before the Legislature that would touch on some of these issues. Senate Bill 5440[2] outlines a framework for transitioning certain patient populations away from the state hospitals, including shifting responsibility for restoration of lower level crimes and civil conversions to the counties themselves.[3] The bill would also create more flexibility so that felony conversion patients could be admitted into facilities other than the state hospitals. Some of these policy proposals are similar to what Plaintiffs have requested as relief—but consistent with the principles of federalism these changes would be appropriately enacted through the state legislative process rather than imposed through litigation.

### III.   CONCLUSION

The Counties' brief does not change the analysis presented by the State in its response to Plaintiffs' motion. This Court should find the Department has not breached the Settlement Agreement, and that it has performed all reasonable steps necessitated by the Court's prior finding of contempt. The absence of other viable ideas presented by the Counties may be the best evidence to demonstrate that the State has developed reasonable plans based on the information available to it over the years of this litigation.

\\
\\
\\
\\
\\
\\
\\

---

[2] The current draft of SB 5440 (the version available as of the filing of this brief) is available at https://lawfilesext.leg.wa.gov/biennium/2023-24/Pdf/Bills/Senate%20Bills/5440.pdf?q=20230126221619. Future versions will be available at https://app.leg.wa.gov/billsummary?BillNumber=5440&Year=2023&Initiative=false.

[3] This bill includes a number of policy proposals, some that the Parties may agree on, and some that the Parties likely do not agree on. For example, the bill also makes changes to state statute in order to support the use of jail based restoration either by the counties or by the state.

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO.  2:14-CV-1178 MJP

10

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

Further, this court should deny relief sought by Plaintiffs' counsel and the Counties, and allow the Department continue to move forward with plans made under the Contempt Settlement Agreement, plans to open more bed capacity for class members, and plans to continue the transformation and modernization of Washington's behavioral health system.

RESPECTFULLY SUBMITTED this 27th day of January 2023.

ROBERT W. FERGUSON
Attorney General

*s/ Marko L. Pavela*
NICHOLAS A. WILLIAMSON, WSBA No. 44470
ANTHONY W. VAUPEL, WSBA No. 47848
MARKO L. PAVELA, WSBA No. 49160
Assistant Attorneys General
Attorneys for Defendants

Nicholas.Williamson@atg.wa.gov
Anthony.Vaupel@atg.wa.gov
Marko.Pavela@atg.wa.gov

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO. 2:14-CV-1178 MJP

11

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I, *Christine Townsend*, state and declare as follows: |
| 3 | I am a citizen of the United States of America and over the age of 18 years and I am |
| 4 | competent to testify to the matters set forth herein. I hereby certify that on this 27th day of |
| 5 | January 2023, I electronically filed with foregoing document with the Clerk of the Court using |
| 6 | the CM/ECF system, which will send notification of such filing to the following: |
| 7 | David Carlson:  davidc@dr-wa.org |
| 8 | Kimberly Mosolf:  kimberlym@dr-wa.org |
| 9 | Elizabeth Leonard:  bethl@dr-wa.org |
| 10 | Christopher Carney:  Christopher.Carney@CGILaw.com |
| 11 | Sean Gillespie:  Sean.Gillespie@CGILaw.com |
| 12 | David JW Hackett:  David.Hackett@kingcounty.gov |
| 13 | I certify under penalty of perjury under the laws of the state of Washington that the |
| 14 | foregoing is true and correct. |
| 15 | Dated this 27th day of January 2023, at McCleary, Washington. |

*/s/ Christine Townsend*
CHRISTINE TOWNSEND
Legal Assistant

THE STATE'S RESPONSE TO
COUNTIES' AMICUS BRIEF
NO. 2:14-CV-1178 MJP

12

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
(360) 586-6565