1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT SEATTLE

10   A.B., by and through her next friend        CASE NO. C14-1178 MJP
     CASSIE CORDELL TRUEBLOOD, et
11   al.,                                        FINDINGS OF FACT AND
                                                 CONCLUSIONS OF LAW ON
12                       Plaintiffs,             PLAINTIFFS' MOTION FOR
                                                 MATERIAL BREACH OF
13          v.                                   CONTEMPT SETTLEMENT
                                                 AGREEMENT
14   WASHINGTON STATE
     DEPARTMENT OF SOCIAL AND
15   HEALTH SERVICES, et al.,

16                       Defendants.

17

18          This matter comes before the Court on Plaintiffs' Motion for Material Breach of

19   Contempt Settlement Agreement and Motion for Civil Contempt. (Dkt. No. 938.) Having

20   reviewed the Motion, the Response (Dkt. No. 943), the Reply (Dkt. No. 954), the brief of Amici

21   King, Pierce, and Snohomish Counties (Dkt. No. 950-1), Plaintiffs' Response to the Amici (Dkt.

22   No. 957), Defendants' Response to the Amici (Dkt. No. 958), Amici's Reply (Dkt. No. 962), and

23   all supporting materials, and having held a four-day Evidentiary Hearing from June 12 through

24

June 16, 2023, the Court GRANTS in part the Motion and issues the following Findings of Fact and Conclusions of Law.

**SUMMARY**

In April 2015, the Court found that the Washington State Department of Social and Health Services (DSHS) was violating the constitutional rights of pretrial criminal detainees in city and county jails by failing to provide them timely court-ordered competency evaluations and restoration services. (See Findings of Fact and Conclusions of Law (Dkt. No. 131).) The Court certified a class of similarly-situated criminal detainees—the Trueblood Class. Members of the Trueblood Class are presumed to be innocent but cannot stand for trial until their competency is evaluated and restored. (See id.; Order Certifying Class (Dkt. No. 84).) Delay in receiving competency services violates Trueblood Class Members' constitutional rights and leaves them in peril. Prolonged incarceration exacerbates Class Members' underlying mental illnesses, denies them access to consistent mental health treatment, and adds yet more trauma that leads to recidivism.

To protect Class Members' constitutional right to prompt receipt of competency services and minimize further harms, the Court issued a Permanent Injunction (as modified), which requires DSHS to provide competency evaluation and restoration within strict time limits: (1) seven days for inpatient competency evaluations and restoration; and (2) fourteen days for jail-based competency evaluations. Without evaluation and restoration, the criminal process of these Class Members is halted, and the criminal justice system cannot move forward with trials or plea negotiations with members of the Class.

It is important to remember that Class Members are presumed innocent. They have not been convicted of any crime for which they have been arrested. More importantly, no one should

1   assume that arresting individuals, placing them in jail, and providing competency services is any

2   form of "treatment" for a mental illness. Competency evaluation and restoration is <u>not</u> treatment.

3   It does not assist or help treat any underlying mental health issue.

4          More than eight years later, DSHS continues to violate the Trueblood Class Members'

5   constitutional rights and the Permanent Injunction. (<u>See</u> Attachment A to the Declaration of

6   Thomas Kinlen (Dkt. No. 999-1) (documenting excessive wait times of Trueblood Class

7   Members).) The Court has not sat idly by during this time. The Court has twice found DSHS in

8   contempt of the Permanent Injunction, which has led to the imposition of daily fines calculated

9   as to each Trueblood Class Member who does not receive timely competency services. The

10  Court appointed a monitor to oversee DSHS's compliance with the Permanent Injunction, which

11  requires the Parties to submit quarterly reporting to the Court and Court Monitor. And the Court

12  has conducted more than thirty hearings in this single case. The Court has also imposed roughly

13  $400 million in fines, $100 million of which has been paid by DSHS while the remaining

14  balance has been held in abeyance in the hope of compliance. The Court has authorized the

15  distribution of over $80 million of the collected fines to fund diversion programs selected by the

16  Parties to help keep individuals from becoming Trueblood Class Members and to redress the

17  harms DSHS continues to place on Class Members by denying them timely competency services.

18  This included construction of Building 27 at WSH and distribution of funds to the following

19  grantees around the State of Washington: (1) King County; (2) Kitsap County; (3) Pierce

20  County; (4) Thurston County; (5) Mason County; (6) Comprehensive Healthcare; (7) Great

21  Rivers Behavioral Health Organization; (8) Catholic Charities; (9) Lourdes Health Network; (10)

22  Frontier Behavioral Health; (11) Columbia River Mental Health Services; (12) Lifeline

23

24

1  Connections; and (13) Olympic Health And Recovery Services. And yet, DSHS has never once

2  been in compliance with the Permanent Injunction.

3  To bring itself into substantial compliance with the Court's permanent injunction, DSHS

4  negotiated a Settlement Agreement with Plaintiffs in late 2018 with the oversight and assistance

5  of a Washington State Court of Appeals Judge. (Dkt. No. 599-1.) The Settlement Agreement

6  contains many goals for programming and organization which DSHS has carried out. But the

7  touchstone of this litigation and the Settlement Agreement remains the timely provision of

8  competency evaluation and restoration services. For this reason, "the fundamental goal of th[e

9  Settlement] Agreement is to provide timely competency services to Class Members pursuant to

10  the Court's orders." (Id. at 4.) One of the key components DSHS negotiated to meet this goal

11  was its agreement to add ninety-two additional forensic beds (for a total of at least 303 beds) by

12  December 31, 2019, for use by Class Members at the two state-run psychiatric hospitals: Eastern

13  State Hospital (ESH) and Western State Hospital (WSH). (Id. at 19 (Section III(B)(4)).) While

14  DSHS has added some bed capacity, it agrees that it failed to ensure that these promised beds

15  were available to Class Members from at least September 2022 through May 2023. Over these

16  nine months, Class Members waited on average between: (1) 13.6 to 16.2 days to receive jail-

17  based competency evaluations, representing 65% to 84% rate of compliance with the Permanent

18  Injunction; (2) 45.7 and 133.1 days for inpatient competency evaluations, representing a 0% to

19  17% rate of compliance with the Permanent Injunction; and (3) 82.1 to 130.4 days for restoration

20  services, representing a 0% to 8% rate of compliance with the Permanent Injunction. Plaintiffs

21  now ask the Court to find Defendants in material breach of the Settlement Agreement's bed

22  addition requirement and in contempt of the Court's Permanent Injunction from at least

23  September 2022 through May 2023.

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' MOTION FOR MATERIAL BREACH
OF CONTEMPT SETTLEMENT AGREEMENT - 4

After hearing evidence over four days, the Court finds that DSHS materially breached the Settlement Agreement from September 2022 through May 2023 by failing to provide the negotiated-for bed space for Class Members at the state hospitals. The Court also finds DSHS in further contempt of the Permanent Injunction by knowingly and inexcusably denying Class Members timely competency services over this same time period. Although several factors impacted the rise in wait times, the primary reason Class Members suffered was DSHS's own lack of foresight, creativity, planning, and timely response to a crisis of its own making. The Court is unpersuaded that DSHS adequately planned for and took reasonable measures to address the bed shortage. Specifically, DSHS removed civil beds at WSH and closed wards at the same time it used the remaining forensic beds for "Civil Conversion" patients instead of Class Members. Civil Conversion patients are individuals whose criminal charges have been dismissed and a court then orders that person "converted" or "flipped" from the criminal or forensic side to the civil commitment side, where the individual must be evaluated, but not treated at a state hospital. These individuals are not held in jail, and unlike Class Members they do not possess the constitutional right to be evaluated promptly. Notwithstanding this distinction, DSHS prioritized Civil Conversion patients over Class Members at state hospitals. This violated Class Members' constitutional rights, the terms of the Settlement Agreement, and the Court's Permanent Injunction. And it hobbled the criminal justice system within the State, creating yet more Civil Conversion patients and lengthening wait times for Class Members' receipt of competency services.

As part of the remedy for the breach of the Settlement Agreement and the Court's Permanent Injunction, the Court will require DSHS to pay the fines that were assessed but uncollected for untimely inpatient competency evaluation and restoration services from

1  September 1, 2022, through May 30, 2023. The size of this fine is substantial: $100,318,000.00.

2  This represents roughly one-third of the Court's total uncollected fines. The Court finds the

3  payment of these fines necessary to redress DSHS's inexcusable violation of Class Members'

4  constitutional rights from at least September 2022 through May 2023. The other relief the Court

5  imposes seeks to open up more forensic beds at the state hospitals and clear out Civil Conversion

6  patients who have occupied forensic beds that should be open to and used by Class Members.

7  Additional fines will be imposed on DSHS for delays in moving Civil Conversion patients out of

8  state hospital beds.

9       While DSHS has met many of the Settlement Agreement's elements, it has not met its

10  core goal. And its most recent failure to provide adequate forensic beds to Class Members is both

11  inexcusable and contrary to the very heart of the Settlement Agreement and the Court's

12  Permanent Injunction. The Court will ensure that the fines collected are targeted at providing

13  services to the harmed Class Members and that DSHS acts with all due speed to treat Class

14  Members humanely, justly, and according to their constitutional rights.

15                          **FINDINGS OF FACT**

16  **A.     The Competency Evaluation and Restoration System**

17       1.     Defendant DSHS is charged under Washington law with overseeing competency

18  services, which includes jail-based, inpatient, and outpatient competency evaluations and

19  competency restoration services for those charged with crimes within the State. RCW 10.77 et

20  seq.

21       2.     The competency process begins when there is reason for a state court judge or an

22  attorney to doubt that an individual charged with a crime is competent to stand trial. Because

23  state and federal law forbid the criminal prosecution of individuals who do not understand the

24

charges against them or are unable to aid in their own defenses, courts order that these individuals' competency be evaluated to determine whether they may stand trial. RCW 10.77.050; see also Medina v. California, 505 U.S. 437, 449 (1992) ("[T]he Due Process Clause affords an incompetent defendant the right not to be tried[.]").

3.       When a court orders an individual to receive a competency evaluation, the criminal case is stayed (i.e., halted) during the competency-related proceedings. See RCW 10.77.084; Washington State Court Rules: Superior Court Criminal Rules, CrR 3.3(e)(1).

4.       Competency evaluations may be conducted in jail, in the community in an "outpatient" setting, or in an "inpatient" setting at one of the two state hospitals, Eastern State Hospital (ESH) or Western State Hospital (WSH).

5.       When an individual is found not competent, they then can be ordered to undergo restoration services. Competency restoration services must be provided at ESH or WSH, or, in certain cases, at alternative residential treatment facilities at Fort Steilacoom and Maple Lane. RCW 10.77.086; RCW 10.77.088.

6.       Competency evaluation and restoration is not treatment for mental illness. It is stabilization and education so that the individual can understand the criminal charges brought against them. The competency system is designed solely to determine whether the person accused of a crime is competent to stand trial on criminal charges. As such, even those Class Members who receive restoration services do not per se obtain medical treatment for their underlying mental health conditions.

7.       No police officer, prosecutor, judge, or member of the public should assume that restoration is treatment for mental illness. It is not. Competency evaluation and restoration do not provide treatment of Class Members' underlying mental health conditions.

8.     Consistent with the Court's Permanent Injunction, competency evaluations for those in jail (also called "jail-based" evaluations) must occur within 14 days of the signing of a court order for such an evaluation. (Order Modifying Permanent Injunction as to In Jail Competency Evaluations (Dkt. No. 303).) Inpatient evaluations at ESH or WSH or at an outpatient evaluation must occur within seven days of the signing of a court order. (Findings of Fact and Conclusions of Law (Dkt. No. 131).) And for those ordered to receive restoration services, the individual must be admitted within seven days of signing of the court order. (Id.)

9.     The Court entered the Permanent Injunction in order to protect Class Members' rights under the Due Process Clause of the Fourteenth Amendment to receive timely competency treatment while being incarcerated pending criminal charges. (See Dkt. No. 131 at 16-25; Order Granting Plaintiffs' Motion for Summary Judgment at 5-7 (Dkt. No. 104) (noting that Defendants "agree that Plaintiffs and class members have due process rights to be free from prolonged incarceration absent conviction, and in restorative treatment when they are being incarcerated for the purpose of competency evaluation and restoration").)

10.     It is important to note in the context of Plaintiffs' Motion that Class Members do not include "Civil Conversion" patients. Civil Conversion patients are "defined as a patient whose felony criminal charges have been dismissed for reasons of incompetency to stand trial, and the criminal court orders the Department to admit the patient to a state hospital for purposes of an evaluation for civil commitment under Wash. Rev. Code § 71.05." (Updated Stipulation Re: Hearing at 3 (Dkt. No. 992).); see RCW 71.05.280. A Court may also order such individuals to be committed to a state hospital for treatment. See RCW 10.77.086(5).

11.     "If the patient was waiting in jail for a competency service at the time of dismissal or waited in jail before being admitted to a Department facility for a competency service, that

1   patient was a Trueblood class member." (Updated Stip. at 3.) "Once a felony conversion patient

2   is admitted for evaluation, the state hospital may not file a petition for commitment if the patient

3   is assessed to not meet the criteria for civil commitment." (Id.) "Even if a petition is filed a

4   felony conversion patient could still be released if the state does not prove in court that the

5   patient meets civil commitment criteria by clear, cogent, and convincing evidence. Over the last

6   several years, approximately 80% of felony conversion court orders lead to a civil commitment

7   to the state hospital by the superior court following admission, evaluation, and the filing of a

8   civil commitment petition." (Id.) And Civil Conversion patients may then be either recommitted

9   or discharged. (Tr. Ex. 113.)

10      12.     But those individuals who are found incompetent to stand trial and have their

11  misdemeanor charges dismissed cannot be ordered into state hospitals. They are instead directed

12  for evaluation and detention, if they meet civil commitment criteria, within the local civil

13  commitment system in each region. RCW 10.77.088(5).

14      13.     While a Class Member may become a Civil Conversion patient by dint of a court

15  order dismissing the felony charges and ordering civil commitment, a Civil Conversion patient

16  lacks the same rights as a Class Member. That is because Class Members possess rights under

17  the Due Process Clause of the Fourteenth Amendment to receive timely competency evaluation

18  and restoration treatment while they face criminal charges. Civil Conversion patients do not

19  possess these same rights because they no longer face criminal charges and are not held in jail.

20      14.     While Civil Conversion patients are civilly committed, they receive treatment for

21  their underlying mental health conditions.

22      15.     Civil Conversion patients and Class Members have competing needs for forensic

23  beds at both ESH and WSH. Historically, Civil Conversion patients were required to receive an

24

1  initial hospital-based evaluation before being eligible for transfer to community-based treatment

2  facilities. See RCW 10.77.086(5) (2022); (June Monitor Report at 35.) A recent change in state

3  law effective May 15, 2023, no longer requires Civil Conversion patients to be sent to ESH or

4  WSH for an initial evaluation. RCW 10.77.086(5) (effective date: May 15, 2023); see WA

5  LEGIS 453 (2023), 2023 Wash. Legis. Serv. CH. 453 (S.S.S.B. 5440) (WEST). Instead, they

6  may be sent to "a facility operated or contracted by" DSHS. RCW 10.77.086(5).

7  **B.**  **The Composition of the Trueblood Class**

8  16.  The most important people in this action are the Trueblood Class Members and

9  their right to receipt of timely competency services.

10  17.  As the Court Monitor recently summarized, "Trueblood Class Members are in the

11  main individuals who may have intellectual and developmental disabilities, serious and disabling

12  mental health and/or substance use conditions, traumatic brain injuries and/or other cognitive

13  impairments." (Court Monitor's Quarterly Report dated June 8, 2023, at 1 (Tr. Ex. 12).) "These

14  vulnerable people too often find themselves involved with the criminal justice system because of

15  nonresponsive health and human services systems upon which they would better depend for care,

16  treatment, rehabilitation, and recovery support services." (Id.)

17  18.  Data presented at the Evidentiary Hearing about the "Baseline Characteristics" of

18  the Trueblood Class from State Fiscal Year (SFY) 2019 to SFY 2022 confirm the accuracy of the

19  Court Monitor's assessment.

20  19.  Dr. Thomas J. Kinlen, Director of the Office of Forensic Mental Health Services

21  within the Behavioral Health Administration (BHA) of the DSHS, testified about those data.

22  20.  The average Trueblood Class Member is a male, person of color:

23      a.  living in desperate poverty;

24

b.  experiencing homelessness or living without stable housing;

c.  possessing little likelihood of employment;

d.  suffering from a serious mental illness, which is most likely to include a psychotic diagnosis;

e.  requiring substance use disorder treatment; and

f.  for roughly one-third of the Class, likely living with a chronic physical disease.

21.    Trueblood Class Members cycle through the State's criminal justice and competency system, receiving repeated competency evaluation and restoration orders. Between 2019 and 2022, almost all Class Members were arrested at least once in the prior year, with the Class averaging three arrests in the prior year.

22.    For each year between 2019 and 2022 the average Class Member had been ordered to receive competency evaluations three times in the preceding five years. Over this same period, the average Class Member received approximately two prior orders for competency restoration and around one-third had been found not competent to stand trial.

23.    From SFY 2019 through 2022, roughly half of the Class Members had only been charged with a misdemeanor as their most serious criminal offense. (Tr. Ex. 104.)  Most Class Members commit crimes linked to poverty and homelessness in which they live and their underlying mental health conditions. Examples include theft of food, indecent exposure for urinating or defecating in public due to the lack of an available restrooms, or trespassing on private property to sleep.

**C.      Class Members Suffer Harm from Delayed Receipt of Competency Services**

24.      Class Members waiting in jail for competency services face serious harms to their physical and mental safety and wellbeing.

25.      The Evidentiary Hearing confirmed the same core facts the Court found to be true in 2016 when it issued an Order Modifying the Permanent Injunction. (Dkt. No. 303.) In that Order, the Court explained:

> Jails are inherently punitive institutions, and are not designed or administered so as to provide for the needs of the mentally ill. A correctional environment, calibrated to provide safety and order, is incongruous with the particular needs of the mentally ill, and results in people with confirmed or suspected mental illness spending more time in solitary confinement, where their mental health further deteriorates. This deterioration is in direct conflict with the State's interest in prompt evaluation and treatment so that the individual may be brought to trial, especially for individuals whose illnesses become more habitual and harder to treat while they wait in isolation.

> In jails, class members are routinely held in a solitary lock down for twenty-three hours out of every day for reasons unrelated to their mental health needs. Class members are placed in solitary confinement because they are victimized by other inmates, or because symptoms of their illnesses prevent them from following generally applicable rules or behavioral expectations. Sometimes class members are placed in solitary confinement for their erratic or unpredictable behavior, not as punishment for breaking the rules, but to prevent them from continuing to break other rules which may result in additional charges or some other more serious form of punishment. These same solitary confinement cells are used to punish other inmates for bad behavior. Class members cannot enter or exit their cells freely, and are not encouraged to interact with other people. Even class members on suicide watch are observed by video camera; they experience almost no human interaction, even though isolation is known to be clinically destructive to these individuals' mental health.

> Incarceration, generally, is bad for class members for several reasons. While waiting for long periods of time in local jails, class members are not receiving the mental health treatment they need. Their conditions worsen not only because of lack of treatment, but because prolonged incarceration exacerbates mental illness, making symptoms more intense and more permanent, and reducing the likelihood the person's competency can ever be restored. Incarceration increases the likelihood of suicide. Incarceration also unnecessarily exposes class members to harmful conditions such as jail overcrowding, which leads to increased violence among inmates and to the targeting of individuals perceived as weak. Because class members are stigmatized for what others perceive as erratic and unpredictable behavior, they are less likely to find a social support

network within the jail and therefore are less successful than others at navigating the jail
environment, increasing their feelings of isolation, terror, and despair.

(Order Modifying Preliminary Injunction at 15-16 (paragraph numbering removed).)

26.   The Court adopts the findings above. As Dr. Kinlen confirmed: jails make Class
Members sicker.

27.   There is an adverse impact that incarceration has on Class Members' ability to
obtain treatment once out of the criminal justice system. As a result of prolonged incarceration,
Class Members lose Medicaid benefits. Roughly one-third of Trueblood Class Members lack
Medicaid benefits. Without Medicaid, the vast majority of the Class Members cannot obtain
necessary access to mental and physical health care for their serious mental health and medical
conditions.

28.   Class Members have difficulty re-enrolling in Medicaid once they become re-
eligible after incarceration. The process is complicated, particularly for Class Members who lack
stable housing and suffer from serious mental health conditions.

**D.   The Court's Permanent Injunction and Contempt Orders**

29.   After holding a trial in March 2015, the Court issued a permanent injunction on
April 2, 2015, requiring DSHS to provide jail-based and inpatient competency evaluations within
seven days of a signed court order. (See Findings of Fact and Conclusions of Law (Dkt. No.
131).)  The Court gave DSHS nine months to comply with the Permanent Injunction.

30.   DSHS appealed and the Ninth Circuit largely affirmed the injunction. (Dkt. No.
233.) But the Ninth Circuit directed the Court to reassess whether jail-based evaluations should
be completed within seven days or some other time period.

31.   Before reconsidering the scope of the Permanent Injunction, the Court found
DSHS in contempt of the Permanent Injunction. (Dkt. No. 289.) The Court noted that as of May

1   2016, DSHS failed to provide competency restoration within seven days of a court order for 68%

2   of Class Members and competency evaluation services within seven days of a court order for

3   80% of the Class Members. The Court found Plaintiffs had proved by clear and convincing

4   evidence that DSHS had not taken all reasonable steps to comply with the Permanent Injunction,

5   notwithstanding its efforts at increasing bed counts, staffing, and diversion services, among other

6   things. The Court then imposed fines for every day that each Class Member does not timely

7   receive competency services.

8          32.     After remand, the Court held an evidentiary hearing and modified the Permanent

9   Injunction in August 2016 to require jail-based evaluations within fourteen days of a court order.

10  (Order Modifying Permanent Injunction (Dkt. No. 303).) The Court did not alter the Permanent

11  Injunction's requirement that inpatient orders must be completed within seven days. The Court

12  found that as of July 2016, the average wait time for jail-based competency evaluations statewide

13  was 11.4 days and that only thirty-five percent of such evaluations were completed within seven

14  days of a court order. (Id., Findings of Fact ¶ 31.)

15         33.     On October 17, 2017, the Court found DSHS in contempt of the Permanent

16  Injunction, as modified. (Dkt. No. 506.) The Court found that DSHS had failed to comply with

17  the timeliness requirements for jail-based evaluations since April 2015 when the Court issued its

18  Permanent Injunction. The Court also found that DSHS had amassed $30,696,500 in fines and

19  penalties that had been collected as of October 2017. The Court further found that as of June

20  2017, only 46.2% of Class Members waiting in jail received timely competency services, and

21  that the remainder of Class Members waited beyond the mandated time for services, which

22  slowed the criminal justice system and harmed the Class Members. The Court found that

23  Defendants failed to comply with the specific and definite portions of the Court's Orders

24

requiring the timely completion of jail-based competency evaluations within fourteen days of receipt of a court order or twenty-one days from the date of the court order. The Court also found that DSHS failed to take all reasonable steps to reduce wait times for jail-based competency evaluations, had not taken all reasonable steps to comply with the Permanent Injunction, and had not demonstrated substantial compliance or that they were unable to comply with the Court's Orders. The Court increased daily fines and expressed its hope that "Defendants will stop their procrastination and false promises." (<u>Id.</u> at 13.)

**E.     The Settlement Agreement**

34.     In late 2018, DSHS negotiated for and entered into a Settlement Agreement through which the Parties intended DSHS to bring itself into substantial compliance with the Court's orders. (Dkt. No. 599-1.) The Parties were assisted in their negotiations by a Washington State Court of Appeals Judge.

35.     DSHS recognized "the fundamental goal of th[e Settlement] Agreement is to provide timely competency services to Class Members pursuant to the Court's orders." (<u>Id.</u> at 4.)

36.     The Settlement Agreement requires changes in how DSHS provides competency evaluation and restoration services and delivery of other services intended to reduce the number of individuals who become or remain Class Members.

37.     The Court approved the Settlement Agreement on December 12, 2018. (Dkt. No. 623.)

38.     One of the central provisions of the Settlement Agreement required the State to add 50 beds at ESH and 42 beds at WSH for Class Members by December 31, 2019. (<u>Id.</u> at 19 (Section III(B)(4)).) Adequate bed capacity for Class Members forms the bedrock of the Court's Permanent Injunction and prior Contempt Orders. Without adequate forensic beds, Class

1    Members face increased wait times for competency services and DSHS remains unable to meet

2    the Court-imposed deadlines to satisfy its constitutional obligation to Class Members.

3        39.    Although the Settlement Agreement did not require DSHS to track the utilization

4    of additional bed availability, DSHS was required to add 92 forensic beds by December 31,

5    2019. At the time the Parties signed the Settlement Agreement in October 2018 there were 211

6    beds in use by Class Members at WSH and ESH. (Tr. Ex. 101.) This meant that DSHS promised

7    to provide at least 303 beds for Class Members by the end of 2019.

8    **F.    DSHS's Lack of Compliance with the Settlement Agreement**

9        40.    Plaintiffs gave notice to DSHS in September 2022 that they believed DSHS was

10   in breach of the Settlement Agreement's requirement for additional forensic beds.

11       41.    The Parties agree that DSHS breached the Settlement Agreement's requirement to

12   provide at least 303 forensic beds from September 2022 through May 2023. The Parties also

13   agree that DSHS cured the breach by having added more than 303 beds by the end of May 2023.

14   But the Parties dispute whether the breach was material.

15       42.    The Court briefly reviews historical data on bed space at WSH and ESH. At the

16   time the case was tried in March 2014, there were 125 forensic beds statewide in use by Class

17   Members. When the Court first found DSHS in contempt of the Permanent Injunction in July

18   2016, there were 143 forensic beds in use by Class Members statewide. When the Court found

19   DSHS again in contempt in October 2017, there were 200 forensic beds in use by Class

20   Members statewide. And in October 2018, at the time the Parties entered into the Settlement

21   Agreement, there were 211 forensic beds in use by Class Members statewide.

22       43.    Although the State failed to meet the December 31, 2019 deadline to add 92 beds,

23   the Court granted additional time at DSHS's request with Plaintiffs' agreement. (Dkt. Nos. 743,

24

750, and 752.) DSHS opened 50 additional forensic beds at ESH in Summer 2020, while opening an additional 40 beds at WSH in February 2021. (Declaration of Kevin Bovenkamp ¶ 3 (Dkt. No. 944).)

44.     In 2021, the State began construction of a 350-bed forensic hospital on the WSH campus. The new hospital has an anticipated completion date between 2027 and 2029. (Evidentiary Hearing Exhibit ("Tr. Ex.") 3 a 6.) Because the new hospital is being sited on the same footprint of the existing hospital at WSH, DSHS has had to close wards as part of the construction process. The following table details each ward closure at WSH as of the date of the Evidentiary Hearing:

| WSH Ward | Scheduled Closure Date | Actual Closure Date | # of Beds lost |
|----------|------------------------|---------------------|----------------|
| E5 | 7/1/2021 | 7/1/2021 | 30 |
| E3 | 11/1/2021 | 11/1/2021 | 30 |
| S8 | 3/1/2022 | 4/1/2022 | 30 |
| S3 | 7/1/2022 | 9/6/2022 | 31 |
| S7 | 11/1/2022 | 12/16/2022 | 29 |
| S9 | 4/1/2023 | 6/30/2023 (scheduled) | 29 |
| | | **TOTAL** | **179** |

45.     As a result of the ward closures, DSHS removed 150 beds from WSH from July 2021 through the date of the Evidentiary Hearing, with 29 beds slated to be removed at the end of June 2023.

46.     In March 2023, there were only 250 beds in use by Class Members. (Dkt. No. 978-1.)

47.     In April and May 2023, the State opened two new wards at WSH (F9 and F10), which added 58 forensic beds for Class Members. (Court Monitor Report dated June 8, 2023, at 17, 20, 35 (Tr. Ex. 12).)

48.     By the end of May 2023, there were 334 forensic beds used by or potentially available to Class Members.

49.     But Even with the addition of these beds, DSHS, by its own calculations, would still need an additional 213 forensic beds at WSH to clear the waitlist for all Class Members in the next twelve months to comply with the Court's Permanent Injunction. (Tr. Ex. 102 at 15.)

50.     DSHS also provides forensic bed forecasting. (See Tr. Ex. 102 at 20.) According to its own projections, DSHS will not have sufficient forensic beds capacity for Class Members through 2023 and 2024. (Id.)

51.     Not every bed at WSH and ESH is available to or in use by Class Members. As of the Court Monitor's June 2023 report, there were 428 licensed beds at WSH. (Tr. Ex. 12 at 35.) Only 171 were occupied by Class Members, while 125 were occupied by Civil Conversion patients and 123 were occupied by patients who have been found "not guilty by reason of insanity" (NGRI patients). At ESH, the forensic ward capacity is 175 beds, with only 146 occupants at the time of the Court Monitor's report. Of those beds, only 73 are used by Class Members, with seven Civil Conversion patients and 66 NGRI patients.

**G.     Increased Wait Times for Competency Evaluation and Restoration Services**

52.     The lack of adequate forensic bed capacity has driven up the wait times for Class Members to receive competency services.

53.     The Court reviews some historical data regarding jail-based competency evaluations. In July 2016, the average wait time for a completed jail-based competency

evaluation was 11.4 days as averaged between WSH and ESH. Only 35 percent of jail-based evaluations were completed within 7 days of the signing of a court order. (Dkt. No. 303 at ¶ 31.) DSHS reached its best compliance with jail-based evaluations in August 2018, completing 92% of evaluations on time. It has never duplicated that result.

54.     As to the timeliness of jail-based competency evaluations the Court Monitor presented the following table capturing the twenty-four-month data (Tr. Ex. 12 at 7):

| | Number of Orders | Complete w/in 14 days of Signature (Tables 8/11) | Complete w/In 14 Days of Receipt (Tables 8/11) | Average Number Days |
|---|---|---|---|---|
| April *2021* | 386 | 81/84% | 85/89% | 12.3 |
| May | 381 | 86/79% | 89/84% | 11.9 |
| June | 438 | 76/75% | 81/78% | 12.4 |
| July | 479 | 74/77% | 77/80% | 13.0 |
| August | 545 | 73/63% | 77/68% | 13.4 |
| September | 491 | 62/71% | 67/74% | 14.8 |
| October | 492 | 74/79% | 77/84% | 13.4 |
| November | 500 | 83/74% | 86/78% | 12.6 |
| December | 489 | 72/67% | 79/72% | 13.5 |
| January *2022* | 439 | 63/68% | 68/73% | 15.4 |
| February | 473 | 72/69% | 74/72% | 14.4 |
| March | 599 | 71/75% | 76/81% | 13.7 |
| April | 594 | 72/70% | 78/74% | 13.6 |
| May | 538 | 73/74% | 78/79% | 14.2 |
| June | 561 | 68/60% | 74/66% | 14.7 |
| July | 634 | 65/62% | 69/67% | 15.2 |
| August | 642 | 59/59% | 65/63% | 15.3 |
| September | 539 | 61/67% | 65/70% | 15.7 |
| October | 535 | 65/67% | 68/70% | 16.2 |
| November | 458 | 67/75% | 71/78% | 15.5 |
| December | 481 | 73/66% | 75/70% | 13.7 |
| January *2023* | 584 | 68/75% | 75/84% | 14.4 |
| February | 465 | 74/75% | 83/82% | 14.1 |
| March | 608 | 78/77% | 84/82% | 13.6 |
| April, 1st look | 515 | 75/57% | 81/62% | 14.0 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' MOTION FOR MATERIAL BREACH OF CONTEMPT SETTLEMENT AGREEMENT - 19

1         55.    From September 2022 through April 2023, the number of jail-based orders ranged

2    between 458 and 608, with the wait times reaching their highest in October 2022. Over this same

3    time, DSHS was able to timely complete evaluations between 61% and 78% of the time as

4    measured from the order's signature date and between 65% and 84% of the time if measured

5    from the receipt of the order.

6         56.    The Court Monitor presented data concerning inpatient competency evaluations.

7    By way of historic reference, in July 2019, the average number of days for inpatient competency

8    evaluation was 39.5 days, while in October 2020, Class Members waited an average of 38 days

9    for inpatient restoration services. The following table captures twenty-four months of data from

10   April 2021 through April 2023.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| Month Under Review | Number of Orders | Complete W/In 7 Days of Signature *Tables 9/12* | Complete W/In 7 Days of Receipt *Tables 9/12* | Average Number Days |
|---|---|---|---|---|
| April *2021* | 20 | 2%/0% | 2%/10% | 31.5 |
| May | 21 | 6%/14% | 6%/19% | 31.3 |
| June | 27 | 19%/11% | 19%/26% | 20.5 |
| July | 24 | 11%/17% | 11%/17% | 18.9 |
| August | 34 | 25%/12% | 31%/12% | 21.4 |
| September | 29 | 20%/14% | 20%/14% | 30.9 |
| October | 17 | 3%/6% | 3%/6% | 49.9 |
| November | 25 | 13%/12% | 17%/16% | 37.3 |
| December | 31 | 0%/0% | 0%/0% | 44.0 |
| January *2022* | 32 | 20%/13% | 20%/13% | 25.7 |
| February | 22 | 19%/18% | 24%/23% | 44.2 |
| March | 16 | 3%/19% | 3%/19% | 61.7 |
| April | 25 | 15%/16% | 20%/12% | 39.9 |
| May | 15 | 10%/13% | 10%/7% | 23.2 |
| June | 22 | 5%/5% | 5%/5% | 68.1 |
| July | 34 | 43%/26% | 43%/26% | 37.3 |
| August | 35 | 16%/14% | 16%/11% | 33.7 |
| September | 39 | 3%/13% | 3%/8% | 45.7 |
| October | 25 | 9%/0% | 9%/0% | 63.3 |
| November | 13 | 0%/8% | 0%/8% | 69.9 |
| December | 19 | 11%/5% | 11%/5% | 102.7 |
| January *2023* | 17 | 3%/6% | 3%/6% | 78.7 |
| February | 7 | 0%/0% | 0%/0% | 133.1 |
| March | 8 | 0%/0% | 0%/0% | 129.8 |
| April 1st look | 6 | 5%/17% | 5%/17% | 90.7 |

57.     From September 2022 through April 2023, the number of inpatient competency evaluation orders started at 39 in September 2022 and steadily fell to 6 in April 2023. Wait times over this same period of time rose from 63.3 days wait up to a maximum of 133.1 days, falling more recently to 90.7 days. Timely provision of these evaluations has been poor—ranging between 0% and 17% when measured from the date of signature and 0% to 17% if measured from date of receipt.

58.     The Court Monitor also presented data on inpatient competency restoration performance. The following table captures twenty-four months of data from April 2021 through April 2023.

| Month Under Review | Number of Orders | Complete W/In 7 Days of Signature | Complete W/In 7 Days of Receipt | Average Number Days |
|---|---|---|---|---|
| | | Table 10/13 | Table10/13 | |
| April 2021 | 135 | 12%/14% | 13%/15% | 34.8 |
| May | 115 | 14%/14% | 14%/14% | 27.5 |
| June | 109 | 2%/3% | 5%/6% | 34.0 |
| July | 152 | 6%/5% | 6%/5% | 36.1 |
| August | 155 | 7%5% | 7%/5% | 33.3 |
| September | 184 | 12%/5% | 13%/7% | 38.9 |
| October | 186 | 5%8% | 6%/9% | 48.3 |
| November | 169 | 10%/9% | 11%/9% | 49.0 |
| December | 190 | 7%/8% | 7%/8% | 50.9 |
| January 2022 | 171 | 5%/5% | 8%/7% | 48.2 |
| February | 187 | 6%/5% | 6%/5% | 55.4 |
| March | 171 | 6%/6% | 6%/6% | 61.1 |
| April | 196 | 3%/3% | 2%/3% | 57.9 |
| May | 185 | 7%/5% | 8%/5% | 53.9 |
| June | 181 | 11%/7% | 11%/7% | 65.1 |
| July | 145 | 3%/3% | 3%/3% | 77.1 |
| August | 205 | 6%/7% | 7%/5% | 69.1 |
| September | 166 | 5%/4% | 7%/4% | 82.1 |
| October | 140 | 3%/5% | 3%/5% | 96.3 |
| November | 130 | 5%/8% | 5%/3% | 95.6 |
| December | 159 | 1%/2% | 2%/1% | 95.6 |
| January 2023 | 120 | 2%/8% | 2%/5% | 106.7 |
| February | 138 | 5%/7% | 5%/6% | 133.5 |
| March | 160 | 6%/6% | 6%/5% | 119.1 |
| April 1st look | 129 | 5%/6% | 5%/5% | 130.4 |

59.     From September 2022 through April 2023, the number of inpatient competency restoration orders stretched from between 120 and 166 each month. Wait times over this same period of time rose from 82.1 to 133.5 days with wait times in April 2023 at 130.4 days. Timely provision of restoration services has been poor—ranging between 1% and 8% when measured from the date of signature and 1% to 5% if measured from date of receipt.

60.     Current rates for restoration services were six to seven months for Class Members at WSH and four to five months at ESH, while individuals waiting for outpatient restoration faced two-month delays.

61.     The number of "outlier cases," where a Class Members waits 20 or more days for evaluations and 40 days or more for restoration has greatly increased. There were 15 cases in June 2021, 188 in April 2022, and 405 in August 2022, with the longest wait for inpatient restoration reaching 681 days. There were 537 outlier cases in December 2022, 515 cases in January 2023, 438 cases in February 2023, and 399 in March 2023. (Tr. Ex. 12 at 12.)

**H.     Increase in Demand for Competency Services**

62.     The demand for competency services has gone up consistently over the past ten years. But the total number of in-jail referrals for competency services increased more rapidly between SFY 2021 and SFY 2022. The total went from 6,131 competency orders in 2021 to 8,596 in 2022. (Tr. Ex. 2 at 3.) This is an increase of roughly 40%.

63.     The following chart was presented to the Court as "reflecting data kept in the Forensic Data System" and, according to Dr. Kinlen's sworn declaration, is "a true and accurate depiction of demand for competency services":



Notes:
*Data in the graph: 1) do not include Pierce Panel Evaluations; 2) do not include those on Personal Recognizance (PR); 3) may include non-competency evaluation referrals prior to 2018 due to limitations of ESH data system; 4) numbers may differ from reports provided elsewhere due to system updates; Sources: Aug. 2018 and forward: BHA Forensic Data System (FDS); Prior to Aug. 2018: WSH-FES; ESH - MILO. This reflects jail status at the date the order was signed or the beginning of an in-jail status change.

64.     Both the flattening of competency orders in 2020 and the increase in 2022 reflect the impact that the COVID-19 pandemic had on jail admission rates and demands for competency services. As the COVID-19 pandemic took hold in 2020, fewer individuals were booked in jail and the demand for competency services slackened. But as the jails reopened in 2021 and 2022, a backlog of criminal cases began to churn through the courts, raising the number of competency orders.

65.     While the uptick in competency orders for SFY 2022 is significant, it was not altogether unexpected, particularly given the historic data and DSHS's knowledge that the pandemic created a substantial backlog. Historical data show that there was an average increase in jail-based orders from SFY 2013 through 2019 of approximately 12% per year. Had that same rate of annual increase been applied to SFY 2020 through 2022, the total jail-based orders would

1   have been 6,882 in 2020, and 7,745 in 2021, and 8,717 in 2022 (approximately 100 more than

2   the actual number of orders). This broader view of those data shows how COVID-19 slowed the

3   growth rate only temporarily as the criminal justice systems slowed down and then quickened as

4   the system reopened to process the backlog. As DSHS has conceded, "While COVID-19 cases

5   continue to impact the Department, more acute current impacts result from a backlog of cases

6   now being processed in the criminal justice system." (Quarterly Status Report at 4 (Dkt. No. 990-

7   1 at 6).) This statement was made with explicit reference to the chart above. And it impacts the

8   total number of Civil Conversion patients, who would have been in need of competency services

9   prior to having their charges dismissed.

10  **I.      Civil Conversion Patient Demand Stripped Bed Capacity from Class Members**

11       66.     One of the primary drivers for increased Class Member wait times and lack of

12  forensic bed capacity at WSH from September 2022 through May 2023 are Civil Conversion

13  patients housed in forensic beds at WSH.

14       67.     The number of Civil Conversion orders requiring evaluations as ESH and WSH

15  went up 40% between SFY 2021 and SFY 2022.

16       68.     The following chart shows the increase in Civil Conversion patients in forensic

17  wards from January 2020 to the May 2023 (Tr. Ex. 102 at 22):

18

19

20

21

22

23

24



69.     The above chart shows that on average, between January 1, 2020, and July 2022, there were anywhere between 5 and 50 Civil Conversion patients in forensic beds at WSH. This is consistent with testimony that DSHS usually saw approximately 30-35 Civil Conversion patients in forensic beds at WSH from 2016 to 2022. But between July 1, 2022, and February 2023, that number climbed from nearly 60 to 152. That number has since decreased to 102 as of May 1, 2023, but still remains historically high.

70.     The above chart also shows that at ESH, the number of Civil Conversion patients has remained steady throughout this entire time period.

71.     Over the same period of time that Civil Conversion patients at WSH increased rapidly in 2022, the number of orders for competency services did not similarly increase, as the three tables in Section H confirm.

72.     DSHS presented historical data on the total number of Civil Conversion orders from SFY 2018 through 2022, with only partial data for 2018. These data show: (1) in 2018, there were 142 Civil Conversion orders (106 at WSH and 36 at ESH); (2) in 2019, there were 369 Civil Conversion orders (284 at WSH and 85 at ESH); (3) in 2020, there were 443 Civil Conversion orders (340 at WSH and 103 at ESH); (4) in 2021, there were 473 Civil Conversion orders (364 at WSH and 109 at ESH); and (5) in 2022, there were 660 Civil Conversion orders (490 at WSH and 170 at ESH). And the number of Civil Conversion orders have been coming down steadily in 2023.

73.     An analysis of these somewhat limited data shows that between 2019 and 2020 the number of Civil Conversion orders increased by 20%, while the increase between 2020 and 2021 was only 6%. The increase between 2018 and 2019 is 260%, but this reflects—to some unknown extent—the lack of complete data for 2018.

74.     Several interrelated factors contributed to the rise in Civil Conversion orders and their impact on the lack of forensic bed space at WSH for Class Members. The Court finds three primary drivers: (1) DSHS's inability to accommodate an increase in demand for competency and Civil Conversion orders in 2022; (2) DSHS's decision to continue ward closures at WSH; and (3) DSHS's admission algorithm for patients at WSH.

75.     First, the COVID-19 pandemic created a backlog within the criminal justice system. As the annualized data show, there was a large decrease in competency orders in 2020 and 2021 that then rose significantly in 2022. Similarly, the data show that Civil Conversion orders decreased substantially in 2021 but then rose significantly in 2022. The increase in demand for competency services put a strain on DSHS's forensic bed capacity. It also caused competing demand for bed space between Class Members and Civil Conversion patients. The

1    increase in demand led to an increase in Class Member wait times for competency services, as

2    DSHS was unable to keep up with demand. Longer wait times led to more Civil Conversion

3    orders. As Kevin Bovenkamp, Assistant Secretary for the BHA of DSHS, wrote in December

4    2022: an "increase in wait times for inpatient beds . . . leads to more dismissals and an increase

5    in civil conversion patients." (Tr. Ex. 7.)

6           76.     Second, the closure of five wards at WSH had a substantial impact on the number

7    of Civil Conversion patients occupying forensic beds at WSH that should have been used by

8    Class Members. According to Assistant Secretary Bovenkamp, "[t]he COVID fueled backlogs

9    and the newest spike in demand occurred while the Department is beginning construction of the

10    new forensic hospital on the WSH campus." (Bovenkamp Decl. ¶ 13(b) (Tr. Ex. 1).) Through the

11    closures, WSH effectively lost 150 forensic beds for use by Class Members from July 2021

12    through December 2022 by placing Civil Conversion patients in those beds. At its zenith, the

13    Civil Conversion patient population at WSH was 153. Had DSHS kept the WSH wards open, the

14    beds in those civil wards would have been filled with Civil Conversion patients. By shutting

15    down civil wards at WSH when the Civil Conversion patients were increasing in number, the

16    State effectively created a bed shortage for Class Members from at least September 2022 through

17    May 2023. The increased number of Civil Conversion patients occupying forensic beds was

18    directly attributable to the closure of the civil wards at WSH. This was poor planning for the

19    laudable goal of building a new hospital.

20           77.     Use of forensic beds by Civil Conversion patients poses a significant delay in

21    Class Members obtaining access to forensic beds. As Assistant Secretary Bovenkamp admitted,

22    "each civil conversion patient admitted to the state hospital has resulted in fewer beds available

23    for competency patients [Class Members], and those beds being unavailable for longer periods of

24

time." (Tr. Ex. 7 at 1.) That is because "[w]hen a treatment bed is occupied by a civil conversion patient during a year, it services only that patient, instead of it being able to serve at least 4-5 competency patients [Class Members] in that bed, during the same time period." (Tr. Ex. 7 at 1.)

78.      Third, DSHS's decision to continue use of an admission algorithm that prioritizes Civil Conversion patients over Class Members at WSH deprived Class Members of forensic beds. Developed in 2016, the algorithm assigns points for various characteristics of an individual seeking admission into ESH or WSH. (See Tr. Ex. 111.) The higher the points, the more priority that person has. The highest point score by order type is given to Civil Conversions. The algorithm's prioritization of Civil Conversion patients had not been problematic until the total number of Civil Conversion orders began to increase in 2022. But this changed as the demand for beds increased as the criminal justice system processed the backlog of criminal cases.

**J.      DSHS Failed to take Reasonable Steps to Avoid or Address the Breach**

79.      DSHS did not take all reasonable steps to ensure the 92 additional beds provided for in the Settlement Agreement were available to Class Members from September 2022 through May 2023.

80.      DSHS failed to take reasonable steps to address the bed shortage at WSH and longer wait times for Class Members. There are three root failures: (1) the failure to prepare for and react swiftly to the rise in demand for competency services and Civil Conversion orders; (2) the decision to continue prioritizing Civil Conversion patients over Class Members and the delay in stopping new admissions; and (3) the decision not to delay ward closures at WSH.

81.      First, DSHS was aware of the backlog of cases that the COVID-19 pandemic created. DSHS was also aware that as the COVID-19-related restrictions eased, the criminal justice system would see an increase in volume of both competency and Civil Conversion orders.

1 Despite being aware of the backlog, DSHS was surprised by the speed and total volume of

2 orders. For example, the Assistant Secretary for the Behavioral Health Administration of DSHS,

3 Kevin Bovenkamp, was surprised by the speed and total volume of orders. Dr. Kinlen similarly

4 knew there would be a backlog of cases that would come through the criminal justice system and

5 impact competency and Civil Conversion orders as the COVID-19 pandemic matured. Dr.

6 Kinlen was not able to figure out when the backlog would start to clear, and the rates might

7 increase. To gauge this potential, Dr. Kinlen spoke with "community local partners" within a few

8 counties. But Dr. Kinlen did not identify any historical data he relied on to help forecast demand

9 or information from the courts themselves.

10  82. DSHS did not act on its knowledge that COVID-19 created a backlog of

11 competency and Civil Conversion orders to adequately plan for the surge in demand. DSHS had

12 historic data for both competency orders and Civil Conversion orders that it could have used to

13 project capacity needs. Had DSHS used, for example, historic growth rates for competency

14 orders, it could have reasonably forecast the demand needs. (See ¶ 65, above.) Similarly, had

15 DSHS applied a 20% annual rate of increase to project the number of Civil Conversion orders, it

16 would have expected roughly it would have expected 532 Civil Conversion orders in 2021 (443

17 x 120%) and 638 Civil Conversion orders in 2022 (532 x 120%). This would have prepared

18 DSHS to expect a number closer to what it saw in 2022.

19  83. The Court recognizes that forecasts are only as good as the data and that DSHS

20 could not have known with precision the timing and rate of increase in demand. Even with that

21 caveat, DSHS showed only limited diligence in trying to address the rise in demand for

22 competency services and Civil Conversion orders. DSHS did not timely move to identify beds

23 outside of WSH to take Civil Conversion patients. Although Assistant Secretary Kevin

24

1  Bovenkamp undertook some efforts internally to find new locations for Civil Conversion

2  patients, the first documented efforts appear to have occurred in November 2022. (Tr. Ex. 6.)

3  And this did not lead to alternative bed capacity for Civil Conversion until 2023 when roughly

4  32 Civil Conversion patients were moved to beds at South Sound Behavioral Hospital and

5  Wellfound Behavioral Health Hospital. Plans are also under way to expand the number of beds at

6  these facilities, and additional 16 beds for Civil Conversion patients should be online at a facility

7  in Thurston County. But as of the date of the Evidentiary Hearing, only 32 individuals had been

8  moved out of WSH to these two facilities.

9      84.    Second, DSHS knowingly violated the Court's Permanent Injunction and the

10  fundamental goal of the Settlement Agreement by prioritizing Civil Conversion patients over

11  Class Members. And it failed to take prompt action to change its admission practices.

12      85.    Once DSHS saw a spike in both competency and Civil Conversion orders and a

13  dramatic increase in Civil Conversion patients at WSH, DSHS knowingly prioritized Civil

14  Conversion patients over Class Members. In a memorandum dated September 9, 2022, Assistant

15  Secretary Bovenkamp wrote to Jilma Menses, Secretary of DSHS:

16      Dr. Waiblinger and I met and discussed the bed space concerns at WSH and
        potential impacts to admissions. <u>We agreed that WSH should prioritize Civil</u>
17      <u>conversion cases ahead of Forensic cases, still admitting as many TB [Trueblood]</u>
        <u>class members as possible</u>. We are not stopping TB class member admissions as
18      we intend to still take them in as we are able to.

19  (Tr. Ex. 5 (emphasis added).) This decision violated the Court's Permanent Injunction and the

20  fundamental goal of the Settlement Agreement.

21      86.    Assistant Secretary Bovenkamp was aware that the Court's Permanent Injunction

22  required Trueblood Class Members to be admitted in a timely fashion, but he continued to

23  believe the algorithm's prioritization was proper. Assistant Secretary Bovenkamp knew there is

24

1  no authority that would either compel admission of Civil Conversion patients over Class

2  Members or that doing so would follow the Court's Permanent Injunction or satisfy Class

3  Members' constitutional rights. Assistant Secretary Bovenkamp admitted at the Evidentiary

4  Hearing: "Our intent was to continue to balance the competing demand of state law and your

5  Court order and continue to admit the most serious patients based on the algorithm into the

6  hospital into the beds we had available." But Civil Conversion patients do not have the same

7  rights as Class Members—a point DSHS willfully ignored.

8      87.      DSHS failed to take swift or meaningful action to stop prioritizing Civil

9  Conversion patients over Class Members. Despite the lack of bed space and rising number of

10  Civil Conversion patients at WSH, DSHS waited until December 2022 to adjust admission

11  procedures for Civil Conversion patients. (Tr. Ex. 7.) After the changes in admissions took

12  effect, DSHS denied admission to 43 of roughly 160-180 total Civil Conversion patients. Even

13  with the change in the algorithm in December 2022, the number of Civil Conversion patients

14  increased through February 2023. DSHS could have changed the algorithm's prioritization of

15  Civil Conversion patients earlier than it did. DSHS did not stop admitting Civil Conversion

16  patients until March 2023. By stopping new admissions of Civil Conversion patients, DSHS has

17  seen a large decrease from over 130 Civil Conversion patients in March to 108 patients in May

18  2023. DSHS could have stopped admitted Civil Conversion patients into forensic beds well

19  before March 2023.

20      88.      Additionally, DSHS did not apply the admission criteria to screen existing Civil

21  Conversion patients in WSH to determine whether they could be moved to non-forensic beds.

22  DSHS could have, but chose not to. And it did so despite the fact that roughly half of the Civil

23  Commitment patients do not need to be housed in a hospital setting.

24

89.     DSHS could also have transferred more patients from WSH to ESH, but did so for only 10 individuals.

90.     Third, DSHS failed to take any steps to delay closures of wards at WSH when it saw the increase in demand for both competency services and Civil Conversion orders. DSHS knew that further ward closures would increase wait times for Class Members, but nonetheless continued to shut down wards in the face of increasing demand. DSHS presented no evidence that it could not have delayed ward closures to handle the surge in demand. Its decision to close more wards helped only to increase the number of beds absent for Class Members from September 2022 through May 2023.

**K.     DSHS's Explanations for the Lack of Beds and Rise in Wait Times**

91.     DSHS contends that the Omicron wave of COVID-19 adversely impacted timely competency services because it created a backlog of patients awaiting admission and slowed discharged. Omicron infections at WSH began and lasted throughout 2022, creating difficulty for DSHS to admit and move patients through the different wards at WSH. DSHS points to this as a cause of increased wait times for Class Members. As of April 2023, both ESH and WSH no longer have any COVID-19 restrictions.

92.     DSHS has also faced staffing shortages at the state hospitals. DSHS's staff vacancy rates are consistent with nationwide data. And the vacancy rates have not changed in any meaningful way from 2022 through 2023. (See Monitor Report at 17 (noting that staffing "rates haven't changed"); id. at 19 (noting that "Staffing has remained stable although staffing for behavioral health services across the state remains challenging."); Id. at 20 ("Staffing has been remarkably stable"—in reference to clinical and non-clinical staff at Maple Lane and Fort

1   Steilacoom).) The vacancy rates presented by the Parties in their most recent Status Report show

2   relatively stable staffing vacancies. (See Dkt. No. 990-1 at 8.)

3   **L.    Civil Conversion Admission Group**

4       93.    The State also implemented what the Court finds to be a troubling process of

5   determining which Civil Conversion patients to admit.

6       94.    In December 2022, the State started to convene a group to consider which Civil

7   Conversion patients would be admitted or not. The Court refers to this as the "Admission

8   Group." Dr. George Petzinger, Chief Medical Officer at the Gage Center at WSH, testified that

9   DSHS continues to use the Admission Group to determine whether a Civil Conversion patient

10  needs a forensic bed or not.

11      95.    The Admission Group includes Assistant Secretary Bovenkamp, Dr. Kinlen, Dr.

12  Petzinger, and the CEOs and CMOs of WSH and ESH. The Admission Group does not include a

13  public defender or representative of the individuals being considered for admission.

14      96.    The Admission Group makes decisions about which Civil Conversion patients to

15  admit or not based on the charging information and the Admission Group's assessment of the

16  risk to public safety and the acuity of the Civil Conversion patient. (See Tr. Ex. 112.) The

17  Admission Group examines the history of past arrests including juvenile convictions, the result

18  of prior charges, and jail-based clinical evaluations.

19      97.    Without any particular knowledge of how to read or evaluate criminal history or

20  any legal expertise on charging decisions, the Admission Group's subjective evaluation is

21  suspect for implicit bias. This is a significant problem given that people of color form the

22  majority of the Trueblood Class.

23

24

98.     DSHS could identify no statute that authorized the Admissions Group and no criteria for them to use public safety as a criterion to determine admission.

**M.     Additional Efforts by DSHS**

99.     Keri Waterland, Ph.D., Washington State Health Care Authority's (HCA) Division Director for the Division of Behavioral Health and Recovery, discussed HCA's efforts to create diversion programs and services that provide community mental health care and treatment and housing services.

100.     Relevant to Plaintiffs' Motion is the fact that HCA played a role in contracting with South Sound and Wellfound to identify beds for Civil Conversion patients. Indeed, HCA started to look for beds in November 2022 for Civil Conversion patients.

101.     Director Waterland stated that if HCA had more money, it could identify and secure new beds for Civil Conversion patients. These funds could help pay higher contract rates.

102.     The Court appreciates the efforts that HCA has undertaken, and the money the state has allocated to fund the programs and services. These programs and services are important to the Class Members and the overall Settlement Agreement. But ultimately, the Court finds this information to be of limited utility to the issues presented by Plaintiffs' Motion. That is because the Court was presented with no data showing how any of the services or programs HCA provides has increased bed space (aside from South Sound and Wellfound) or reduced wait times for Class Members. So while the Court believes that diversion and housing assistance remain critical to the ultimate goal of the Settlement Agreement and DSHS's ability to comply with the Permanent Injunction, the information presented was not relevant to determining the legal issues presented.

1  **N.      County Concerns over Evaluations**

2      103.    Amici King, Pierce, and Snohomish Counties raised concerns about the quality of

3  competency evaluators and the overall rates of "not-competent" findings. They also questioned

4  whether the State was taking sufficient steps to acquire new hospital space.

5      104.    Amici failed to identify or propose any evidence that would show any problem in

6  the quality of competency evaluations.

7      105.    The Parties stipulated that "the outcomes of competency evaluations, specifically,

8  the rate at which criminal defendants are found competent or incompetent by Department

9  evaluators has remained relatively steady during the pendency of this case, as represented in the

10  attached chart titled 'Trend in Competency Evaluation Determinations'[.]" The chart referenced

11  was admitted as Exhibit 106 and it depicts the following:

12



13

14

15

16

17

18

19

20

21

22

23

24

106. This supports the Parties' assertions. There is no spike in the rate of competent or not-competent findings that might suggest a problem with the evaluation process. Any increase can be correlated with the types of arrests being made and not the quality of the evaluations. In addition, and perhaps most importantly, it is the ordering court that makes the ultimate determination on when to order restoration, <u>not</u> the evaluator.

**O.     Fines Held in Abeyance**

107. Since entry of the Settlement Agreement, the Court has calculated the fines for untimely inpatient and outpatient competency services as part of each monthly judgment, but those fines have not been due to the Court's registry and remain held in abeyance.

108. From December 2018 to the present, the Court has held in abeyance payment of $290,656,500 in inpatient and outpatient restoration fines.

109. From September 1, 2022, through May 31, 2023, the Court has calculated the fines held in abeyance to be $100,318,000. (<u>See</u> Dkt. Nos. 923, 928, 933, 935, 953, 970, 973, 987, 989, 1001.)

**CONCLUSIONS OF LAW**

**A.     Standard**

1. In order for the Court to find a party in civil contempt, the "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." <u>F.T.C. v. Affordable Media</u>, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting <u>Stone v. City and County of San Francisco</u>, 968 F.2d 850, 856 n.9 (9th Cir. 1992)). "The contempt 'need not be willful,' and there is no good faith exception to the requirement of

obedience to a court order." In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (citation omitted).

2.      Civil contempt is defined as "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y, 774 F.3d 935, 945 (9th Cir. 2014) (citing In re Dual-Deck, 10 F.3d at 695).

3.      Substantial compliance with a court order is a defense to an action for civil contempt. Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986). "If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." Id. A party's inability to comply with a judicial order also constitutes a defense to a charge of civil contempt. F.T.C., 179 F.3d at 1239.

4.      A district court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court. Shillitani v. United States, 384 U.S. 364, 370 (1966); see also United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947). Courts also have a "wide latitude" in determining whether a party is in contempt of its orders. Gifford v. Heckler, 741 F.2d 263, 266 (9th Cir. 1984). As such, it is up to the court to determine whether an entity is in contempt, and that decision is subject to abuse of discretion review. F.T.C., 179 F.3d at 1239. Once finding a party in contempt, federal courts also have broad remedial powers to address noncompliance. Stone, 968 F.2d at 861-62 (affirming court's power to authorize sheriff to override state law); see also, e.g., Brown v. Plata, 563 U.S. 493 (2011) (imposing prison population limit); Nat'l Org. for the Reform of Marijuana Laws v. Mullen, 828 F.2d 536 (9th Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to

1  rectify the problems, more intrusive measures are justifiable. Stone, 968 F.2d at 861 (citing Hutto

2  v. Finney, 437 U.S. 678, 687 n.9 (1978)). Federal courts possess whatever powers are necessary

3  to remedy constitutional violations because they are charged with protecting these rights. Id.

4  (citing Hutto, 437 U.S. at 687 n.9); Milliken v. Bradley (Milliken II), 433 U.S. 267, 280–81

5  (1977). When the least intrusive measures fail to rectify the problems, more intrusive measures

6  are justifiable. Stone, 968 F.2d at 861 (citing Hutto 437 U.S. at 687 n.9). This Court's orders may

7  infringe upon state laws because "otherwise valid state laws or court orders cannot stand in the

8  way of a federal court's remedial scheme if the action is essential to enforce the scheme." Id. at

9  862.

10      5.      Civil contempt sanctions can be imposed for one or both of two distinct purposes:

11  to compel or coerce the defendant into compliance with a court's order, and to compensate the

12  complainant for losses sustained as a result of the contemnor's noncompliance. Shuffler v.

13  Heritage Bank, 720 F.2d 1141, 1147 (9th Cir. 1983). "Where a fine is not compensatory, it is

14  civil only if the contemnor is afforded an opportunity to purge." Int'l Union, United Mine

15  Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994).

16      6.      Civil contempt fines can take the form of per diem fines imposed for each day a

17  contemnor fails to comply with an affirmative court order, or of fixed fines imposed and

18  suspended pending future compliance. See Int'l Union, United Mine Workers of Am., 512 U.S.

19  at 829. "A court, in determining the amount and duration of a coercive fine, must 'consider the

20  character and magnitude of the harm threatened by continued contumacy, and the probable

21  effectiveness of any suggested sanction in bringing about the result desired.'" Whittaker Corp. v.

22  Execuair Corp., 953 F.2d 510, 516 (9th Cir. 1992) (quoting United Mine Workers, 330 U.S. at

23

24

304). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." Id. at 517.

7.      "The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989) (applying Idaho contract law to a Settlement Agreement and Stipulation entered into in Idaho where the Parties were all Idaho residents). In determining substantial compliance and material breach, Washington courts look to the criteria identified in the Restatement (Second) of Contracts § 241. See DC Farms, LLC v. Conagra Foods Lamb Weston, Inc., 179 Wn. App. 205, 221 (2014). The Restatement's criteria include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981).

**B.      Jurisdiction**

8.      The Court continues to possess subject matter jurisdiction and jurisdiction to enforce the Settlement Agreement and issue orders of contempt.

**C.      DSHS was in Material Breach of the Settlement Agreement**

9.      The Parties agree that DSHS breached the Settlement Agreement by failing to provide adequate forensic beds as promised in the Settlement Agreement to Class Members from September 2022 through May 2023.

1       10.    The Court finds by clear and convincing evidence that DSHS's failure to provide

the required number of beds resulted from its failure to make all reasonable efforts to comply

with the Settlement Agreement.

       11.    This breach was material because it contravened "the fundamental goal of th[e]

Settlement] Agreement . . . to provide timely competency services to Class Members pursuant to

the Court's orders." (Settlement Agreement at 4.) And the breach cannot be said to be an

"unintentional or minor" deviation from the Settlement Agreement that might not constitute a

material breach. (See id. § V(A)(3).) Here the breach was material because it "substantially

defeat[ed] the object which the Parties intend to accomplish" for at least nine months. (Id.)

       12.    DSHS knew or should have been aware that there was a backlog of Class Member

evaluations that would lead to an increase in the number of Civil Conversion orders and greater

demand for bed space at WSH. DSHS failed to plan and forecast adequately. Not only did DSHS

fail to plan, but it also actively removed civil beds by closing five wards at WSH to begin initial

construction on a new hospital that will not likely open until 2029. Doing so created a civil bed

shortage for Civil Conversion patients that DSHS tried to remedy by placing these individuals in

forensic beds that should have been reserved for Class Member use given the primacy of Class

Member's constitutional rights. This violated Class Members' constitutional rights. And once

DSHS saw a spike in the number of Civil Conversion patients occupying forensic beds at WSH,

it failed to take reasonable steps to address the bed shortage for Class Members that this created.

       13.    DSHS knew that the increase in wait times for Class Members would spawn more

Civil Conversion orders, as prosecutors dismiss charges against Class Members because they are

languishing in jail waiting for competency services. Given that DSHS knew that a COVID-19

related backlog was heading through the criminal justice system and sparking greater numbers of

1    competency orders, it should have known that it would see higher Civil Conversion orders. The

2    Court saw no evidence that DSHS adequately forecasted or planned for this increase.

3         14.    The Court is particularly struck by DSHS's willful decision to violate Class

4    Members' constitutional rights to receive timely competency services. Assistant Secretary

5    Bovenkamp testified that he knew DSHS was violating this Court's Permanent Injunction by

6    prioritizing Civil Conversion patients over Class Members despite the fact Civil Conversion

7    patients lack the same rights as Class Members to timely services. Assistant Secretary

8    Bovenkamp wrote in September 2022 that "WSH should prioritize Civil conversion cases ahead

9    of Forensic cases, still admitting as many TB [Trueblood] class members as possible." (Tr. Ex.

10   5.) His testimony did nothing to convince the Court that he and DSHS did not knowingly chose

11   to violate the core goal of the Settlement Agreement. And it shows that DSHS consciously chose

12   to ignore the Settlement Agreement and the Court's Permanent Injunction.

13        15.    DSHS also took far too long to change its admission policies for Civil Conversion

14   patients. As has been made clear, DSHS has had the power to refuse admission of Civil

15   Conversion patients to WSH. DSHS failed to act on that authority, and did not take any steps to

16   limit admissions until December 2022. And even then, it did little to help triage Civil Conversion

17   patients out of WSH.

18        16.    DSHS took a laconic and inadequate approach to identifying alternative

19   placements for Civil Conversion patients. The first evidence of action was in November 2022.

20   While this ultimately unearthed some beds at South Sound and Wellfound for Civil Conversion

21   patients, it was well into a crisis largely of DSHS's own creation, having chosen to continue

22   closing wards at WSH as Conversion Orders spiked. Specifically, DSHS could have delayed

23   closure of two wards in September and December 2022 in light of the spike in Civil Conversion

24

1    patients taking up forensic beds at WSH. Its only response was a limited effort to find a handful

2    of alternative beds.

3         17.    The State had ample alternative actions it could have taken but did not. These

4    include, but are not limited to: (1) delaying ward closures at WSH; (2) ceasing new admission of

5    Civil Conversion patients before March 2023; (3) swiftly changing the admission algorithm to no

6    longer prioritize Civil Conversion patients over Class Members; (4) promptly discharging Civil

7    Conversion patients from WSH to alternative facilities; (5) identifying additional capacity in

8    advance of the ward closures and by no later than September 2022 to take Class Member and/or

9    Civil Conversion patients; and/or (6) supporting legislation to eliminate competency restoration

10   for Class Members charged with only misdemeanor and nonviolent Class C felonies.

11        18.    DSHS failed to identify any compelling evidence that it could not have complied

12   with the Settlement Agreement's bed requirement. While the Court acknowledges that Civil

13   Conversion and competency orders have increased and the precise timing of their increase was

14   unknown, those increases were foreseeable. And DSHS knew its failure to timely provide

15   competency services would increase the number of Civil Conversion orders. There is thus a

16   direct correlation between DSHS's failure to provide timely competency services to Class

17   Members and the increase in Civil Conversion orders. And while the Court understands that

18   Civil Conversion patients are often Class Members before their charges are dismissed, the Court

19   cannot accept this as a reason to violate Class Members' constitutional rights to timely

20   competency services. And prioritizing Civil Conversion patients in hospital beds increased wait

21   times for Class Members because Civil Conversion patients occupy forensic beds for four-to-five

22   times longer, as DSHS reports, than Class Members.

23

24

1      19.      DSHS's breach of the Settlement Agreement caused continued harm and trauma

2    to the Trueblood Class Members. As a result of inadequate bed space, Class Members lacked

3    access to prompt competency evaluation and restoration services. This compounded the harms

4    and trauma Class Members suffer from prolonged incarceration and delays in being processed

5    through the criminal justice system. Even those Class Members awaiting inpatient treatment

6    suffered harms. During that period of time Class Members did not receive care for their

7    underlying mental health conditions. That is because competency services do not include

8    treatment. Class Members waiting for services, whether in jail or outpatient, continue to suffer

9    without care. And for those who lose access to Medicaid, they often cannot get access to

10   treatment once released. These harms have been documented throughout the life of this case and

11   they remain unremediated.

12      20.      The Court also rejects DSHS's contention that it could not have ensured adequate

13   bed capacity for Class Members over the nine months in question. DSHS raises three arguments:

14   (1) it did not control the volume of Civil Conversion or competency orders and could not have

15   foreseen demand; (2) the Omicron wave of COVID-19 prevented it from providing timely

16   services; and (3) it lacked adequate staffing.

17      21.      The Court rejects DSHS's argument that it had no agency in the volume of

18   competency and Civil Conversion orders and could not have been prepared. DSHS knew of the

19   backlog within the criminal justice system and the strain this would put on bed demand at WSH.

20   DSHS also knew that the increase in delays in providing competency services would increase the

21   number of Civil Conversion orders. It further knew that keeping Civil Conversion patients in

22   forensic beds removes those beds for use by Class Members for far more time than if the beds

23   are used only by Class Members because Civil Conversion patients stay in hospital beds 4-5

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' MOTION FOR MATERIAL BREACH
OF CONTEMPT SETTLEMENT AGREEMENT - 44

times longer than Class Members. As such, DSHS does have control, in part, over the number of competency orders. Assistant Secretary Bovenkamp's December 2022 memo expressly acknowledged that an "increase in wait times for inpatient beds . . . leads to more dismissals and an increase in civil conversion patients." (Tr. Ex. 7.) By denying Class Members timely access to competency services, DSHS directly impacted the rising rates of Civil Conversion orders. Even if DSHS could not have forecast when the backlog would start to run through the system and drive competency orders, it had sufficient historical data to make well-reasoned forecasts on overall demand. Had DSHS looked at historical data, it could have reasonably predicted demand in 2022. The Court saw no evidence of any such planning. Additionally, DSHS did not take swift action when it saw the rise in demand. The response to the sharp increase in Civil Conversion patients at WSH was lethargic and weak. Concerted action did not occur for months after it should have. And it was unjustifiable.

22.     Second, DSHS failed to present evidence that Omicron was to blame for the wait times and bed shortage. DSHS did not distinguish the impact of Omicron wave from prior COVID-19 outbreaks which did not lead to a similar bed shortage and increase in wait times or to an increase in Civil Conversion orders. DSHS did not identify anything unique to the Omicron wave that would have otherwise created the bed shortage. Indeed, the data presented on Civil Conversion patients at the start of the pandemic show that the number of Civil Conversion patients increased in the first half of 2020, but that the numbers stabilized thereafter. The primary difference between the earlier COVID-19 outbreaks and the Omicron wave insofar as bed capacity at WSH for Class Members was the closure of 150 beds.

23.     Third, DSHS was unable to show any increase in shortages that might explain the recent lack of bed space and increased wait times. As the Court Monitor confirmed, staffing

1    shortages remain a significant problem but the staff vacancy rates are consistent with nationwide

2    data. And the vacancy rates have not changed in any meaningful way from 2022 through 2023.

3    See Monitor Report at 17 (noting that staffing "rates haven't changed"); id. at 19 (noting that

4    "Staffing has remained stable although staffing for behavioral health services across the state

5    remains challenging."); Id. at 20 ("Staffing has been remarkably stable"—in reference to clinical

6    and non-clinical staff at Maple Lane and Fort Steilacoom.) The vacancy rates presented by the

7    Parties in their most recent Status Report show relatively stable staffing vacancies. (See Dkt. No.

8    990-1 at 8.) The stability in the vacancy rates undermines DSHS's argument and the Court

9    rejects it.

10   **D.    DSHS Continues to be in Contempt of the Permanent Injunction**

11           24.     The Court also finds by clear and convincing evidence that DSHS has again

12   violated the Permanent Injunction, as modified.

13           25.     While the Court allowed DSHS to continue to be in contempt, the length of time it

14   has taken and recent spike in constitutional violations are unacceptable. The closest DSHS has

15   ever come to compliance for jail-based competency was in August 2018. Since then, DSHS has

16   regressed and shown uneven signs of achieving compliance. As DSHS highlighted, it needs an

17   additional 213 beds to clear the Class Member waitlist in twelve months. This shows that DSHS

18   is far from compliance. And it shows that DSHS is not planning to come timely into

19   compliance—using a twelve-month period to measure bed demand offends the Permanent

20   Injunction's requirement that these services be provided within one to two weeks of an order.

21           26.     The nine-month period in which Civil Conversion patients stripped forensic bed

22   space from Class Members showcases a particularly egregious violation of the Permanent

23   Injunction. One need look no further than Assistant Secretary Bovenkamp's September 2022

24

memo to see that DSHS chose knowingly to violate the rights of Class Members. While the Court accepts that DSHS was attempting to serve both populations, DSHS actively chose the option that violated the Permanent Injunction and violated the rights of Class Members by prioritizing bed space to Civil Conversion patients. Doing so also exacerbated wait times for Class Members because Civil Conversion patients occupy forensic beds for four-to-five times longer than Class Members. And it led to the rise in Civil Conversion patients. This created further harm to the Class Members.

27.     DSHS's decisions concerning Civil Conversion patients led to a clear increase in violations of the time limits for competency treatment as required by the Permanent Injunction.

28.     For these and all of the reasons set forth in Conclusions of Law Section C, the Court finds that DSHS's actions and inactions show clear and unjustifiable violation of the Court's Permanent Injunction. This supports a conclusion that DSHS was in further contempt from September 2022 through May 2023.

29.     Additionally, DSHS's approach to determining the admission of Civil Conversion patients appears to be structurally and substantively defective. The Admission Group lacks an adequate representative voice for forensic and Civil Conversion patients, and it suffers from an apparent structural bias that is likely to lead to biased and improper decisions. Moreover, the criteria being used lack any statutory basis, and the materials being considered are not standardized and do not include information presented by the individual or any person representing the person's interests. While this issue falls outside of the Court's Permanent Injunction, the Court makes these observations because the process stood in the way of Class Members receiving timely competency services.

**E.  Remedy**

30.   The Court agrees with a portion of the relief requested by Plaintiffs, as outlined in closing arguments, and set forth below. This relief is aimed to redress the harms created by the lack of bed space and increased wait times for Class Members. The Court has also tailored the relief to help increase forensic bed capacity for Class Members.

31.   In issuing this relief, the Court does not find it proper or necessary to terminate the Settlement Agreement. Not only has DSHS cured the breach, but the Parties agree that the work DSHS is performing within the Settlement Agreement is ultimately providing benefits to the Class Members and should continue. Terminating the Settlement Agreement would therefore be counterproductive and unnecessary. But the Court does find that payment of the fines held in abeyance are a proper remedy from DSHS's material breach of the Settlement Agreement. This relief is expressly provided for and countenance in the terms of the Settlement Agreement itself. (See Settlement Agreement § V(A) (Dkt. No. 599-1).)

32.   The other relief the Court orders below flows from its power to hold DSHS in further contempt of the Permanent Injunction. The contempt finding and other relief do not require termination or alteration of the Settlement Agreement, which expressly preserves the Court's "contempt powers or any other powers possessed by the Court." (Settlement Agreement § V(A)(1) (Dkt. No. 599-1 at 48); See also id. § VI(A).) The Court's relief is tailored to ensure that Civil Conversion patients no longer deprive Class Members of timely competency services and that DSHS more swiftly reaches compliance with the Permanent Injunction. This includes further fines, limitations on new Civil Conversion patient admissions, discharge of Civil Conversion patients, and reporting on how much bed space is needed to comply with the Permanent Injunction.

33. The Court ORDERS as follows:

 a. Defendants shall immediately cease admitting Civil Conversion patients to the state hospitals for ordered civil commitment treatment, except for patients for whom the commitment court has made a special finding of violent felony pursuant to RCW § 71.05.280(3)(b) (which the Parties refer to as "HB1114 patients").

 b. Within 30 days, Defendants shall identify all civil patients at the state hospitals who are not HB1114 patients. For all such non-HB1114 patients, Defendants shall, within 45 days, provide to the Court Monitor and to Plaintiffs the patient's name and a description of the patient's discharge plan and anticipated living arrangement upon discharge, or transfer plan to another treatment facility.

 c. Within 60 days, Defendants shall discharge or transfer all non-HB1114 patients out of the state hospitals. If discharge or transfer of a non-HB1114 patient is not possible within 60 days, Defendants shall provide the Court Monitor with a report explaining why discharge of the patient is impossible and a date certain for discharge or transfer. Any report proposing discharge or transfer more than 90 days of this Order must also be presented to the Court for review and approval.

 d. Defendants shall ensure that all vacated forensic beds at the state hospitals are made available to and immediately filled with Class Members.

 e. The Court imposes a fine per Civil Conversion patient held in a forensic bed at the state hospitals on a per day basis. Defendants shall pay a fine for

each day spent in a state hospital forensic bed beyond 21 days after

dismissal of the patient's underlying criminal case. For each Civil

Conversion patient held in a forensic bed for more than 21 days after

dismissal of the underlying criminal charge, but less than 28 days, the

daily fine shall be $1,000 per day. For each Civil Conversion patient who

is held in a forensic bed 28 days or more, the daily fine shall be $2,000 per

day. The existing in-jail and inpatient fines shall remain in place.

    f.   Within 30 days of entry of this Order, DSHS must prepare and file a report

outlining how many additional beds are needed to clear the waitlist for

competency services owed to Class Members to come into compliance

with the Permanent Injunction in four months of the report's due date to

the Court. The Court warns DSHS that it may order DSHS to use civil

beds at WSH and ESH in order to clear the waitlist and achieve

compliance with the Permanent Injunction.

    g.   Defendants shall pay all fines held in abeyance from September 2022

through May 2023, which totals $100,318,000.00. This must be remitted

to the Court's registry within 30 days of this Order. Pursuant to Section

V(A)(4) of the Settlement Agreement, DSHS may move the Court for a

reasonable schedule for payment of the amount due on an installment

basis.

    h.   Defendants and Plaintiffs to meet and confer within 14 days of this

Court's Order and to submit a written plan to implement this Court's

Order which may include a joint proposal to amend the Order upon Court

1    approval, so long as the implementation plan accomplishes substantial

2    compliance with this Order.

3         i.    Defendants to consult with the Court Monitor within 14 days of this

4              Court's Order in order to identify an expert to evaluate the State's current

5              Civil Conversion practices and identify improvements. After consultation

6              with Defendants, the Court Monitor shall select the evaluator and

7              determine the scope and purpose of the evaluation. Defendants are

8              responsible for the costs of this evaluation.

9         j.    The Court Monitor shall convene a working group to prepare a plan to

10             distribute the fines held in abeyance that are now being collected. This

11             plan should be prepared and submitted to the Court within 45 days of

12             entry of this Order. Further time may be requested.

13       34.    The Court will not require an investigation into the evaluators given a lack of any

14   evidence that they are improperly increasing the rates of incompetency findings.

15       35.    Contempt fines paid pursuant to this Order shall be deposited into the Registry of

16   the Court after they are reduced to judgment and shall remain in the Court's Registry until

17   further order from the Court. The fines shall be reduced to judgment once per month, or more

18   frequently if the Court in its discretion so orders. The judgments shall bear interest at the federal

19   statutory rate until satisfied.

20       36.    Consistent with the Court's previous reporting requirement, Defendants shall

21   submit to the Court a proposed calculation of contempt fines along with the wait time data. This

22   shall be submitted to the Court by the fifteenth day of every month. The proposed calculation

23   shall specify the amount of the fine to be imposed and shall contain all calculations performed by

24

1    Defendants in order to reach the proposed number. As with the monetary sanctions, this monthly

2    reporting requirement shall terminate upon Defendants' achievement of substantial compliance

3    with the constitutional standards for inpatient evaluations and restorations. These contempt fines

4    and other remedial orders will continue until Defendants demonstrate substantial compliance

5    with the Courts orders or unless the Court otherwise orders.

6         The clerk is ordered to provide copies of this order to all counsel.

7         Dated July 7, 2023.

8

9         Marsha J. Pechman
          United States Senior District Judge